UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

BENJAMIN SCHWARZ,            )
CHRISTINA SCHWARZ         )
and DANIEL SCHWARZ,        )       Civil Action No: 09 CV 9346 (LAK)
                                  )
                                  )
            Plaintiffs,      )
                                  )
     -against-               )
                                  )
THINKSTRATEGY CAPITAL      )
MANAGEMENT LLC and CHETAN KAPUR,    )
                                  )
            Defendants.     )
-----------------------------------------------------------------x

RECEIVED
NOV 24 2009
U.S. D.C. S.D. N.Y.
CASHIERS

## AMENDED COMPLAINT

Plaintiffs, Benjamin Schwarz, Christina Schwarz and Daniel Schwarz ("Plaintiffs"), by and through their counsel of record, allege the following against ThinkStrategy Capital Management LLC and Chetan Kapur ("Defendants"), for fraud, negligent misrepresentation, breach of fiduciary duty, and the imposition of a constructive trust as follows:

## NATURE OF THE ACTION

1. Beginning in October 2004, Plaintiffs invested approximately $2.7 million with TS Multi-Strategy Fund, L.P. ("TS Multi-Strategy Fund" or "TS Fund"), a leveraged "fund of funds" composed of approximately 25 sub-funds, which is run by Defendant ThinkStrategy Capital Management, the General Partner of the TS Fund, and Defendant Chetan Kapur, the Managing Director and Chief Investment Officer of ThinkStrategy Capital Management.

2. Defendants touted their due diligence in selecting sub-funds in marketing materials, offering memoranda, yearly performance reports, and monthly newsletters to Plaintiffs,

and Defendant Kapur made representations concerning the Defendants' rigorous due diligence during a meeting with Plaintiff Daniel Schwarz.

     3.  In contravention of their representations, Defendants invested a disproportionately large share of assets under management (approximately 10%) in Valhalla Investment Partners LP ("Nadel Funds"), which were funds founded and managed by Arthur Nadel.

     4.  Defendants invested in the Nadel Funds despite readily available information indicating that Nadel Funds were not appropriate investments for the Plaintiffs' assets, that Nadel Funds were not even legitimate investment funds, and that Mr. Nadel was not an appropriate fund manager.

     5.  Had Defendants conducted reasonable due diligence, they would have learned, among other things, the following:

        a.  Mr. Nadel, the founder and portfolio manager of the Nadel Funds, had a history of engaging in fraudulent activities.  According to publicly available records, Mr. Nadel, a former lawyer, was disbarred on March 11, 1982.  He was found guilty of dishonesty, fraud, deceit and misrepresentation by a disciplinary committee;

        b.  Mr. Nadel had no professional training or experience in finance and was a destitute lounge musician before starting a day trading club with his fourth wife in or around 1997;

        c.  Mr. Nadel claimed average annual returns from 2000 to 2006 of 32%, and Nadel Funds reported profits for 55 consecutive months from October 2001 to April 2006.  Such extraordinary returns should have been regarded with great suspicion given, *inter alia*, Mr. Nadel's unethical past and lack of financial training and experience;

        d.  Nadel Funds had never been audited;

        e.  Nadel Funds' internal accountant was not licensed; and

        f.  Nadel Funds' internal accountant had falsely represented in offering materials

that he was a CPA, while in fact he had been sanctioned by the Florida Department of Business and Professional Regulation for making that false representation.

6.  In January 2009, Defendants informed Plaintiffs that it had been discovered that Mr. Nadel had engaged in a massive Ponzi scheme with the Nadel Funds and that the funds were insolvent.

7.  Defendants further stated that due to Defendants' leveraging of the investment in the Nadel Funds – that is, the investment of borrowed funds as well as investors' capital – the insolvency of the Nadel Funds had resulted in a 20% decrease in the value of the TS Fund.

8.  On information and belief, the decrease in value attributable to the collapse of the Nadel Funds was much greater than 20%, as losses resulting from the insolvency had caused Defendants' lenders to invoke loan guarantees that required Defendants to deleverage – that is, to liquidate positions at steep losses in order to restore the debt/equity ratio specified in the loan guarantees.  On information and belief, the deleveraging skewed the TS Fund asset allocation and concentrated the investment portfolio in poorly performing funds.

