124

F5leschc                    Kapur - cross

1   and unmistakable that there's absolutely no way for me to
2   possibly make payment towards these default judgments and
3   monetary sanctions.  At this point I am in the process of
4   searching for a job.  And when I do obtain a job, I do plan and
5   start -- I do plan to start making payments towards my default
6   ████████████████ judgments.
7            THE COURT:  If you find a job.
8            THE WITNESS:  Yes, your Honor, if I find a job.
9            Your Honor, I'd like to also just talk about a couple
10  of background items or larger items and then address several
11  specific items thereafter.
12           I'd like to start by just generally talking about
13  managed account process, how things were traditionally
14  structured, if a client came to us and wanted structuring work
15  done.
16           As part of ThinkStrategy managed account program, we
17  started the company firstly, I would note, by way of managed
18  account.  If a client came to us to do a managed account and
19  wanted structuring work done, we would set up a structure in
20  our name, or as though it was for the client, and then transfer
21  the structure to the client.  The client would then fund the
22  structure, and then we would do a managed account, if that was
23  part of the mandate, per the managed account agreement, per the
24  power of attorney agreement.
25           I would also like to note that we worked with hundreds

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F5leschc                    Kapur - cross

1   of counterparties.  In general, I would say there were five
2   categories of counterparties that we worked with.  We worked
3   with fund retail clients, qualified retail clients.  We worked
4   with fund institutional clients.  We worked with institutional
5   advisers.  We worked with retail advisers.  And we worked with
6   potential clients, as well as the one too many entities.  We
7   also worked with hundreds of service providers over the years;
8   consultants, placement agents, advisers, accountants, auditors,
9   law firms, trust companies, administrators, tax preparers,
10  banks, broker dealers, leverage providers, foreign exchange
11  providers and research providers.  And at any one point we
12  might have been working with one or two providers, whether it
13  was for the domestic fund or the international fund or for the
14  managed account program.
15              I'd also just generally like to note that I feel that
16  some of the plaintiffs' claims, they've been taking facts out
17  of context or contorted from many years ago on a company that's
18  been defunct for about five years now.  And I would say mostly
19  everything as it relates to the company, unless reminded, is
20  quite unmemorable to me, particularly any unpaid projects.
21              I'd also like to, as part of the general discussion,
22  note that it makes no sense to me that I would even set up an
23  asset protection structure in the latter part of 2010 because
24  our firm and me personally had very minimal assets at
25  that point and was used to pay for all the operating and

