F5leschc                    Kapur - cross

1    as I've noted before, that we used to personalize assets and
2    give an optimistic view on assets to get better servicing from
3    the bank. It also appears --
4            THE COURT: When you say "personalize assets," can you
5    be more specific about what you were saying to the bank?
6            THE WITNESS: Yes, your Honor. We were giving them
7    the impression, since often the banks didn't know who owned the
8    structures or the day-to-day team, assumed that the structure
9    belonged to the people they were dealing with, we gave the
10   impression that the assets belonged to us when they did not.
11           THE COURT: Let me be clear. You were representing to
12   the banks that the money was yours personally, whereas, in
13   fact, it was not?
14           THE WITNESS: That's correct, your Honor.
15           THE COURT: And the reason for doing that was that you
16   thought by representing to the bank that the assets here were
17   yours personally, you would get better treatment than if you
18   represented that they belonged to your company or your
19   customers?
20           THE WITNESS: Than representing that -- yes, your
21   Honor, because as an emerging manager in this industry, where
22   people do managed accounts for hundreds of millions and
23   billions of dollars, just doing one small account for a
24   relatively small -- I don't know if it's a small client or not.
25   We often didn't get the servicing that we expected and that our

```
                                                                  136
     F5leschc                  Kapur - cross
 1   clients expected to get, accurate timely and complete
 2   reporting.
 3            THE COURT:  Okay.  The Exhibit 3, SEC Exhibit 3,
 4   contains in relevant part an e-mail exchange between you and a
 5   Philip Stibolt of Bank Sarasin.  And in it you say to
 6   Mr. Stibolt that you've been -- you've spent five hours trying
 7   to figure out certain transfers that had been made from CCO to
 8   others.  And then you write, quote, I am not one bit happy
 9   about my hard-earned money being accounted for in this manner,
10   closed quote.  And then you go on to say, quote, I urge you to
11   check every statement sent to me each month before it gets sent
12   so that I get accurate statements, which is the least I should
13   expect from my bank, closed quote.
14            The question is, is it your testimony that the money
15   in question belonged to an account holder, and you felt that by
16   using the word "my" -- my hard earned money, my bank, my
17   statements -- you thought you would get better treatment than
18   if you had said, my client's bank account, my client's
19   statement, my client's hard-earned money?  Is that your
20   testimony?
21            THE WITNESS:  Yes, your Honor.
22            THE COURT:  Thank you.
23            THE WITNESS:  I would also note that it clearly
24   appears from this e-mail that some of the accounts were
25   negative and earned negative interest as well.
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

```
                                                                137
        F5leschc                 Kapur - cross
 1              As it relates to the foundation structure --
 2              THE COURT:  May I ask you this.
 3              THE WITNESS:  Yes, your Honor.
 4              THE COURT:  In 2008, then, by your account, there were
 5      account or accounts at Bank Sarasin of your customers, correct?
 6              THE WITNESS:  That's correct.
 7              THE COURT:  And you were in effect on their behalf
 8      receiving statements and communicating with Mr. Stibolt?
 9              THE WITNESS:  That is correct.
10              THE COURT:  Okay.  What efforts have you made since
11      then to obtain a current statement of the accounts in question?
12      In other words, I'm interested in finding out the account
13      activity in those accounts.  You are by -- as you describe it,
14      the person dealing with the bank on behalf of your account
15      holders.  What efforts have you made to try to obtain for
16      yourself and, therefore, for the Court, the accounts --
17      activity in the account?  I'm interested in what became of
18      those accounts.
19              THE WITNESS:  Your Honor, once the project was
20      completed, we would be taken off the account.  And so we would
21      have no control or access to the account, once the project
22      was --
23              THE COURT:  What project?
24              THE WITNESS:  The managed account project, your Honor.
25              THE COURT:  What concluded the managed account
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
```

