153

F5leschc                          Kapur - redirect

1    wanted you to have it.
2                You testified this morning that by 2010 or so you only
3    had a couple of hundred thousand dollars left?
4    A.   That's just a guess.
5    Q.   What's that?
6    A.   That was my guesstimate.
7    Q.   Okay.  Now, prior to the financial crisis, you managed the
8    multistrategy fund, right?
9    A.   That's right.  Correct.
10   Q.   And there was a domestic multistrategy fund and an offshore
11   fund, right?
12   A.   That's correct.
13   Q.   And there was also a capital fund, correct?
14   A.   That's correct.
15   Q.   And was that both onshore and offshore as well?
16   A.   For a period, we had an offshore on both.  Offshores were
17   structured later.
18   Q.   And approximately how much in fees did ThinkStrategy
19   Capital Management derive from its management of the
20   multistrategy funds and the capital funds prior to the
21   financial crisis?
22               THE COURT:  By year or in total?
23               MR. SOLOTAROFF:  In total.
24   A.   You would have to look at the fund administration sheets,
25   Mr. Solotaroff.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

154

F5leschc                        Kapur - redirect
1   Q.  Have you made any effort to quantify exactly how much money
2   you made prior to 2008?
3   A.  No.
4   Q.  And have you made any effort -- and then the money that the
5   ThinkStrategy Capital Management fund made in fees, that would
6   have to cover expenses as well, right?
7   A.  I'm sorry.  Could you repeat the question?
8   Q.  The revenue that the capital management company would get
9   in fees, that would have to cover expenses as well, correct?
10  A.  That's correct.
11  Q.  And if there was money left over, that would be profit,
12  right?
13  A.  That's correct.
14  Q.  And have you calculated the amount of profit that you made
15  through ThinkStrategy Capital Management LLC prior to the
16  financial crisis?
17  A.  Prior to the financial crisis, no, I have not.
18  Q.  So you're not in a position to tell the Court how much
19  money you made prior to the financial crisis, are you?
20  A.  Well, it's available on my tax returns.  And I do remember
21  that we were expecting 2008, '9 and '10, our expectation was
22  for those years to be profitable for us.  Unfortunately, we
23  were hit with the financial crisis.
24  Q.  You have access to your tax returns, right?
25  A.  I do.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

F5leschc                         Kapur - redirect
1    Q.  Now, turning to these loan agreements that you introduced
2    to the Court, who drafted these documents?
3    A.  Can you reference a specific exhibit?
4    Q.  Sure.  Let's just start with Exhibit 3, the loan --
5                THE COURT:  Defense Exhibit 3?
6                MR. SOLOTAROFF:  Defense Exhibit 3.
7    Q.  The loan agreement between you and Naveen and Manju Kapur.
8    A.  Who drafted it?
9    Q.  Yes.
10   A.  I don't know.
11   Q.  Did you draft it?
12   A.  I did not.
13   Q.  So is it your testimony that your parents prepared this
14   document and provided it to you for your signature?
15   A.  That's correct.  Either they prepared it or had it
16   prepared, correct.
17   Q.  And your parents live in India, correct?
18   A.  That is correct.
19   Q.  And were they in India when they presented this document to
20   you?
21   A.  Were they in India when -- yeah, I believe they were in
22   India.  Correct.
23               THE COURT:  And were you in India at the time?
24               THE WITNESS:  No, your Honor.  I was in the United
25   States.

                      SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

156

F5leschc                     Kapur - redirect

```
 1              THE COURT:  When were you last in India?
 2              THE WITNESS:  I was in India in 2003.
 3              THE COURT:  You have not been in India since 2003,
 4   correct?
 5              THE WITNESS:  Yes, your Honor.
 6              THE COURT:  When did you last see your parents?
 7              THE WITNESS:  I last saw them in 2012, 2013.
 8              THE COURT:  Thank you.  But in any event, these loan
 9   agreements were prepared with your parents being in India and
10   you being in the United States?
11              THE WITNESS:  Yes, your Honor.
12              THE COURT:  And they were prepared by or at the
13   direction of your parents, not you?
14              THE WITNESS:  That's correct, your Honor.
15              THE COURT:  Go ahead.
16   BY MR. SOLOTAROFF:
17   Q.  Now let's turn to Exhibit 4, which is the Bina Rai
18   affidavit and loan agreement.  Do you see that?
19   A.  I do.  That's correct.
20   Q.  And if we refer to the installment agreement, do you see
21   that?
22   A.  The loan agreement?
23   Q.  It's called the installment loan agreement.
24   A.  That's correct, yes.
25   Q.  And who drafted this document?
```