9.  As a result of Defendants' failure to conduct due diligence on the Nadel Funds and Nadel himself, and Defendants' false representations to Plaintiffs concerning their due diligence and ongoing monitoring activities, Plaintiffs have suffered damages, including, but not limited to, a loss of at least 20% of their investment in the TS Multi-Strategy Fund.

## JURISDICTION AND VENUE

10. This Court has jurisdiction pursuant to 28 U.S.C. §1332(a), which provides jurisdiction over actions between citizens of different states where the amount in controversy exceeds $75,000.

3

11.  Venue is proper in this District inasmuch as Defendants maintain their corporate headquarters and conduct business in this District.

## THE PARTIES

12.  Plaintiffs Benjamin Schwarz and Christina Schwarz are domiciled in, and citizens of, California.  Plaintiff Daniel Schwarz is domiciled in, and a citizen of, New Jersey.

13.  Defendant ThinkStrategy Capital Management LLC (referred to herein as "ThinkStrategy" or the "General Partner") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 150 East 52nd Street, 11th Floor, New York, NY 10022. ThinkStrategy is the General Partner of the TS Multi-Strategy Fund, L.P. On information and belief, the sole member of ThinkStrategy is Chetan Kapur.  As set forth below, Mr. Kapur is domiciled in, and a citizen of New York.

14.  Defendant Chetan Kapur is the Sole Member, Managing Director and the Chief Investment Officer of ThinkStrategy, and is domiciled at 85 East End Avenue, Apartment 11E, New York, NY 10028.  He is domiciled in, and a citizen of, New York.

## STATEMENT OF FACTS

15.  Defendants enticed Plaintiffs and other investors to invest and hold their investments in the TS Fund through numerous materially false statements and omissions of material fact in, among other things, offering memoranda, fund overview annual reports, and fund monthly newsletters.  Defendants represented that they engaged in comprehensive and advanced due diligence and fund monitoring activities, and that a key element of their investment strategy was diversification.  None of these representations proved accurate with respect to the Defendants' investments of the TS Fund assets in the Nadel Funds.  Plaintiffs detrimentally relied

on Defendants' materially false and misleading statements and omissions of material fact by

investing and holding their positions in the TS Fund.  As a result thereof, Plaintiffs have suffered

damages, including, but not limited to, losses of at least 20% with their investment in the TS

Fund.

## Defendants Made Materially False and Misleading Statements

16.   Prior to investing various amounts with Defendants at various times between

October 2004 and 2007, and during the time Defendants were holding Plaintiffs' investments,

Plaintiffs reviewed various documents sent to them by Defendants.  Plaintiffs relied on the

representations contained therein both in deciding to initially invest in the TS Multi-Strategy Fund

and in deciding to maintain those investments.  The documents they reviewed, and the

misrepresentations therein, included the following:

17.   In offering memoranda, fund overview reports, and fund monthly newsletters,

Defendants made numerous materially false representations concerning their due diligence and

monitoring of fund managers.  Defendants also made materially false representations concerning

capital preservation and risk management through diversification.

18.   In the TS Fund, LP Private Offering Memorandum dated January 1, 2003,

Defendants represented that "[p]roceeds received from the sale of Units will be used exclusively

to invest, either directly or indirectly, in a professionally managed, leveraged, diversified portfolio

of alternative and traditional investments."

19.   Defendants represented in the January 2003 Offering Memoranda that the General

Partner engaged in extensive monitoring of the investment managers, funds and indices in which

it invested:

5

> A comprehensive database of reporting investment managers, funds and indices is monitored by the proprietary system to assist in determining the specific investments to be made. The General Partnership will actively allocate and reallocate the assets and trading leverage among the potential investments.

20. In the January 2003 Offering Memoranda, the Defendants emphasized the importance of the managers of the sub-funds they selected for investment, stating that "[t]he General Partner will use its proprietary models to assist in determining the investments to be made by the Partnership" and that the "ThinkStrategy proprietary models are based on the following principles:

> The return and risk of an investment portfolio, for any given period, is primarily determined by the choice of investment managers/funds and styles, and the level of allocation to each of these funds/managers.