F5leschc                    Kapur - cross
1    infrastructure costs of the fund and the firm until resources
2    were fully depleted, placing me in debt.
3              THE COURT:  When were you sued by the Schwarz family?
4    It was 2009, correct?
5              THE WITNESS:  I believe it was 2009.
6              THE COURT:  And the judgment wasn't entered until
7    2012, correct?
8              THE WITNESS:  2012, correct.
9              THE COURT:  When were you sued by the SEC?
10             THE WITNESS:  In 2011.  It was the end of 2011.
11             THE COURT:  Explain to me, then, if you knew that you
12   were facing a lawsuit at least by the Schwarzes in 2010 -- I'm
13   not understanding your point as to why it would not make sense
14   to set up what you call asset protection, given that you were
15   facing a substantial lawsuit from the Schwarzes and the
16   possibility of a lawsuit by the SEC or perhaps other investors.
17   Why would it be irrational for you to try to shelter assets for
18   yourself in Switzerland?  Why is that implausible?
19             THE WITNESS:  That's implausible, your Honor, because
20   we just had a minimal -- a nominal amount of assets left.  And
21   we had no way -- we weren't receiving any fees from our core
22   fund.  And we just didn't know how to put this fund into
23   liquidation.  Our legal didn't advise us on how -- the only
24   solution our legal told us to get this fund into liquidation
25   was to get KBC to put it into liquidation because they adjusted
              SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

```
                                                                    120
     F5leschc              Kapur - cross
 1              THE COURT:  She's your?
 2              THE WITNESS:  She's my godmother.
 3              THE COURT:  Right.  And on Exhibit, 5 Kabir Kapur, who
 4   is that?
 5              THE WITNESS:  He's my older brother, your Honor.
 6              THE COURT:  Thank you.
 7              THE WITNESS:  Thank you, your Honor.
 8              So those affidavits are submitted to demonstrate the
 9   source of funds.  I would note that each of these family
10   members that have loaned me money have provided -- or Manju
11   Kapur, Karan Kapur, as well as Bina Rai, have provided the bank
12   statements to the SEC.  And as per my understanding, those are
13   fully consistent with the loan agreements and their support.
14   In aggregate, my family provided me loans for my living and
15   legal expenses.
16              I submit Exhibit 2 as the loan contracts with
17   differing members of my family.  It was detailed in terms of
18   the loans, as well as appendices, that have details on the
19   installments on each of the loans.  I note, your Honor, the
20   loan agreement from Naveen and Manju Kapur with their terms and
21   majority dates; a loan between Manju Kapur and Bina Rai; a loan
22   agreement between Chetan Kapur and Bina Rai; and the loan
23   agreement between Chetan Kapur and Kabir Kapur.
24              THE COURT:  One moment.  So one between you and
25   Ms. Rai, I just want to make sure I've got that right.  As I
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
```

```
                                                                    121
         F5leschc                Kapur - cross
1    look through Exhibit 2, the first document is an agreement
2    between you, on the one hand, and Manju Kapur and Naveen Kapur
3    on the other hand, and then it has an appendix.
4              The second document dated February 25, 2014, is
5    between Bina Rai and Manju Kapur, in which Manju Kapur is
6    loaning some $65,000 to Bina Rai.  Correct?
7              THE WITNESS:  Yes, your Honor.
8              THE COURT:  The third document is a loan agreement
9    dated September 10, 2011, between you and Bina Rai.  In the
10   middle of the document is an appendix, although it looks like
11   the appendix is out of order, because the appendix sheet right
12   now is appearing between paragraph seven and paragraph eight.
13             Am I correct that the appendix ought to be on the next
14   page?
15             THE WITNESS:  Yes, your Honor, you're absolutely
16   correct.
17             THE COURT:  And then the next document is an
18   installment loan agreement between you and Kabir Kapur dated
19   June 18, 2014, correct?
20             THE WITNESS:  That is correct, your Honor.
21             THE COURT:  Thank you.
22             THE WITNESS:  I submit these documents, your Honor, to
23   demonstrate in evidence the loans that were provided to me to
24   support my living expenses.
25             I will also note that since November of 2013 my family
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                                  122
         F5leschc              Kapur - cross
 1   has refused to provide any moneys for any legal support to me.
 2            THE COURT:  Since when?
 3            THE WITNESS:  Since November of 2013.
 4            THE COURT:  When you say your family, do you mean all
 5   of the people I've just referred to?
 6            THE WITNESS:  Yes, your Honor.
 7            THE COURT:  So have you received any loans from
 8   anybody since November 2013?
 9            THE WITNESS:  Yes, I have, your Honor, but only for
10   personal expenses.  They've not supported any legal expenses.
11   And as noted to the Court prior, my family makes payment
12   directly to the vendors and wants to approve and understand all
13   charges before they provide these loans.
14            Moving forward, your Honor, it's also come to my
15   understanding relatively recently through discussion with
16   different members of my family is the reason they've been
17   refusing me -- refusing to pay both for legal and personal
18   expenses and have only been supporting my personal expenses
19   since November of 2013 is because they're financially unable to
20   support both legal and personal expenses, and have also noted
21   to me that they are currently having extreme difficulty
22   supporting my personal expenses as well.
23            THE COURT:  What are your current monthly personal
24   expenses?
25            THE WITNESS:  My rent and sundry expenses for
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                             123
         F5leschc              Kapur - cross
1    transportation, food.
2              THE COURT:  What is the sum total of your monthly
3    living expenses?
4              THE WITNESS:  Varies from month to month, but around
5    5,000 to 6,000 approximately.
6              THE COURT:  And right now that is being provided by
7    your family?
8              THE WITNESS:  That's been provided by my family.  It's
9    specifically being provided by Manju Kapur and Naveen Kapur.
10   And if your Honor looks at the loan agreements in the appendix,
11   you'll note that they've been paying the rent with quite a
12   significant delay, as well as the credit card expenses with
13   quite a significant delay, right, since the end of 2014.  So
14   they have been having difficulty, you know, supporting the
15   personal expenses, just, you know, you can see from the delay
16   in which they are paying these expenses.
17             In the March 6 submission to the Court, which is
18   Defense Exhibit 1, I had submitted detailed ledgers of all my
19   living and other expenses, who paid those expenses, as well as
20   other details.  I submitted several hundred pages of financials
21   of credit card ledgers, of rental ledgers, and all of these
22   expenses are fully consistent with the loan agreements and the
23   loan contracts and the loan contract appendices that have been
24   provided by my family.
25             Your Honor, based on the above, I feel that it's clear
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