```
                                                                    138
        F5leschc                  Kapur - cross
 1    project?
 2              THE WITNESS:  When the client said that, you know,
 3    the -- you know, they no longer wanted our services for
 4    investment management administrative services that concluded
 5    the project, and so we would have no access to the bank.
 6              THE COURT:  What client was this?
 7              THE WITNESS:  I don't know, your Honor.  I don't
 8    recall.
 9              THE COURT:  Go ahead.
10              THE WITNESS:  As it relates to the foundation
11    structure from five years ago, I noted that there are three
12    possibilities as it relates to that structure.  It appears to
13    me that the structure was set up for a private lender of my
14    brother that may have been the private lender that lent Ms. Rai
15    moneys.  It also very possibly could have not been a private
16    lender that lent Ms. Rai moneys but just knew the private
17    lender that lent Ms. Rai moneys, or it could possibly have just
18    been a client that knew my brother's private lenders.  I feel
19    that those are all feasible possibilities for whom the
20    structure was possibly set up.
21              I would also note that the lender that provided moneys
22    to Ms. Rai clearly had the same or similar name, and possibly
23    even the same bank, but that could have been a totally
24    different type of structure, could have had a different
25    purpose.  It could have been a charitable structure.  It could
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

```
                                                                 139
          F5leschc                  Kapur - cross
 1   have been in a different jurisdiction.  It could have been set
 2   up by a different law firm.
 3            And just reflecting on the Exhibit 7 and the other --
 4            THE COURT:  This is SEC Exhibit 7?
 5            THE WITNESS:  SEC Exhibit 7, as well as the other
 6   exhibits of the SEC, noting due diligence with the law firm, I
 7   can't be 100 percent certain that the account was eventually
 8   even set up with Bank Vontobel, although it does very much
 9   appear that -- I don't see any account documents in the e-mail
10   with Bank Vontobel.
11            Your Honor, I'd like to --
12            THE COURT:  May I ask you a question.
13            THE WITNESS:  Yes, your Honor.
14            THE COURT:  This exhibit, SEC 7, contains e-mails
15   dated June 2010, correct?
16            THE WITNESS:  Yes, your Honor.
17            THE COURT:  Now, by that point the Schwarzes had sued
18   you the previous year, correct?
19            THE WITNESS:  Yes, your Honor.
20            THE COURT:  And what was the state of your business at
21   that point?
22            THE WITNESS:  At that point a core fund was in
23   liquidation for about two years.  Our resources were almost
24   fully depleted.  And so there wasn't -- there was a nominal
25   amount of resources left.  There would have been no reason for
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

```
                                                                    140
        F5leschc                 Kapur - cross
 1   us to be setting up estate planning structures for ourselves or
 2   asset protection structures.
 3           THE COURT:  Were you representing any clients at
 4   that point?  At that point were you still custodian of any
 5   client money?
 6           THE WITNESS:  We were setting up -- you know, we were
 7   trying to launch our, you know, managed account platform.  We
 8   moved our managed account program into the AIM advisory entity,
 9   and we were trying to, you know, as noted in Defense Exhibit 8,
10   trying to launch the diversified strategy managed account
11   platform.
12           THE COURT:  There was a point at which a receiver took
13   over the moneys of ThinkStrategy, correct.
14           THE WITNESS:  That's correct.
15           THE COURT:  When was that?
16           THE WITNESS:  We put the fund into liquidation with
17   PriceWaterhouse for the onshore fund in November, October
18   November of 2010.  And then, by the time the offshore fund got
19   put into liquidation, I believe it was April, May of 2011.
20           THE COURT:  And these e-mails are in June of 2010.  So
21   you're saying you still were managing some customers' accounts
22   in June 2010?
23           THE WITNESS:  No, your Honor.  There wasn't any --
24   this was just a structuring project.  Once again, we did
25   structuring projects and unpaid managed accounts as a way to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                               141
     F5leschc              Kapur - cross
1    win paid business.
2            THE COURT:  I'm sorry.  I'm not understanding.  Yes or
3    no, were you managing customer money in 2010?
4            THE WITNESS:  Was I managing customer money in 2010?
5            THE COURT:  June 2010.
6            THE WITNESS:  Yes, your Honor.
7            THE COURT:  You were?
8            THE WITNESS:  The funds were not in formal liquidation
9    with the receiver here.
10           THE COURT:  And Exhibit 7, SEC Exhibit 7, involves
11   communications from the MossFon Trust Corporation to you.  Do
12   you see that?
13           THE WITNESS:  Yes, your Honor.
14           THE COURT:  Just explain to me, because I'm having
15   difficulty understanding what you're saying this relates to,
16   what was the purpose of your communicating in June 2010 with
17   the MossFon Trust Corporation with respect to the use of
18   vintage shell companies?
19           THE WITNESS:  Your Honor, we had a client that wanted
20   to set up a structure.  And that's what it clearly appears to
21   me, is that they wanted to set up a structure for the estate
22   planning needs.  And we were helping them with that initially.
23           THE COURT:  And what client was that?
24           THE WITNESS:  I don't recall, your Honor.
25           THE COURT:  Over the course of your work for
                      SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
```