157

```
F5leschc                         Kapur - redirect
1    A.  I don't know.
2    Q.  This is a loan agreement between you and Ms. Rai?
3    A.  That's correct.
4    Q.  And --
5              THE COURT:  But you did not draft it, correct?
6              THE WITNESS:  That's correct, your Honor, I did not
7    draft it.
8    Q.  And is it your testimony that this document was prepared at
9    the direction of Ms. Rai?
10   A.  When you say "direction," what do you mean?
11   Q.  That she asked someone to prepare this for her.
12   A.  That's correct.  I believe she -- she mentioned the same
13   when she was in court.
14   Q.  And Ms. Rai lives in Queens, right?
15   A.  That is correct, yes.
16   Q.  And now let's turn to Exhibit 5 and the loan agreement
17   between you and Kabir Kapur.  Do you see that?
18   A.  I do.
19   Q.  And that's also called an installment loan agreement.  Do
20   you see that?
21   A.  I do.
22   Q.  And did you prepare this document?
23   A.  I did not.
24   Q.  Was this document also prepared at the direction of Kabir
25   Kapur?
```

F5leschc                              Kapur - redirect

1  A.  That's correct.
2  Q.  And where does Kabir Kapur live?
3  A.  In India.
4  Q.  Now --
5            THE COURT:  When did you last see him?
6            THE WITNESS:  2013.
7            THE COURT:  When he was in the United States?
8            THE WITNESS:  Yes, your Honor.
9            THE COURT:  Thank you.
10           But this agreement, in any event, though, was prepared
11  in 2014 at or -- by or at the direction of Kabir Kapur, not by
12  you?
13           THE WITNESS:  That's correct, your Honor.
14  BY MR. SOLOTAROFF:
15  Q.  Now, could you turn to paragraph seven of the Kabir Kapur
16  loan agreement.
17  A.  Right.
18  Q.  And I'm just going to read a clause from the first sentence
19  of that paragraph.  It says, same shall not be construed as a
20  debt remission or waiver of these rights or its guarantees.
21           Do you see that?
22  A.  I do.
23  Q.  Is there anything grammatically incorrect about that
24  sentence, Mr. Kapur?
25  A.  Let me just read the whole clause so I understand.

159

F5leschc                         Kapur - redirect
1    Q.   Sure.
2    A.   Your question is, is there something grammatically
3    incorrect?
4    Q.   Grammatically incorrect.
5    A.   Grammatically incorrect?  I -- I don't see anything
6    grammatically incorrect in there.
7    Q.   What about, do you see where it say "it's," I-T apostrophe
8    S?
9    A.   There should not be an apostrophe, is that what you're
10   saying?
11   Q.   Well, I'm asking you.
12   A.   Yeah, I probably agree with you that there should not be an
13   apostrophe.
14   Q.   Okay.  Now let's go back to Exhibit 4.  And let's turn to
15   paragraph nine of the loan agreement that's attached to
16   Exhibit 4.  It's on the last page of the exhibit because of the
17   fact that the list is in the wrong place.
18            Do you see the last page?
19   A.   I do see the last page, yes.
20   Q.   And do you see paragraph nine, "it's" is used incorrectly
21   there as well, right?
22   A.   I see that, yes.
23            THE COURT:  Same in paragraph seven there, too.
24            MR. SOLOTAROFF:  Thank you, Judge.
25   Q.   And if you turn to paragraph three, which is the loan
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

160

F5leschc                          Kapur - redirect
1   agreement with your parents --
2             THE COURT:   Which document?
3             MR. SOLOTAROFF:   What's that?
4             THE COURT:   That's Exhibit 3?
5             MR. SOLOTAROFF:   Yes, Judge.
6   BY MR. SOLOTAROFF:
7   Q.  Do you see the sentence that begins, the debtor shall have
8   the prerogative?  Do you see that?
9   A.  The fourth paragraph?
10  Q.  Yes.
11  A.  I do see that.
12  Q.  And "it's" is used incorrectly there as well, right?
13  A.  That's correct.
14  Q.  So, Mr. Kapur, these documents were prepared for three
15  different individuals in -- according to your testimony, were
16  prepared for three different individuals in two different
17  countries, right?
18  A.  Correct.  That all know each other and that are family.
19  Q.  Right?
20  A.  Correct.
21  Q.  And they all have the same mistake, right?
22  A.  It appears that way, yes.
23  Q.  Now, you talked about the managed account platform, right?
24  A.  Correct.
25  Q.  And I think you used the word "we" when you talked about
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