21. Defendants also made these representations concerning the monitoring of investment managers and diversification in the May 2008 Offering Memorandum.

22. Indeed, in other documents disseminated to their investors and potential investors, Defendants made representations concerning their "stringent selection criteria", "rigorous qualitative analysis", and "superior risk control" when deciding in which sub-funds (and sub-fund managers) to invest, and emphasized that "[c]apital preservation and risk control are central to all investment opportunities." Defendants emphasized that their investment strategy was conservative, disciplined and risk averse:

> Since January 1999, ThinkStrategy Capital Management LLC has used a highly disciplined investment strategy to produce stable returns over 328% while maintaining a very conservative risk profile [. . .] ThinkStrategy Capital Management is a firm that seeks to offer investors innovative investment strategies that

generate superior rates of return at reduced levels of risk.

*Barclay Managed Funds Report*, Volume 18, No. 3, 3rd Quarter 2005.

23. In the Fund Overview, Defendants represented that "[c]apital preservation and risk control are central to all investment activities."

24. In the Fund Overview, Defendants represented that they achieved results by following an investment strategy which included "strategic allocation of funds", "monitoring of fund portfolios", "risk control", and "capital preservation."

25. Defendants strongly emphasized their due diligence, especially with respect to the fund managers with whom the Defendants invested. In the Fund Overview, the TS Fund represented that its "investment philosophy" relied on "an exacting process" to identify and invest with hedge fund managers who demonstrated "integrity" and who possessed an "analytical background" and relevant financial "experience":

> We look for managers with integrity, analytical background, intelligence and requisite experience required to produce superior returns. We look for special talent. We believe that a hedge fund manager's ability to earn high risk-adjusted returns is predicated on a rigorous, disciplined decision-making process. We invest with managers who have an uncompromising analytic framework, who evaluate investment opportunities with a consistent, repeatable approach. We use the same exacting process to identify and select superior hedge fund managers for our clients.

26. Defendants further represented in the Fund Overview that they immediately excluded from investment consideration all sub-funds whose managers had an "inadequate background", that they conducted "in-person interviews" with sub-fund managers before making their decision to invest, that sub-fund managers were required to demonstrate a "Definable Investment Edge" at the interview, and that, with respect to the managers who made the

Defendants' "short list" for investments, Defendants conducted "reference checks" and "due diligence checks".

27. Defendants also represented in the Fund Overview that they continued to monitor the fund managers for the life of the sub-fund investment by, *inter alia*, conducting "fund manager on-going interview and analysis" and that the "[m]anagers in the portfolio [are] reviewed formally each month." Defendants represented that if their fund monitoring activities revealed that "[t]he manager is managing too much capital for their strategy or there has been unusually rapid growth of assets in a short period of time", that this was an indicator that they should exit the sub-fund.

28. The Fund Overview also represented that Defendants' investment strategy included three phases which emphasized, *inter alia*, due diligence, continual monitoring of the fund managers, and diversification. "Phase I" of its investment strategy included "screen[ing] [the] universe of funds", conducting "due diligence", and "monitor[ing] activities." "Phase II" was "risk analysis", which emphasized "diversification", and "Phase III" was the "decision process", which focused on "track[ing] performance risk", "fund manager on-going interview and analysis", and "monitoring of fund portfolio."

29. The Fund Overview further represented that Defendants "select[ed] funds that have reputable service providers" and that "[a]llocations are made based on rigorous quantitative analysis and qualitative due diligence resulting in fund selection that possesses longevity, strong absolute returns and superior risk control."

30. With respect to "risk management", Defendants represented in the Fund Overview that they engaged, *inter alia*, in "[a]ctive monitoring of portfolio", that the "monitoring process"

included "[r]evisiting fund's performance and risk monthly for tracking current managers", and

that "[m]anagers in the portfolio [were] reviewed formally each month."

31. With respect to diversification, Defendants represented in the Fund Overview:

> We use a systematic approach to allocate capital among strategies
> which makes the return/risk profile more favorable.  We believe
> that diversification among independent investment styles produces
> returns independent of traditional asset classes.