```
                                                                  124
        F5leschc              Kapur - cross
1    and unmistakable that there's absolutely no way for me to
2    possibly make payment towards these default judgments and
3    monetary sanctions.  At this point I am in the process of
4    searching for a job.  And when I do obtain a job, I do plan and
5    start -- I do plan to start making payments towards my default
6    █████████████████ judgments.
7             THE COURT:  If you find a job.
8             THE WITNESS:  Yes, your Honor, if I find a job.
9             Your Honor, I'd like to also just talk about a couple
10   of background items or larger items and then address several
11   specific items thereafter.
12            I'd like to start by just generally talking about
13   managed account process, how things were traditionally
14   structured, if a client came to us and wanted structuring work
15   done.
16            As part of ThinkStrategy managed account program, we
17   started the company firstly, I would note, by way of managed
18   account.  If a client came to us to do a managed account and
19   wanted structuring work done, we would set up a structure in
20   our name, or as though it was for the client, and then transfer
21   the structure to the client.  The client would then fund the
22   structure, and then we would do a managed account, if that was
23   part of the mandate, per the managed account agreement, per the
24   power of attorney agreement.
25            I would also like to note that we worked with hundreds
                     SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
```

```
                                                                 125
         F5leschc              Kapur - cross
 1   of counterparties.  In general, I would say there were five
 2   categories of counterparties that we worked with.  We worked
 3   with fund retail clients, qualified retail clients.  We worked
 4   with fund institutional clients.  We worked with institutional
 5   advisers.  We worked with retail advisers.  And we worked with
 6   potential clients, as well as the one too many entities.  We
 7   also worked with hundreds of service providers over the years;
 8   consultants, placement agents, advisers, accountants, auditors,
 9   law firms, trust companies, administrators, tax preparers,
10   banks, broker dealers, leverage providers, foreign exchange
11   providers and research providers.  And at any one point we
12   might have been working with one or two providers, whether it
13   was for the domestic fund or the international fund or for the
14   managed account program.
15              I'd also just generally like to note that I feel that
16   some of the plaintiffs' claims, they've been taking facts out
17   of context or contorted from many years ago on a company that's
18   been defunct for about five years now.  And I would say mostly
19   everything as it relates to the company, unless reminded, is
20   quite unmemorable to me, particularly any unpaid projects.
21              I'd also like to, as part of the general discussion,
22   note that it makes no sense to me that I would even set up an
23   asset protection structure in the latter part of 2010 because
24   our firm and me personally had very minimal assets at
25   that point and was used to pay for all the operating and
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
F5leschc                    Kapur - cross                    126
```

1   infrastructure costs of the fund and the firm until resources
2   were fully depleted, placing me in debt.
3            THE COURT:  When were you sued by the Schwarz family?
4   It was 2009, correct?
5            THE WITNESS:  I believe it was 2009.
6            THE COURT:  And the judgment wasn't entered until
7   2012, correct?
8            THE WITNESS:  2012, correct.
9            THE COURT:  When were you sued by the SEC?
10           THE WITNESS:  In 2011.  It was the end of 2011.
11           THE COURT:  Explain to me, then, if you knew that you
12  were facing a lawsuit at least by the Schwarzes in 2010 -- I'm
13  not understanding your point as to why it would not make sense
14  to set up what you call asset protection, given that you were
15  facing a substantial lawsuit from the Schwarzes and the
16  possibility of a lawsuit by the SEC or perhaps other investors.
17  Why would it be irrational for you to try to shelter assets for
18  yourself in Switzerland?  Why is that implausible?
19           THE WITNESS:  That's implausible, your Honor, because
20  we just had a minimal -- a nominal amount of assets left.  And
21  we had no way -- we weren't receiving any fees from our core
22  fund.  And we just didn't know how to put this fund into
23  liquidation.  Our legal didn't advise us on how -- the only
24  solution our legal told us to get this fund into liquidation
25  was to get KBC to put it into liquidation because they adjusted