```
           F5leschc              Kapur - cross
 1    ThinkStrategy, did you have one or more than one client who
 2    wanted to set up such a structure for estate planning purposes?
 3              THE WITNESS:  Yes, your Honor.  We had several clients
 4    as part of our managed account program, and we had several of
 5    them that wanted to set up structures as part of the managed
 6    account program.
 7              And it's also quite difficult for me today to sit here
 8    today and say -- you know, if you give me a name from our
 9    entire list and said, okay, you know, this is a potential
10    client or this is a fund client and this is an institutional
11    fund client and this is an institutional adviser client and
12    this is a managed account client, I'll have to take your word
13    for it.  I couldn't remember the difference between those
14    clients sitting here today.
15              THE COURT:  Overall as of 2010, how many clients did
16    you have?
17              THE WITNESS:  As of 2010?
18              THE COURT:  As of June 2010.
19              THE WITNESS:  I would say between the onshore and the
20    international fund, managed account, potential managed account,
21    I'd say hundreds of clients.
22              THE COURT:  As you sit here now --
23              THE WITNESS:  Potential clients even higher.
24              THE COURT:  As you sit here now, can you remember the
25    name of any client who asked you to set up a structure for
```

```
                                                              143
        F5leschc              Kapur - cross
 1   estate planning purposes involving vintage shelf companies?
 2              THE WITNESS:  No, your Honor.
 3              THE COURT:  Go ahead.
 4              THE WITNESS:  I'd like to conclude, your Honor, by
 5   just highlighting a couple of issues that might speak to the
 6   credibility of some of the items presented by the SEC and the
 7   Schwarzes.
 8              I'd first like to note that as it relates to the SEC,
 9   and as a matter of record, the capital fund returns in the A
10   class and B class and the original claims was -- were knowingly
11   inaccurate.  They clearly had information from the fund of all
12   the underlying self accounts in the capital fund A class.  They
13   knew the principal protection was available in the B class and,
14   nonetheless, you know, took returns of just one of the
15   subfunds, one of the submanagers in the capital fund A class to
16   calculate their returns.  And once the fund was closed, they
17   used dormant bank accounts to calculate returns, compare that
18   to former returns.
19              Subsequently, from information that was in the SEC's
20   possession, the reported returns were confirmed as being fully
21   accurate.  And these were the returns that the investors
22   received.
23              I'd also like to note that the SEC has noted that the
24   Chase payment from Chase credit card was made by a Ms. Rai
25   when, in fact, the documents, the loan agreements, the bank
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                               144
         F5leschc              Kapur - cross
 1   statements all show that the Chase credit card payment was made
 2   by Manju Kapur when she was in a cash flow position to do so.
 3   And she came into that cash flow position when Bina Rai
 4   partially paid her back the loan that Manju Kapur gave to Bina
 5   Rai.
 6            I'd also like to note that in the Schwarz's case, the
 7   car title of Ms. Rai's car was provided to the Schwarzes on two
 8   or three different occasions.  In fact, there was even an order
 9   for the Court noting the car was formally owned by
10   ThinkStrategy Capital.  And the Schwarz's attorney repeatedly
11   wrote to the Court that he did not believe that the car was
12   formally owned by ThinkStrategy and submitted two letters to
13   that effect.  It seemed like bald-faced lies to this Court in
14   writing.
15            It seems also, your Honor, that it's unbelievable to
16   me that the SEC can't find client correspondence both in
17   e-mails or in client databases.  And at this point I feel that
18   even if they did find this information in e-mails and client
19   databases, they might contort matters or with --
20            MR. ROESSNER:  I object to the characterization of
21   what the commission would do.
22            THE COURT:  Mr. Roessner, Mr. Kapur is pro se.  I
23   think I would rather hear what he has to say and determine
24   later on what weight to attach to particular statements by him.
25   So the objection is overruled.
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                              145
         F5leschc              Kapur - cross
 1                Go ahead, Mr. Kapur.
 2                THE WITNESS:  Thank you, your Honor.
 3                I feel just the way the information has been presented
 4       to me, the types of questions that have been asked and the way
 5       this process has unraveled, I clearly am left with the
 6       understanding and impression that information is being
 7       contorted and withheld so that arguments can be made with facts
 8       that are out of context or contorted.
 9                I'd also like to note, your Honor, just as an example
10       of this, in Exhibit 7, one can see all the back and forth with
11       the law firms of Mossack Fonseca is coming from a domain name,
12       the correspondences with AIM Advisory Group, the
13       correspondences with ThinkStrategy Capital.  There are many,
14       many e-mails in Exhibit 7, and 99 percent of those e-mails are
15       to and from AIM Advisory Group and ThinkStrategy Capital, but
16       the SEC produces the one e-mail yesterday that happened to be
17       from a personal e-mail address when the company e-mail was not
18       working.
19                THE COURT:  Does that complete your testimony on
20       cross-examination?
21                THE WITNESS:  Yes, your Honor.
22                THE COURT:  Okay.  Thank you.
23                What we're going to do now is take a ten-minute
24       comfort break.  When we resume, I'll entertain any redirect
25       examination, beginning with Mr. Roessner, then beginning with
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                   (212) 805-0300
```