F5leschc                          Kapur - redirect
1   the managed account platform, right?
2   A.  What do you mean?  In what context?
3   Q.  You said, the way we would do it was that we would, you
4   know.
5            Let me ask it this way:  Were there other people
6   involved in servicing ThinkStrategy's managed accounts?
7   A.  I was a portfolio manager, so I was the main point of
8   contact, but the research of the firm applied to all products.
9   Q.  What about in handling kind of the day-to-day
10  administration of the managed accounts?  Who did that?
11  A.  I was the point person for that.
12  Q.  Was there anyone else involved?
13  A.  Involved in what?
14  Q.  In the management of the managed accounts.
15  A.  Well, I was the portfolio manager, so it was my
16  responsibility.
17  Q.  Who --
18            THE COURT:  Was there anybody else involved, was the
19  question.
20            THE WITNESS:  Yes.  They were involved in the research
21  for investments in the managed accounts.
22  Q.  Who's John Correa?
23  A.  He used to be a director of business development at
24  ThinkStrategy Capital Management for a couple of years.
25  Q.  So was his -- so as director of business development, his
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

162

F5leschc                          Kapur - redirect

1    job was to try to find clients for the firm, correct?
2    A.  As part of his many responsibilities, yes.
3    Q.  And did he have any interaction with the managed account
4    clients?
5    A.  It's possible, yes.
6    Q.  And have you talked to Mr. -- when's the last time you
7    talked to Mr. Correa?
8    A.  He was let go in 2010, so maybe five years ago.
9    Q.  Have you made any effort to try to contact Mr. Correa?
10   A.  I have not.
11   Q.  But Mr. Correa, if what you're telling us is true, could
12   corroborate that there were these managed account clients,
13   right?
14   A.  He was familiar with the program, and he was -- you know,
15   he was familiar with the program, correct.
16   Q.  He might even remember some of the names of the clients,
17   right?
18   A.  He might.
19   Q.  But you've made no effort to get him here, have you?
20   A.  Well, he was let go from the firm five years ago.
21   Q.  Now, now, your testimony was the way the managed account
22   program would work was that ThinkStrategy would set up the
23   structure, and then the structure would be funded by the
24   client, is that right?
25   A.  That is correct.

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

163

F5leschc                          Kapur - redirect

1  Q.  Now, in talking about the transfer to Sarasin, you
2  testified this morning that there were at least three
3  possibilities that could explain that transfer, right?
4  A.  Which transfer are you talking about?
5  Q.  The $2.1 million transfer to CCO Limited at Sarasin, right?
6  A.  In 2007.
7  Q.  Right.
8  A.  That's correct.
9  Q.  And the three that you gave was that it had been an
10  investment that had been reversed, right?
11  A.  Correct.  Erroneous transfer into the management company
12  which had happened before, in fact, as well.
13  Q.  The other would be a payment to a service provider, right?
14  A.  That's correct.
15  Q.  Was there any -- I only wrote down two, but there were
16  three.  Do you remember what the third one was?
17  A.  Just reflecting on it, I thought it could possibly be a
18  rebate to an institutional investor.
19  Q.  But we know now that none of those possibilities are
20  actually the explanation, right?
21  A.  Those all seem like feasible possibilities to me.
22  Q.  Still?
23  A.  What do you mean, "still"?
24  Q.  Even as you sit here today, you think those are feasible
25  possibilities?