32.   Prior to any of the Plaintiffs' investment, in July 2004, Plaintiff Daniel Schwarz

met in person with Defendant Kapur on behalf of the other Plaintiffs.  During that meeting,

Defendant Kapur told Plaintiff Daniel Schwarz that analysts at ThinkStrategy usually meet with

fund managers *in person* and that if an in-person meeting was not possible, the analysts conducted

lengthy telephone conversations with the fund managers.  Defendant Kapur represented – falsely

– that ThinkStrategy performed thorough due diligence background checks on all funds and made

sure that all funds are audited.  Defendant Kapur also represented that ThinkStrategy limited risk

by allocating small amounts of money to each sub-fund, and that the funds in which

ThinkStrategy invested were less volatile than the S&P 500.

33.   Following Defendant Kapur's meeting with Plaintiff Daniel Schwarz, Defendant

Kapur spoke with Plaintiff Benjamin Schwarz on the telephone and repeated the representations

regarding ThinkStrategy's due diligence.  Specifically, Defendant Kapur represented during that

conversation that ThinkStrategy followed the hedge fund industry's "best practices" – including

background checks, thorough reviews of sub-fund's audits, and on-site visits.

34.   Throughout 2008, Defendants continued to represent the superiority of their due

diligence and fund monitoring activities.  Indeed, in the October, November and December 2008

Fund Updates for the TS Fund, Defendants represented, *inter alia*, that "the investment team continues to allocate to managers with better consistency and stability" and that Defendants continued to engage in "intense due diligence and risk process."

35.  Significantly, Plaintiffs were completely dependent on Defendants' due diligence regarding the selection of sub-funds because Defendants, as a matter of practice, do not disclose to their investors the sub-funds in which the TS Fund invests.

### Defendants Received Lucrative Fees

36.  Defendant ThinkStrategy, the General Partner, received lucrative incentive, management, and administrative fees from Plaintiffs and other investors in the TS Fund.  At the end of each fiscal quarter, the General Partner received an incentive fee equal to 15% of the investment profits after interest expenses of the Partnership.  The incentive fee was payable without regard to the profitability of the Partnership, and the amount of the incentive fee was calculated based on unrealized gains.

37. In addition, Defendant ThinkStrategy received a monthly management fee equal to 1/6th of 1% of the Partnership's Net Asset Value on the last day of the prior month (2% annually), and also received an administrative fee reimbursement of up to .35% of the average of the Partnership's month-end net asset value during the prior twelve months.

38.  Defendants wrongfully took these lucrative fees from Plaintiffs because Defendants failed to provide the represented investment services in exchange – that is, due diligence, ongoing monitoring, and diversification.  Moreover, insofar as the incentive fee was based on false and fraudulent profits attributable to the Nadel Funds, Defendants' fees are false and fraudulent as well.

10

**As Evidenced By Defendants' Investment With The Nadel Funds,
Defendants' Representations Were False**

39.  Defendants' statements, as set forth above, are materially false with respect to diversification.  Although Defendants invested in 25 sub-funds, a disproportionately large percentage of the Plaintiffs' investment in the TS Fund – nearly 10% – was invested in the Nadel Funds managed by Mr. Nadel.

40.  Defendants' statements, as set forth above, are also materially false with respect to due diligence and fund monitoring.  Had Defendants monitored and/or conducted due diligence on the Nadel Funds, and on Mr. Nadel, the investment manager of those funds, they would have been made aware, *inter alia*, of the following red flags:

    a.  Mr. Nadel, a former lawyer, was disbarred on March 11, 1982, for violating terms of an escrow agreement. He was found guilty of dishonesty, fraud, deceit and misrepresentation by a disciplinary committee.

    b.  Mr. Nadel had no professional training or experience in finance and was a destitute lounge musician before starting a day trading club with his fourth wife in or around 1997;

    c.  Mr. Nadel claimed average annual returns from 2000 to 2006 of 32%, and the Nadel Funds reported profits for 55 consecutive months from October 2001 to April 2006.  Such extraordinary returns should have been regarded with great suspicion given, *inter alia*, Nadel's unethical past and lack of financial training and experience;

    d.  The Nadel Funds lacked checks and balances such as custodians, transfer agents, and other entities that ordinarily monitor the accounts of investment funds.  They also lacked valuation protocols, which ordinarily ensure that the value of assets can be accurately assessed;

    e.   The Nadel Funds had never been audited by an outside auditor;

    f.   The Nadel Funds' internal accountant was not licensed; and

g.  Nadel Funds' internal accountant had falsely represented in offering materials that he was a CPA, and had been sanctioned by the Florida Department of Business and Professional Regulation for making that false representation.