```
F5leschc                    Kapur - cross                    127
         the assets.
                 THE COURT:  I think you're saying to me that it would
         have been difficult to remove money from the funds for your
         personal benefit, but it doesn't I think address the issue of
         whether assets that you had otherwise to your own personal name
         couldn't have been moved to Switzerland.  Can you address that?
         Why would it not make -- you seem to be saying it would not be
         rational to shelter your assets in Switzerland.  I think I hear
         what you're saying about the company's funds, which is that in
         practice there weren't many, and any attempt to move them in
         2010 to Switzerland might have been detected.  I'll be
         interested in counsel's examination on that point.
                 But as to your own assets, why would it not have made
         strategic sense for you to try to protect those assets in
         Switzerland?
                 THE WITNESS:  Your Honor, we just had a nominal amount
         of assets.  We had maybe -- if I had to guess, probably a
         couple of hundred thousand dollars available for the fund's
         operating expenses.  So it wouldn't make sense for me to be
         setting up structures and accounts in Switzerland and all of
         this to protect assets that we were using and needed to pay for
         next month's rent and next month's salaries and next month's,
         you know, bank expenses, which we were covering, because we
         just couldn't figure out a way.  The only solution that the law
         firm that we were working with at the time and, frankly, could
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
```

```
F5leschc                  Kapur - cross                         128
```

1  afford at the time, which was Drohan and Lee, was they were
2  having discussions with KBC to pay our fees because we had
3  these accrued creditor claims towards the fund. And there was
4  just no way, we just didn't want to abandon our investors. We
5  had no solution from our legal.
6            And it was only in -- towards the end of 2010 that we
7  had counsel of the fact that, you know, we could contact
8  liquidators and they can possibly get their fees from the
9  smaller B class, and technically is one fund as a whole. And
10 we didn't -- were weren't being advised in that manner prior.
11 So we were just being advised on the fact that the only way to
12 get this fund into liquidation is with KBC's acceptance. And
13 KBC's position was, you know, put it in liquidation yourself.
14 Why should we pay a liquidator and why should we get involved?
15          THE COURT: What assets did you personally have as of
16 2010?
17          THE WITNESS: I can't speak to that without looking at
18 the bank statements, but I would think just a couple of hundred
19 thousand was left in the account.
20          THE COURT: Are you saying that as of 2010, to your
21 name personally you only had several hundred thousand dollars
22 of assets?
23          THE WITNESS: It was in the name of the company
24 because it was only towards -- if I'm recalling correctly,
25 created personal accounts toward the end of 2010, because my

```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
F5leschc                    Kapur - cross                        129
```