```
                                                              146
        F5leschc                  Kapur - cross
 1   Mr. Solotaroff, and then we'll see if there's any
 2   recross-examination and so forth.
 3            Once Mr. Kapur's testimony is complete, Mr. Roessner,
 4   I'll be inquiring whether you rest your case.  And then we'll
 5   turn to Mr. Solotaroff and Mr. Kapur, in the event that either
 6   of them has any additional evidence to present.
 7            I'll see you in ten minutes.
 8            (Recess)
 9            THE COURT:  Mr. Kapur, I'll remind you that you're
10   still under oath.
11            Mr. Roessner, do you have any redirect?
12            MR. ROESSNER:  Yes, your Honor.
13   REDIRECT EXAMINATION
14   BY MR. ROESSNER:
15   Q.  Good morning, Mr. Kapur.
16   A.  Good morning, Mr. Roessner.
17   Q.  You testified that it wouldn't have made sense in 2010 to
18   create an asset protection structure, correct?
19   A.  To personally create one, correct.
20   Q.  If you could turn to SEC Exhibit 4 in the binder and flip
21   to page three.  On the bottom right-hand corner, it says page
22   one.
23   A.  Yes.
24   Q.  Now, this is an e-mail chain between you and Adrian Taylor.
25   Do you see that?
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

147
F5leschc                       Kapur - redirect
1    A.   I do see that on the exhibit, yes.
2    Q.   And Adrian Taylor is associated with an entity called Asia
3    City Trust.  Do you see that?
4    A.   I do see that, yes.
5    Q.   Now, on the bottom of this page, the first line of the
6    paragraph, it starts with Dear Chetan, here is the resolution
7    that needs to be signed by Dr. Max Albers before we can move
8    forward with the new trust.
9              Do you see that?
10   A.   I do see that, yes.
11   Q.   And what is that trust?  Do you have any recollection what
12   that trust involves?
13   A.   It was probably for some estate planning needs of a client.
14   Q.   And do you recall the name of that client?
15   A.   I do not.
16   Q.   Do you have any documents regarding this transaction?
17   A.   I can look through my sundry files, but I don't believe so.
18   Q.   And the date of this e-mail between -- from Adrian Taylor
19   to yourself is October 16, 2009.  Do you see that?
20   A.   I do see that, yes.
21   Q.   And do you know who Dr. Max Albers is?
22   A.   I do not.
23   Q.   The next paragraph, second sentence, begins, in this case,
24   because I have had to spend time drafting a fresh deed, I
25   propose that our fees to register the new trust be 1550 in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
                                                                     148
     F51eschc              Kapur - redirect
 1   first year and 1350 in second and subsequent years.
 2             Do you see that?
 3   A.  I do see that, yes.
 4   Q.  The first question is:  Do you know what she's referring to
 5   when she says "a fresh deed"?
 6   A.  I do not.
 7   Q.  Do you own any property in the United States?
 8   A.  I do not.
 9   Q.  Any property internationally?
10   A.  I do not.
11   Q.  And do you have any documents regarding that transaction,
12   that deed?
13   A.  I do not.
14   Q.  Have you --
15   A.  I haven't looked for it.  I don't believe I do.
16   Q.  Have you contacted Asia City Trust in the last year?
17   A.  I have not.
18   Q.  When is the last time you've spoken with anyone from Asia
19   City Trust?
20   A.  From this e-mail, it seems October 16, 2009.
21   Q.  You haven't had any communication since this e-mail was
22   sent?
23   A.  No.  Not that I recall.
24   Q.  I just wanted you to go to the next page to look at Adrian
25   Taylor's signature block.  And she is in the Cook Islands.  Do
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                                   149
        F5leschc                 Kapur - redirect
 1      you see that?
 2      A.  I'm sorry.  Could you repeat that?
 3      Q.  If you can flip to the next page, page two.
 4      A.  Right.
 5      Q.  I want you to take a look.  Adrian Taylor, her entity is
 6      based in the Cook islands.  Do you see that?
 7      A.  I do see that.
 8      Q.  Did you ever deal with any other asset protection companies
 9      or any companies based in the Cook Islands?
10      A.  Well, clearly Asia City Trust.
11      Q.  And besides Asia City Trust.
12      A.  Not that I recall.
13      Q.  The last paragraph on page two begins, as discussed, please
14      find an e-mail from me.  We can have the trust be named AP1
15      trust.  Do you see that?
16      A.  I do.
17      Q.  Are you familiar with the trust AP1 trust?
18      A.  I am not.
19      Q.  Do you have any documents regarding AP1 trust?
20      A.  I'd have to look through my files, but I don't believe so.
21      Q.  You don't remember what client this would have been related
22      to?
23      A.  Not after all these years, no.
24      Q.  Now, in 2009, October 2009, was your ThinkStrategy still in
25      existence?  It hadn't been put into liquidation, correct?
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                  (212) 805-0300
```