164

F5leschc                        Kapur - redirect

1  A.  Yes.
2  Q.  Even though you know that the money was transferred to a
3  company called CCO Limited, right?
4  A.  That's correct.  So what?
5  Q.  Well, the next year you're corresponding with someone at
6  Bank Sarasin about this CCO Limited and complaining -- let me
7  finish -- and complaining that your hard-earned money is being
8  misaccounted?
9  A.  As we already established, Mr. Solotaroff, that was in my
10  managed account.  Also, I noted that CCO might not be CCO
11  Limited.  It might just be a tag name for a totally separate
12  structure.  It might be CCO, LP, could be CCO Engineering,
13  could be CCO Trust or foundation.  And also, if it is the same
14  structure, it's very possible we were doing a managed account
15  for that client.
16  Q.  Okay.  So one of the possibilities, even you admit, is that
17  it was a managed account, right?
18  A.  That's what I mentioned.  I mentioned the fact that in
19  2008, that reference to managed account.
20  Q.  So that could have been a structure -- CCO Limited could
21  have been a structure that was set up for the benefit of a
22  client, right?
23  A.  It's possible.
24  Q.  But the client didn't fund CCO Limited, right?  You did?
25  A.  Firstly, Mr. Solotaroff, we even provided managed accounts
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

F5leschc                         Kapur - redirect
1    to service providers.  We provided managed accounts to clients.
2    And if it was an erroneous transfer being reversed, it could
3    have been a client that was possibly in the fund who wanted to
4    do a managed account and sent an erroneous transfer, instead of
5    to the new structure to our management company, instead of the
6    old structure.
7    Q.  Do you have any account statements that in any way evidence
8    or support that, any of those theories?
9    A.  I'd have -- I'll have to go through the files I have
10   available.
11   Q.  But what we do know is that the day before the $2.1 million
12   was sent to CCO Limited at Bank Sarasin, 1.6 million was sent
13   from the multistrategy fund to ThinkStrategy Capital
14   Management, right?
15   A.  I don't know if it was the day before, Mr. Solotaroff.
16   You'd have to provide me the exhibit.  Do you have it?
17   Q.  I have your testimony in which you admit it.  Do you want
18   to go over that?
19   A.  That the day before there was a transfer of 1.6 million?
20   Q.  Yes.
21   A.  Yeah, I'd like to see that testimony.
22   Q.  If you could look in the binder, the testimony binder.  And
23   if you could look at the testimony from 6/24/14.
24   A.  All right.
25   Q.  And turn to page 33.
                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

166

F5leschc                    Kapur - redirect

1   A.  All right.
2   Q.  And was this your testimony, line 5:
3   "Q  Do you see on the first page of that document on July 25th
4   there was a transfer of 1.6 million from TS multistrategy?  Do
5   you see that?
6   "A  I do, yes."
7           And then skipping a few lines.
8   "Q  Well, could it have been fees that ThinkStrategy Capital
9   Management was taking from the fund as either management or
10  incentive fees?
11  "A  That's a possibility.  I don't want to guess and give you
12  incorrect or inaccurate information, Mr. Solotaroff."
13          Then go down a little bit to line 22:
14  "Q  If you turn the page, do you see also on July 25th -- and
15  then, I'm sorry, July 26th, there's a transfer of 2.1 million
16  to a company called CCO Limited?  Do you see that?
17  "A  Yes."
18          So do you see that?
19  A.  I'll take your word for it, then, that you're --
20  Q.  Don't take my word for it.
21          THE COURT:  Mr. Kapur, that was your testimony under
22  oath, correct?
23          THE WITNESS:  That's correct, yes.
24          THE COURT:  Go ahead, Mr. Solotaroff.
25  Q.  Now, in the whole Exhibit 7, right, Exhibit 7 is the
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

167

F5leschc                              Kapur - redirect

```
 1   e-mails between you and Mossack Fonseca, right?
 2        THE COURT:  Is Exhibit 7 of the SEC binder?
 3        MR. SOLOTAROFF:  Yes.  Sorry, Judge.  SEC Exhibit 7.
 4   A.  Mr. Solotaroff, do you have any more questions on the
 5   1.6 million?
 6   Q.  No, I'm --
 7        THE COURT:  Mr. Kapur, let him ask the questions.
 8   You'll have an opportunity to give recross-examination.
 9        Go ahead, Mr. Solotaroff.
10   Q.  So in your testimony about Exhibit 7 this morning you made
11   the point that you would decline to give Mossack -- I'm sure
12   I'm not pronouncing it right -- MossFon -- you'd decline to
13   give MossFon your personal tax returns, right?
14   A.  That's correct.
15   Q.  And you made the point that that was because of the
16   structure that was being created was not for you, right?
17   A.  That's correct.
18   Q.  Is there any way, anyplace in all of those pages that you
19   brought to court today, the full Exhibit 7, in which you tell
20   MossFon or any person associated with MossFon that the
21   structure is not for you?
22   A.  We were in phase one of our managed account program.  We
23   were setting up the structure in our name and then transferring
24   it, as noted in the prehearing brief.  So accordingly, that
25   would explain why.
```