41.  Moreover, had Defendants conducted due diligence in accordance with their representations, they would have learned, among other things, that the total value of the assets of Nadel Funds was approximately only $100,000.  Indeed, as of January 2009, one of the Nadel funds had approximately only $20,571 in total assets, with securities worth $4,413.66 and cash of only $16,158.05, and the other fund had securities worth $1,901.31 and cash of $78,764.37.

42.  Problems with Nadel Funds belatedly came to the attention of Defendants only after the family of Mr. Nadel reported him missing on January 14, 2009, and Mr. Nadel's partner, Neil Moody, represented that the funds managed by Mr. Nadel "may have virtually no remaining value."

### The Value Of Plaintiffs' Investments Plummeted After Defendants' Investments In The Fraudulent Nadel Funds Were Revealed

43.  On January 21, 2009, Defendants wrote to Plaintiffs and other investors in the TS-Multi-Strategy-Fund Class A concerning the disappearance of Mr. Nadel.  In the January 21, 2009 letter, Defendants expressed their "shock" at Mr. Nadel's disappearance, describing Mr. Nadel as a "trusted philanthropist" and graduate of NYU Law School – once again demonstrating that they had not conducted the due diligence and ongoing monitoring activities that they had represented that they would perform to Plaintiffs and other investors.

44.  Mr. Nadel surrendered to the FBI in Tampa, Florida on January 27, 2009.  On April 28, 2009, Nadel was indicted on fifteen counts, including six counts of securities fraud, eight counts of wire fraud and one count of mail fraud, in a federal court in Manhattan.

45.   The value of Plaintiffs' investment in the TS Fund has plummeted since Defendants disclosed their Nadel-related investments and losses. Due to Defendants' leveraging of the investment in the Nadel Funds – that is, the use of borrowed funds as well as investors' capital – the insolvency of the Nadel Funds resulted in at least a 20% decrease in value to the TS Fund.

46.   On information and belief, as a result of the loss of equity in the Nadel Funds, Defendants' lender or lenders have invoked loan guarantees and required Defendants to deleverage on an accelerated basis – that is, to liquidate investments in other sub-funds in order to maintain the required debt/equity ratio. On information and belief, Defendants, in turn, liquidated investments in the relatively well-performing sub-funds, which were likely the only sub-funds to permit redemptions.

47.   Thus, even though other funds of funds have recovered their value as a result of the market recovery, the TS Fund has continued to lose value and is down approximately 27% in 2009 and 79% since 2008.

**Plaintiffs Requested Redemption And An Accounting Of Records From Defendants**

48. On February 9 and February 16, 2009, Plaintiffs requested, in writing, an immediate cash redemption of all their interests in all of the TS Funds. Plaintiffs also requested, in the alternative, a detailed accounting of records and additional information from Defendants concerning their investments. Defendants, however, refused both requests.

**COUNT I**
**FRAUD**

48. Plaintiffs repeat and reallege each and every allegation above with the same force

13

and effect as if fully set forth herein.

49. Defendants falsely represented to Plaintiffs in connection with their investments in the TS Fund that: (i) the TS Multi-Strategy Fund would invest their monies into legitimate sub-funds in accordance with the investment objective of the Partnership and the ThinkStrategy proprietary model (the "investment strategy"); (ii) the Defendants would conduct due diligence into, monitor and verify the investments made by them to confirm that the funds in which the TS Fund invested were operated legitimately; and (iii) the Defendants would use the stated investment strategy in accordance with the required legal and regulatory requirements.

50. Defendants failed to disclose material information – namely, that the Defendants were not conducting customary, or even minimal, due diligence to verify that the TS Fund's assets were being properly invested and managed by Mr. Nadel and others – among other things, which rendered their representations materially false and misleading.