```
 1   legal said you shouldn't be take -- it's better not to take
 2   draws from the company but to take draws into your personal
 3   account for any draws that are personal draws.
 4           THE COURT:  As of 2010 how long had you been in the
 5   investment management industry?
 6           THE WITNESS:  Up to 2010?
 7           THE COURT:  How many years had you been working in
 8   that industry?
 9           THE WITNESS:  From '97.  I graduated in '97.  I worked
10   at Salomon Smith Barney for over five years, and thereafter I
11   started the firm.
12           THE COURT:  So your testimony is that after thirteen
13   year of working in the industry, the only assets to your name
14   were several hundred thousand dollars?
15           THE WITNESS:  That's correct, your Honor.
16           THE COURT:  Go ahead.
17           THE WITNESS:  Absolutely correct.
18           THE COURT:  Go ahead.
19           THE WITNESS:  I would also note, why would I set up a
20   structure called family and children's charitable foundation
21   when I'm single and have no children?  Why would I provide the
22   SEC e-mails about a structure if I was trying to hide assets?
23           And I'd also note, as seen in Exhibit 7, as well as
24   Mr. Romano's testimony, when the law firm of Mossack Fonseca
25   was doing the general due diligence and they asked me for my
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
F5leschc               Kapur - cross                          130
 1   personal tax returns, I drew the line at that point.  They'd
 2   asked me for bank reference letters, which I provided.  They
 3   asked me for accounting reference letter, which I provided.
 4   They asked me for the certificate of insurance for
 5   ThinkStrategy Capital Management, which I provided.  They asked
 6   me the general questions they asked about the lawsuit from the
 7   Schwarzes, because they wanted to know what that was about.
 8   And they were doing the standard KYC due diligence.  But when
 9   it came to --
10            THE COURT:  Slow down, please.
11            THE WITNESS:  When it came to asking me about -- for
12   my personal tax returns, as can clearly be seen from Exhibit 7,
13   I drew the line.  And I said -- you know, we were in phase one
14   of our managed account program.  And I said, this is an unusual
15   request.  And I did not provide my personal tax returns.  And I
16   was not going to provide my personal tax returns for setting up
17   a structure for a third party.
18            THE COURT:  Sorry.  Who were you saying you declined
19   to give your personal tax returns to?
20            THE WITNESS:  To the law firm of Mossack Fonseca as
21   part of the KYC, because this wasn't a structure for myself.
22   Otherwise, I'd have no issue providing my personal tax returns.
23   It was a structure for a third party, which is why I had to
24   draw the line somewhere.
25            THE COURT:  Can you estimate for me -- let's go back
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
F5leschc                                                      131
                        Kapur - cross
```

1   to 2007. Can you estimate for me what your taxable income was
2   in 2007?
3         THE WITNESS: In 2007, it would be the net -- it would
4   be the net income of the company, your Honor.
5         THE COURT: I'm asking for a number. What would your
6   tax return for 2007 have reported as your gross income?
7         THE WITNESS: I would have to look.
8         THE COURT: Approximately. Can you estimate for us?
9         THE WITNESS: I'd have to look at my tax return, your
10  Honor. I can't -- not off the top of my head.
11        THE COURT: Do you have that here in court?
12        THE WITNESS: No, I don't believe I do.
13        THE COURT: Go ahead.
14        THE WITNESS: Just a general point, your Honor. Even
15  if the SECs and the Schwarzes wrongfully believed that some
16  managed account is mine, I recall in most of the managed
17  accounts being -- that we did had the same assets as a class A
18  fund that went under or went bust.
19        Noting these general points based on the information
20  that's been provided to me in exhibits from the plaintiff, I
21  also would like to address some specific items that were
22  brought up in exhibits to this process by the plaintiffs.
23        Firstly, specifically, I'd like to address a wire to
24  CCO Limited from eight years ago.
25        THE COURT: Which document is it from my letter?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
F5leschc                    Kapur - cross                         132
```