```
                                                                    150
        F5leschc                    Kapur - redirect
1    A.   You mean the fund structures?
2    Q.   Yes.
3    A.   No, not at that point.  It was put into liquidation towards
4    the end of 2010.
5    Q.   And at this point had suit been filed against you by the
6    Schwarzes?
7    A.   I don't believe so, no.
8    Q.   Had the investors been making demands and claims regarding
9    their dissatisfaction at this time, do you recall?
10   A.   Well, investors would generally -- after the crisis and the
11   tsunami of the crisis hit the markets in September of 2008,
12   investors just wanted a lot more detail on the investments,
13   what was going on with the funds.  There were a lot more
14   questions about the investments.  They wanted to understand why
15   funds were suspending, why funds were gating, why funds were
16   restructuring, why they were providing restructuring options.
17            So there was a lot more involvement, because for years
18   and years these funds were providing steady, stable returns and
19   very study, stable risk profile.  And all of a sudden, with the
20   financial crisis, they were being hit not only the equity
21   markets but the debt markets, the commodity markets, the real
22   estate market.  Everything hit all at once.  And so investors
23   were upset at the valuation losses, if you will, in alternative
24   portfolios in general, including our fund.
25   Q.   One of the main issues -- one of the main problems that
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
```

```
                                                                151
        F5leschc              Kapur - redirect
 1   your fund involved -- occurred was, the investment with
 2   Mr. Nadel?
 3            THE COURT:  Sorry.  I didn't hear the question.  Can
 4   you repeat the question.
 5            MR. ROESSNER:  Yes, your Honor.
 6   Q.  One of the main problems that your business encountered was
 7   the investment with Mr. Nadel, correct?
 8   A.  Yes.  It was one of our investments, that's correct.
 9   Q.  And when did that occur?  When did that problem surface?
10   A.  I believe we found out about that in early 2009, if I'm
11   recalling correctly.
12   Q.  Now, if you can turn to Kapur Exhibit 9 or Defendant's
13   Exhibit 9, the one you went through during your testimony.
14   This was submitted to the Court in the SEC's case regarding the
15   disgorgement analysis, is that what you testified?
16   A.  Yes.
17   Q.  And it was submitted at approximately mid2011?
18   A.  That's correct.
19   Q.  Now, I've looked through the document.  Is there any
20   reference in this document to the Family and Children
21   Charitable Foundation?
22   A.  No.
23   Q.  And why not?
24   A.  Why would it be?
25   Q.  Okay.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                               152
     F5leschc              Kapur - redirect
 1            THE COURT:  The testimony is for you, not
 2   Mr. Roessner, to give.
 3            Is there a reason why the Family and Children
 4   Charitable Foundation is not referred to in the analysis in
 5   Exhibit 9?
 6            THE WITNESS:  It's not relevant to the analysis in
 7   Exhibit 9.
 8   Q.  Why is it not relevant?
 9   A.  Well, this was a benefit to investor analysis for the
10   investors of the TS multistrategy fund.
11   Q.  The clients in the TS multistrategy fund, were any of those
12   clients also managed account clients?
13   A.  I don't recall.
14            MR. ROESSNER:  I have no further questions, your
15   Honor.
16            THE COURT:  Mr. Solotaroff, do you have any redirect?
17            MR. SOLOTAROFF:  Yes, Judge.
18   REDIRECT EXAMINATION
19   BY MR. SOLOTAROFF:
20   Q.  Mr. Kapur, do you have the testimony binder, or is that
21   still on your desk?
22   A.  Yeah, it's still on the desk.
23   Q.  Could I bring it to you?
24   A.  Sure.  I can pick it up.  However you like.
25   Q.  Mr. Kapur, I'm not going to refer to it just yet.  I just
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```