168

F5leschc                              Kapur - redirect

1  Q.  In fact, you told MossFon that the money represented your
2  savings, right?
3  A.  I don't know if I explicitly said that.
4  Q.  Could you turn to page --
5  A.  Do you have the exhibit?
6          THE COURT:  Mr. Solotaroff, he needs to have Exhibit 7
7  in front of him.
8          Do you have that in front of you?
9          THE WITNESS:  I just have the SEC's original, which is
10  the smallest version.  And then there was an amended --
11          MR. SOLOTAROFF:  Sorry, Judge.  I have another copy.
12          THE COURT:  You have to keep your voice up.  You can't
13  whisper.  The court reporter needs to take down what you're
14  saying.
15          THE WITNESS:  Yes, your Honor.  The fullest version of
16  Exhibit 7 was provided by myself today.  Subsets of this were
17  provided prior by Mr. Roessner and Mr. Solotaroff.
18          THE COURT:  Well, the copy that I was given, which is
19  marked as Exhibit 7, I assume you gave copies to the SEC and to
20  Mr. Solotaroff?
21          THE WITNESS:  No, your Honor.  I just had one copy.
22          THE COURT:  Mr. Solotaroff, do you have all the
23  constituent parts of full Exhibit 7, which I have?
24          MR. SOLOTAROFF:  I've reviewed it, but I don't have a
25  copy of it.  But it's okay, Judge.  I don't need it.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

169

F5leschc                      Kapur - redirect

1          THE COURT:  Well, the witness needs to have a copy in
2     front of him and so do I, so I can follow along.
3          MR. SOLOTAROFF:  I'm sorry.  I can't help.  He only
4     brought one copy.  I don't have the full copy.
5          THE COURT:  What document are you proposing to
6     question him off of?
7          MR. SOLOTAROFF:  It is page three of the 81-page
8     document.
9          THE COURT:  Of the document as it was presented by the
10    SEC in its binder or in the fuller version that Mr. Kapur
11    brought today?
12         MR. SOLOTAROFF:  Let me clarify, Judge.  In the fuller
13    version that Mr. Kapur brought today, it should be page five of
14    81, according to the legend on the top that the PACER system
15    generates.
16         THE COURT:  There's no PACER system on the document
17    that was given to me.  I have been given a document that
18    doesn't have any PACER notations.  It's marked Plaintiff's
19    Exhibit 7.  Mr. Kapur has indicated he brought only this.  I
20    have no idea what document you're referring to, because mine
21    has no PACER exhibits.
22         MR. SOLOTAROFF:  Sorry, Judge.  I thought it did.
23    Mine does.  It has page three on the bottom right-hand corner.
24         THE COURT:  Why don't you hand up to each of us a copy
25    of what you're looking at, because I'm lost.  This indicates

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

F51eschc                    Kapur - redirect
1   that we're looking at a document that was filed two months ago
2   on March the 25th.  Where is it in the binders that were given
3   to me in advance of this hearing?  I'm just trying to make this
4   easy so everyone can follow along.  And then so that we create
5   a clear record as to what happened here.
6           MR. SOLOTAROFF:  Yes, Judge.  What happened here is
7   that I assumed that the SEC would have included these pages in
8   its exhibit.  It didn't.
9           So yesterday, when I came to court, I brought these
10  pages and actually provided to your court and -- before
11  Mr. Kapur brought the very large Exhibit 7, these pages were
12  added to the exhibit that your Honor had as the original
13  Exhibit 7 in the binder.  Do you not see it, Judge?
14          THE COURT:  In my binder I have Exhibit 7.  And it
15  does -- it's much shorter than what Mr. Kapur handed up.  I
16  take it you're proposing to question him about materials that
17  were in the SEC binder?
18          MR. SOLOTAROFF:  Yes, Judge.
19          THE COURT:  Okay.  Then go ahead.  With reference to
20  the SEC binder.
21          Just so you know, Mr. Solotaroff, I don't have your
22  Exhibit 7.  I have the SEC's Exhibit 7.
23          THE WITNESS:  That's what he's asking about, the SEC's
24  Exhibit 7.  I don't have that -- oh, the --
25          MR. SOLOTAROFF:  Is there a page three?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300