51. Defendants made these false and misleading representations and omissions knowingly, recklessly, and/or without regard for their truth or falsity, and with the intent to induce Plaintiffs to rely upon them by investing assets in the TS Fund.

52. Plaintiffs justifiably relied upon the false representations and omissions made by Defendants by investing their assets in the TS Fund.

53. As a direct and proximate result of their reliance upon the false representations and omissions of Defendants, Plaintiffs have suffered damages, including, but not limited to, the loss of at least 20% of their investment with the TS Fund, and the Defendants, in turn, have wrongfully taken substantial assets belonging to the Plaintiffs in the form of improper and unearned fees. Moreover, the sudden 20% loss triggered loan covenants and accelerated de-

14

leveraging, which skewed ThinkStrategy's asset allocation and concentrated the portfolio in poorly performing funds, thus causing additional damages to the Plaintiffs.

54. Because of the willful and wanton conduct of Defendants, Plaintiffs are entitled to punitive, as well as actual, damages.

**COUNT II**
**NEGLIGENT MISREPRESENTATION**

55. Plaintiffs repeat and reallege each and every allegation above with the same force and effect as if fully set forth herein.

56. Based on their unique or special expertise with respect to investments generally, and the Nadel Funds in particular, Defendants had a special relationship of trust or confidence with Plaintiffs, which created a duty on the part of the Defendants to impart correct information to Plaintiffs.

57. Defendants induced Plaintiffs to invest in and hold their positions in the TS Fund by falsely representing to Plaintiffs that: (i) Defendants had conducted thorough due diligence of the sub-funds, including the Nadel Funds, and had determined that those operations were legitimate; and (ii) Defendants continually monitored the investments in the sub-funds, including the Nadel Funds, to confirm that they were operated legitimately and in accordance with all legal and regulatory strictures, and that they were in accordance with the TS Fund investment strategy.

58. The representations made by Defendants were false in that, among other things: (i) Defendants did not conduct thorough due diligence of, or exercise oversight over, the Nadel Funds or Mr. Nadel, the investment manager of the Nadel Funds, and had not determined that Nadel actually invested assets in accordance with the TS Fund investment strategy and/or with a

15

long track record of achieving positive returns; (ii) by investing the Plaintiffs' assets in the Nadel Funds, the Defendants did not invest Plaintiffs' assets in legitimate funds that utilized the TS Fund investment strategy; (iii) Defendants did not intend to monitor the investments of the sub-funds, including the Nadel Funds, to confirm that they were operated legitimately in accordance with all legal and regulatory structures, and did not intend to verify transactions in the Nadel Funds; and (iv) the Nadel Funds' operations and accounts were not audited at all, let alone by reputable and independent auditors using appropriate and accepted accounting and auditing procedures, and thus there could be no assurance that the Nadel Funds actually held the represented assets and were otherwise operated lawfully.

59. Defendants made these false representations knowing that Plaintiffs would use and rely upon them for the particular purpose of determining whether to invest and hold their assets in the TS Fund.

60. Plaintiffs justifiably relied on the Defendants' false representations in furtherance of that particular purpose by investing and continuing to hold assets in the TS Fund.

61. Defendants knew that Plaintiffs were potential investors and understood that Plaintiffs would rely upon the false statements for the particular purpose of investing and continuing to hold assets in the TS Fund.

62. As a result of their reliance on the Defendants' false representations, Plaintiffs have suffered damages, including, but not limited to, at least 20% of their investment in the TS Fund, and the Defendants, in turn, have derived substantial profits from the Plaintiffs in the form of improper and unearned fees.  Moreover, the sudden 20% loss triggered loan covenants and accelerated de-leveraging, which skewed ThinkStrategy's asset allocation and concentrated the

16

portfolio in poorly performing funds, thus causing additional damages to the Plaintiffs.

## COUNT III
## BREACH OF FIDUCIARY DUTY

63. Plaintiffs repeat and reallege each and every allegation above with the same force and effect as if fully set forth herein.

64. In the January 2003 Offering Memorandum and the May 2008 Offering Memorandum, Defendant ThinkStrategy, the General Partner, represents that it is a fiduciary: "The General Partner is accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling its businesses."