1        THE WITNESS: That would be Plaintiff's Exhibit --
2  Mr. Solotaroff?
3        THE COURT: Sorry, counsel. Can you help me? Did you
4  know what exhibit number we're referring to?
5        MR. SOLOTAROFF: Judge, I don't think --
6        THE COURT: Just yes or no. Do you know what he's
7  referring to?
8        MR. SOLOTAROFF: No.
9        THE COURT: Mr. Kapur, can you help me? I have here
10 the SEC's -- you must have it, too.
11       MR. ROESSNER: I think it's Exhibit 3, your Honor.
12       THE COURT: Exhibit 3. Thank you, Mr. Roessner.
13       Do you have a copy of the binder, Mr. -- please sit
14 down. Do you have a copy of your binder? Can you hand it back
15 up to the witness, please, Mr. Roessner?
16       MR. ROESSNER: Yes.
17       THE WITNESS: I think it would be in Mr. Solotaroff's
18 binder.
19       MR. SOLOTAROFF: It's the same binder.
20       THE COURT: I'm just asking for the binder of exhibits
21 in evidence to be handed up to the witness. I thought he
22 already had it in front of him. Thank you, Mr. Roessner.
23       All right. Mr. Kapur, you're referring, then, to
24 Exhibit 3, SEC Exhibit 3?
25       THE WITNESS: No, your Honor.

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

```
F5leschc                    Kapur - cross                        133
 1              THE COURT:  What are you referring to?
 2              THE WITNESS:  I'm referring to an exhibit that
 3   Mr. Solotaroff presented to me the last time I was in court.
 4   And he questioned me about a wire transfer for approximately
 5   2 million to a CCO Limited.  It was part of his binder.
 6              I think it was also part of the binder on the April 30
 7   testimony, Mr. Solotaroff.
 8              THE COURT:  Please don't -- we're not engaging
 9   Mr. Solotaroff in a conversation.  Just give me your testimony.
10              THE WITNESS:  All right.  So we discussed several
11   possibilities on that wire.  I'm just going to reiterate those
12   practical possibilities.
13              On that wire from eight years ago, there was
14   discussion that it could have possibly been an investor --
15   investment that was reversed.  And so that was a reversal of
16   investor moneys coming into the management company erroneously.
17   We discussed that that could possibly have been payment to a
18   service provider for services rendered.  And we also discussed
19   the possibility that that could be a rebate to an institutional
20   investor.
21              THE COURT:  But it's a $2 million payment to CCO
22   limited that you do not -- you don't have a specific memory as
23   to what purpose it served?
24              THE WITNESS:  That's correct, your Honor.  It was
25   eight years ago.  I do not.  And I would also note that I do
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                                    134
        F5leschc                Kapur - cross
 1   not have specific memory of the other large transactions on
 2   that statement.  I'm recollecting that it had a -- an amount
 3   for 1.6 million, another amount for $200,000, large amounts on
 4   that very same statement that I could not recollect the details
 5   about either.  I would note that that was one of several
 6   accounts at Wachovia.  And besides for that, we also had
 7   accounts at other banks.
 8            I noted yesterday as part -- the fact that our managed
 9   accounts had -- we did approximately eight to ten projects.
10   But if you asked me today to differentiate between a managed
11   account client or a qualified retail client or qualified
12   institutional client for the fund or a potential client or an
13   institutional adviser client or retail adviser client, I
14   wouldn't be able to differentiate today after all these years
15   which one would fit into which category unless it was a brand
16   global name.  And here I'm being asked to recall names,
17   details, dealings from one or two counterparties from a long
18   time ago on a company that's been defunct for five years.
19            I'd like to proceed to talk about a managed account
20   e-mail at Bank Sarasin from seven years ago.  That might be
21   Exhibit 3 in the SEC binder.
22            THE COURT:  What exhibit?
23            THE WITNESS:  Exhibit 3 in the SEC's binder.  And I'd
24   like to note that there was an e-mail from Bank Sarasin from
25   seven years ago where I'd like to address that by just noting,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```