65. Defendants had substantial discretion and control over Plaintiffs' assets in the TS Multi-Strategy Fund, the marketing of the TS Fund, and communications to Plaintiffs.

66. The discretion and control over Plaintiffs' assets gave rise to a fiduciary duty and duty of care on part of the Defendants to the Plaintiffs as a result of the following:

    a. Defendants occupied a superior position over Plaintiffs with respect to Defendants' exclusive control over, and knowledge of, how Plaintiffs' assets in the TS Fund were invested;

    b. Defendants' superior position necessitated that Plaintiffs repose their trust and confidence in Defendants to fulfill Defendants' duties, and Plaintiffs did so by investing in, and continuing to hold their assets in, the TS Fund; and

    c. Defendants held themselves out as providing superior client investment services, and acknowledged that they were the fiduciaries of the investors like Plaintiffs. Plaintiffs reasonably and foreseeably relied on such representations and trusted in the Defendants' purported expertise and skill.

67. Defendants breached their fiduciary duties and duty of care owed to Plaintiffs by failing to conduct adequate due diligence and monitoring with respect to the investments of the TS Fund, including the investments in the Nadel Funds, and by retaining fees based on fraudulent

asset values and investment returns.

68. As a proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs are entitled to damages and appropriate equitable relief, including an accounting and imposition of a constructive trust.

69. Because Defendants' breach of fiduciary duties was willful and wanton, Plaintiffs are also entitled to punitive damages.

**COUNT IV**
**IMPOSITION OF A CONSTRUCTIVE TRUST AGAINST DEFENDANTS**

70. Plaintiffs repeat and reallege each and every allegation above with the same force and effect as if fully set forth herein.

71. Defendants had a fiduciary relationship with Plaintiffs, which included an obligation to invest Plaintiffs' assets in legitimate investments and to perform adequate due diligence and monitoring as set forth, *inter alia*, in the January 2003 and May 2008 Private Offering Memoranda.

72. Defendants received compensation from Plaintiffs in the form of management and performance fees that were calculated based on the assets of the TS Fund.

73. Defendants were unjustly enriched by the retention of management and performance fees that were predicated on unrealized and/or fictitious profits and assets of the TS Fund.  Each month, the Partnership paid the General Partner a monthly management fee equal to 1/6th of 1% of the Partnership's Net Asset Value on the last day of the month (2.0% annually) and a quarterly incentive fee of 15% of the Partnership's New Trading Profits.

74. Plaintiffs are entitled to have a constructive trust imposed on the amount of all

monies and other property in the possession of Defendants that relate to Defendants'

compensation from Plaintiffs in the form of management and performance fees, the amount of

which is yet to be determined.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following:

a)      An accounting;

b)      Preliminary and permanent injunctive relief, including imposition of a constructive

trust, as is necessary and appropriate to preserve the assets wrongfully taken from Plaintiffs;

c)      Compensatory, consequential and general damages in an amount to be determined

at trial;

d)      Disgorgement and restitution of all earnings, profits, compensation and benefits

received by Defendants as a result of their unlawful practices;

e)      Punitive damages on account of Defendants' willful and wanton disregard of

Plaintiffs' rights;

f)      Costs and disbursements of the action;

g)      Pre- and post- judgment interest;

h)      Reasonable attorneys' fees; and

i)      Such other and further relief as this Court may deem just and proper.

Dated: November 23, 2009
       New York, New York

Respectfully submitted,

_____
Jason L. Solotaroff (JS-5739)
GISKAN SOLOTAROFF ANDERSON
   & STEWART LLP
11 Broadway, Suite 2150
New York, NY 10004
Tel: (212) 847-8315

JaneAnne Murray (JM-2119)
MURRAY LAW LLC
233 Broadway, 22nd Floor
New York, NY 10279
Tel: (212) 941-9266

**_Counsel for Plaintiffs_**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the Amended Complaint was served by first class and electronic mail on November 24, 2009, to:

> Vivian R. Drohan, Esq.
> DROHAN LEE LLP
> 489 Fifth Avenue
> New York, NY 10017
> Tel: (212) 710-0004
> *Attorneys for Defendants*

_____
Jason L. Solotaroff