F5keschc                    Mroski - cross

1   Q.  And you work in the Washington office?
2   A.  That's correct.
3   Q.  And where is the office in New York?
4   A.  It's at 3 World Financial Center.
5   Q.  I see.  Once I get a job and I'm able to make payment
6   towards these default judgments, do you know where I would send
7   a check to start to make payment towards these default
8   judgments?
9           MR. ROESSNER:  Your Honor, I'm going to object to that
10  question.  I'm not sure this witness is --
11          THE COURT:  Mr. Kapur, that's outside the scope of
12  this witness' testimony.  You're at liberty to ask this witness
13  questions that fairly relate to the questions that Mr. Roessner
14  asked him.  You're at liberty to ask him questions that might
15  tend to impeach his credibility, if you have such questions.
16  But this question is really outside the scope of all that.
17          MR. KAPUR:  No further questions.
18          THE COURT:  No further questions.  Thank you.
19          Any redirect?
20          MR. ROESSNER:  No, your Honor.
21          THE COURT:  Thank you, Mr. Mroski.  Your testimony is
22  complete.  You may step down.
23          MR. ROESSNER:  Can we excuse Mr. Mroski so he can
24  return to DC?
25          THE COURT:  Yes, you may.  Safe travels.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

34

F5keschc                         Mroski - cross

```
 1          (Witness excused)
 2          MR. ROESSNER:  Your Honor, we call Joseph Romano to
 3   the stand.
 4    JOSEPH ROMANO,
 4
 5          called as a witness by the Government,
 6          having been duly sworn, testified as follows:
 7   DIRECT EXAMINATION
 8   BY MR. ROESSNER:
 9   Q.  Mr. Romano, can you state your name for the record.
10   A.  Sure.  Joseph Romano, last name R-O-M-A-N-O.
11   Q.  Where do you work?
12   A.  Presti & Naegele.
13   Q.  What's your profession?
14   A.  I'm a CPA.
15   Q.  How long have you been a CPA?
16   A.  Eighteen years.
17   Q.  And are you licensed in New York?
18   A.  Yes, sir.
19   Q.  Do you know Chetan Kapur?
20   A.  Yes, sir.
21   Q.  How do you know Mr. Kapur?
22   A.  He has been a client for I believe about ten years.
23   Q.  You prepared his tax returns?
24   A.  Yes, sir.
25   Q.  Did you prepare --
```

```
                                                              35
     F5keschc                    Romano - direct
 1              THE COURT:  You prepared his tax returns was the
 2   question?
 3              MR. ROESSNER:  Yes.
 4              THE COURT:  Speak into the microphone, please.  Thank
 5   you.
 6              MR. ROESSNER:  Sorry, your Honor.
 7   BY MR. ROESSNER:
 8   Q.  Did you also prepare the returns for his entities?
 9   A.  No, sir.
10   Q.  Did you provide professional references for Mr. Kapur?
11   A.  Yes, sir.
12   Q.  I'll ask you about a specific reference to an entity called
13   the MossFon trust.  Are you familiar with that reference?
14   A.  I am at this point, yes, sir.
15   Q.  If you could turn to Exhibit 9.  Did your office provide
16   this document to the commission?
17   A.  I'm sorry.  So it's statement 9, the one that says United
18   States District Court, Southern District declaration of
19   Presti & Naegele?
20   Q.  The second page.
21   A.  Second page, yes.
22              THE COURT:  The first page of Exhibit 9 is a document
23   called declaration of Presti & Naegele, and it bears your
24   signature at the bottom, correct?
25              THE WITNESS:  Correct.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

36

F5keschc                         Romano - direct

1              THE COURT:  And behind it is a copy of an e-mail from
2    Mr. Kapur to you?
3              THE WITNESS:  Correct.
4              THE COURT:  Did you produce that e-mail to the SEC?
5              THE WITNESS:  Yes, sir.
6              THE COURT:  And you signed the cover document entitled
7    declaration of Presti & Naegele?
8              THE WITNESS:  Correct.
9              THE COURT:  Thank you.  Go ahead.
10   BY MR. ROESSNER:
11   Q.  And did you prepare a reference for Mr. Kapur for the
12   MossFon trust?
13   A.  Yes, sir.
14   Q.  And is that document attached as Exhibit 12?
15   A.  Yes, sir, that is.
16   Q.  Is that your signature?
17   A.  Yes, sir, that is.
18   Q.  In other instances -- what other references have you
19   provided for Mr. Kapur?
20   A.  None other that I know of.
21   Q.  Never provided a reference for an apartment for Mr. Kapur?
22   A.  I don't believe so.
23   Q.  Are you familiar with a person named Bina Rai?
24   A.  I'm sorry?
25   Q.  Are you familiar with a person Bina Rai?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

F5keschc                          Romano - direct

```
1    A.  Yes, sir.
2    Q.  Did you prepare Ms. Rai's tax returns?
3    A.  Yes, sir.
4    Q.  What years did you prepare her tax returns for?
5    A.  I believe 2000 -- it was on and off, whenever she had
6    income.  But I believe around 2006 to -- through 2012.
7    Q.  If you could turn to Exhibit 23, after the declaration page
8    in the front.
9    A.  Yes, sir.
10   Q.  Is that the return that you prepared for Ms. Rai in 2007?
11   A.  Yes, sir.
12   Q.  And her income for 2007 is $39,000?
13   A.  Yes, sir.
14   Q.  The adjusted gross income on 38 is $39,000?
15   A.  Yes, sir.
16   Q.  Did you prepare a 3520 for Ms. Bina Rai, form 3520?
17   A.  I don't believe so offhand.
18   Q.  What is form 3520?
19   A.  I don't know offhand.
20   Q.  Are you familiar with an FBAR?
21   A.  Yes.  No, we do not prepare an FBAR form for her.
22           THE COURT:  What is an FBAR form?
23           THE WITNESS:  Is that for me?
24           THE COURT:  I'm asking you.
25           THE WITNESS:  Yes.  FBAR form is a foreign form for
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

38

F5keschc                          Romano - direct
1    any individual that has more than $10,000 in nonUS bank
2    account.
3              THE COURT:  Thank you.  And it's filed with the IRS?
4              THE WITNESS:  Filed with the IRS, correct.
5    BY MR. ROESSNER:
6    Q.  And on this return is there any interest income disclosed?
7    A.  No, sir.
8    Q.  If we can go to the next return, 24, 2008.
9    A.  Yes, sir.
10   Q.  Did you also prepare this for Ms. Rai?
11   A.  Yes, sir.
12   Q.  Also $39,000?
13   A.  Yes, sir.
14   Q.  No interest income?
15   A.  No interest income, your Honor -- sorry.
16   Q.  Do you recall where the income was from?
17   A.  I believe it was from -- it was a W-2.  She was an employee
18   from a service.  I don't know if -- from cleaning or from
19   baby-sitting.  I don't remember that, but I do have the W-2, if
20   you should need it.
21   Q.  And she worked for ThinkStrategy?
22   A.  Not that I know of.
23   Q.  If you can turn to the next exhibit, 25, 2009, Ms. Rai's
24   income is $15,692.  Do you see that?
25   A.  Yes, sir.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

39

F5keschc                          Romano - direct

1   Q.  And no interest income that year?
2   A.  Correct.
3   Q.  And you prepared this return?
4   A.  Yes, sir.
5   Q.  Go to Exhibit 26.  This is Ms. Rai's 2010 return.  Do you
6   see that?
7   A.  Yes, sir.
8   Q.  Now, this year her income -- she has no wage income in line
9   7, and her adjusted gross income is negative $8,275.  Do you
10  see that?
11  A.  That is correct.
12  Q.  And you prepared this return?
13  A.  Yes, sir.
14  Q.  So she had no income in 2010?
15  A.  Correct.
16  Q.  If you could turn to Exhibit 27.  This is Ms. Rai's 2011
17  return?
18  A.  Correct.
19  Q.  Did you prepare this return?
20  A.  Yes, sir.
21  Q.  And again, she has no income, no wage income this year?
22  A.  Correct.
23  Q.  There's a little bit of business income in line 12?
24  A.  Correct.
25  Q.  But her adjusted gross income is negative $8,197?

40

```
      F5keschc                    Romano - direct
 1    A.  Yes, sir.
 2    Q.  So she had no income that year as well?
 3    A.  Correct.
 4    Q.  And the last return is Exhibit 28.  If you could turn to
 5    that.  Again, you prepared this return?
 6    A.  Yes, sir.
 7    Q.  And there's no wage income in 2012?
 8    A.  That is correct.
 9    Q.  I'm sorry, Mr. Romano?
10    A.  That is correct.  There's no other income besides the $411.
11    Q.  And the adjusted gross income is negative $8,208?
12    A.  Yes, sir.
13            MR. ROESSNER:  No further questions.
14            THE COURT:  Mr. Solotaroff, any cross-examination --
15    any additional examination from you?
16            MR. SOLOTAROFF:  Just a couple questions, Judge.
17            THE COURT:  Go ahead.
18    DIRECT EXAMINATION
19    BY MR. SOLOTAROFF:
20    Q.  Good afternoon, Mr. Romano.
21    A.  Good afternoon.
22    Q.  How did Ms. Rai become a client of yours?
23    A.  She was referred by Mr. Kapur.
24    Q.  And have you ever met Ms. Rai?
25    A.  Once.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

41

F5keschc                        Romano - direct

1   Q.  Was that in connection with one of the returns that you
2   provided for her?
3   A.  Yes, sir.
4   Q.  Have you ever talked to Mr. Kapur about Ms. Rai's financial
5   affairs?
6   A.  Not in depth.
7   Q.  Well, to what degree, then?
8   A.  To tax preparation.
9   Q.  What did you talk to Mr. Kapur about?
10  A.  Okay.  So as far as when I would get the information for
11  the years that were in question, receiving a W-2, was there any
12  other information, were there any -- was this any other income,
13  any other expenses, anything else to that?
14          THE COURT:  Sorry.  That information, the information
15  on which you formulated Ms. Rai's tax returns, that information
16  came from Mr. Kapur or from Ms. Rai?
17          THE WITNESS:  It was delivered to me -- I don't
18  know -- I don't recall whether it came from Mr. Kapur or
19  Ms. Rai.  I know that I did receive it pretty much at the same
20  time that I received Mr. Kapur's tax information.
21          THE COURT:  But you don't recall whether he was the
22  one or she was the one who communicated her information to you?
23          THE WITNESS:  Well, correct.  I was the one -- I would
24  communicate with Mr. Kapur whether or not there was any other
25  information.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

42

F5keschc                          Romano - direct

1              THE COURT:  So he was a go-between, if you will, in
2    terms of information between you and Ms. Rai?
3              THE WITNESS:  Correct.
4              THE COURT:  And were you paid for the preparation of
5    Ms. Rai's tax returns?
6              THE WITNESS:  Yes.
7              THE COURT:  Who paid you?
8              THE WITNESS:  That was submitted to the SEC, but from
9    what I recall, it was western -- money order.  And it was, I
10   believe, a check from Ms. Rai.  Ms. Rai.  I don't recall
11   offhand.
12             THE COURT:  Approximately how much each year did you
13   charge her for the preparation of her return?
14             THE WITNESS:  About $400.
15             THE COURT:  Thank you.
16   BY MR. SOLOTAROFF:
17   Q.   What's the last time you spoke to Mr. Kapur?
18   A.   Yesterday.
19   Q.   And what did you talk to him about?
20   A.   He called me.  He wanted to speak about testifying today.
21   Q.   And is he still a client of yours?
22   A.   I don't know.  I have not prepared a tax return for 2014.
23   I don't remember if I prepared a 2013 tax return.  But I hadn't
24   spoken to him prior to yesterday for quite a while, over a
25   year.

43

F5keschc                          Romano - direct

1   Q.  Have you ever talked to Mr. Kapur about the judgments that
2   are against him?
3   A.  Yes.
4   Q.  And tell us about those conversations.
5   A.  Mr. Kapur came to my office about a year ago to speak about
6   what had gone on and to give me a little bit of background and
7   to share with me what had happened to him.
8   Q.  And was he asking you to do anything in connection with
9   that?
10  A.  No.  At that point, nothing.
11              THE COURT:  What did he say had happened to him?
12              THE WITNESS:  As far as the judgments and what had
13  happened -- as far as that it was improper and how he felt that
14  he was being put on -- under duress and having to sign off on
15  things, and he felt that it was unjust as to how -- having him
16  pay this money.  And that his name was going to be cleared, and
17  if I checked the website, that his name would be cleared.  And
18  that basically it was just improperly handled, how he was
19  treated, or his judgment against him.
20  Q.  Have you ever talked about, to Mr. Kapur, about whether he
21  has assets overseas?
22  A.  No, sir.
23              MR. SOLOTAROFF:  I don't have anything further, Judge.
24              THE COURT:  Okay.  Mr. Kapur, any questions from you?
25              MR. KAPUR:  Yes, your Honor.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

44

F5keschc                    Romano - direct

```
 1              THE COURT:  By all means, go ahead.
 2      CROSS EXAMINATION
 3      BY MR. KAPUR:
 4      Q.  Mr. Romano, if you could turn to Exhibit 9.  On that
 5      exhibit you see a signature section where it has my name and my
 6      title and the company name?
 7      A.  Yes.
 8      Q.  Could you read out the company name out there?
 9      A.  Sure.  Managing director, investment committee member, AIM
10      Advisory Group, LLC.
11      Q.  Thank you.  And do you see the time at which the e-mail was
12      being sent to you on the date and time of the e-mail?
13      A.  Yes.  Thursday, August 19, 2010, 12:24 and 21 seconds AM.
14      Q.  Do I ask you anywhere in this e-mail to provide my personal
15      tax returns to Mossack Fonseca?
16      A.  No, sir.
17              THE COURT:  May I ask you, just before we leave
18      Exhibit 9, if you look at the e-mail, the last two sentences
19      read as follows -- and this is an e-mail from Mr. Kapur to you.
20      It says, their compliance department, per their standard
21      procedure, needs an accountant letter to confirm basically that
22      we file taxes.  If you could kindly fill out this letter on my
23      behalf, it would be much appreciated.
24              Do you see that?
25              THE WITNESS:  Yes, sir.
```

45

F5keschc                          Romano - cross

1          THE COURT:  Did you, in fact, fill out a letter to
2    that effect?
3          THE WITNESS:  I filled out the letter that was
4    requested of me or that was asked of me.  I think it's in one
5    of the following documents.  But that was the only thing that I
6    had filled out for Mr. Kapur.  There was nothing else that was
7    done.
8          THE COURT:  Okay.  Thank you.
9    BY MR. KAPUR:
10   Q.  Mr. Romano, if you could move to Exhibit 12.  That's the
11   reference letter.  I believe it's a general reference letter
12   that you provided for the law firm.
13          Could you read that letter out, please.
14   A.  Sure.  19th of August, 2010, Maufson Trust Corporation,
15   Maufson building.  Attention Mrs. Luris Madrid, compliance
16   manager.  Reference, Mr. Chetan Kapur.
17          Dear sirs, from my commercial and professional
18   involvement with Mr. Kapur, I have always found him to be
19   creditworthy and upstanding.  From my knowledge, Mr. Kapur has
20   conducted his affairs in a professional and competent manner,
21   with his management following good business practice.  I have
22   known Mr. Kapur for over five years, and in my capacity as his
23   authorized accountant do hereby confirm that Mr. Kapur has
24   complied with all his fiscal duties and obligations with the
25   IRS up to date.  This letter is issued at the request of the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

46

F5keschc                    Romano - cross
1    interested party for the purposes that he may see fit.
2    Sincerely, Joseph Romano, CPA.
3    Q.  Thank you.  Is that your signature, Mr. Romano?
4    A.  Yes, sir.
5    Q.  Would you provide me a reference letter today or similar
6    set of reference letter today, if I were to request that of
7    you?
8    A.  Today?  That's a tough question.  I mean, looking back on
9    it, would I have done something differently?  I mean, I don't
10   know, but today, Mr. Kapur, it's --
11   Q.  You'd have to run it by --
12             THE COURT:  Let's let the witness finish his answer.
13   A.  I would have to make sure that there would be no issue with
14   my legal team.
15             THE COURT:  May I ask you, you in this letter state
16   that you have known Mr. Kapur for over five years, and you
17   certify or confirm that he has complied with his IRS
18   obligations.  What was your source of information as to the
19   taxes due and owing in any given year that you helped Mr. Kapur
20   with?  What was your source of information?
21             THE WITNESS:  Mr. Kapur would provide me with source
22   documents, would provide me with Excel spreadsheets that he had
23   put together regarding his income and expenses with any other
24   expenses that he had; bank statements, which we did not go
25   through; and expenses, which receipts that we did not go
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

F5keschc                          Romano - cross
1   through as well.  Those were the documents that we would
2   prepare his tax returns from.
3              THE COURT:  Did you have any source of information in
4   preparing Mr. Kapur's tax returns beyond information he himself
5   provided you?
6              THE WITNESS:  No, sir.
7              THE COURT:  And supposing, hypothetically, that he had
8   provided you with only a subset of the information relevant to
9   him.  Would there have been any way for you to find that out?
10             THE WITNESS:  Yes, your Honor.  The IRS
11  subsequently -- it happens on all taxpayers something is left
12  out -- a notice would be sent to the taxpayer notifying them
13  that something has been missed on a return and doesn't make
14  sense or asking for a reply from the taxpayer.
15             THE COURT:  In other words, if there was a 1099 from a
16  brokerage firm that had been issued to him but he hadn't
17  disclosed to you, eventually that would catch up with him?
18             THE WITNESS:  It would catch up with him.  I wouldn't
19  see that.  Mr. Kapur, the taxpayer, would originally receive a
20  notice, and then would have to come to me for it.  But I would
21  not see that firsthand.
22             THE COURT:  Would the same be true with respect to a
23  foreign or Swiss bank account?  Is there a reason, if that had
24  been an asset of his, if he had income from there, let's say,
25  is there any reason why that would be drawn to the attention of

48

F5keschc                    Romano - cross

1   the US tax authorities so as to eventually make its way to you?
2           THE WITNESS:  Not as of yet.
3           THE COURT:  Thank you.  Go ahead.
4   BY MR. KAPUR:
5   Q.  Mr. Romano, you had mentioned that my office or my office
6   manager or I provided you all the backup as it relates to tax
7   preparations, bank statements, credit card statements, budgets,
8   invoices, all billing and all backup was provided to you every
9   single year.  Is that correct?
10  A.  For the most part, I believe in the earlier years, yes, it
11  was.
12          THE COURT:  Why do you say "for the most part"?  What
13  are you excepting?
14          THE WITNESS:  Your Honor, for -- I would say through
15  2010 we continued to receive them.  We did not look through
16  them.  We did not update them.  We didn't do anything with
17  those documents.  There was one year, and I don't know the
18  exact year -- I believe it may have been 2010 or '11 -- where
19  we at that point did an updating for one year and put
20  everything together.  And then subsequent to that, if there
21  were any returns, I think there was one year or two, the later
22  years, where we did not -- where it was just a piece of paper.
23          THE COURT:  Where what --
24          THE WITNESS:  There weren't -- it was just
25  income/expenses.  There was not any backup documentation.

               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

F5keschc                         Romano - cross

1          THE COURT:  So if I have it right, in some earlier
2     years you got material like credit card statements but did not
3     look through them?
4          THE WITNESS:  Correct.
5          THE COURT:  And later years, or at least one later
6     year, you got a summary sheet or sheets but not the backup?
7          THE WITNESS:  Correct.  We would receive the summary
8     sheets alone every year, your Honor.
9          THE COURT:  But the backup you received earlier, but
10    perhaps not at the very end?
11         THE WITNESS:  Correct.
12         THE COURT:  And what was the reason for not looking
13    through the primary source material -- the credit card
14    statements, for example -- in the earlier years?
15         THE WITNESS:  We're not paid to do an audit of tax
16    returns to -- our role as tax preparers, as accountants, is to
17    prepare Mr. Kapur's tax return.  So, therefore, we never
18    certified, compiled, gave an opinion on Mr. Kapur's numbers.
19    That was not our role.  That was not what we were paid for.  So
20    the documentation that was there, we never billed Mr. Kapur
21    for, we never did anything with.  It was substantiation that he
22    provided, but nothing that we ever looked through.  We were not
23    asked to look through it.
24         THE COURT:  In other words, you are not a fraud
25    investigator.  You're not a tax compliance investigator.  You

50

F5keschc                          Romano - cross
1   do the best you can with the information the client gives you?
2           THE WITNESS:  Correct.  And some clients will ask for
3   that to be compiled or us to redo that.  In this circumstance
4   we were never asked to recheck the numbers or look through the
5   numbers.  There was none of that.  And we were never -- we
6   never billed Mr. Kapur for any of that time.
7           THE COURT:  And when Mr. Kapur came to you seeking
8   what amounts to the reference letter for a MossFon, would it be
9   your business practice to ask him what MossFon is or what
10  your -- what relationship he intended to have or did have with
11  MossFon?
12          THE WITNESS:  The prior -- the prior number nine, his
13  request from the e-mail was sufficient.  And then, when he
14  asked for number 12, because this is a letter that he had put
15  together, we did not come up with this -- that was enough for
16  me.  I mean, I was not putting myself out in any way or saying
17  anything that was illegitimate to my understanding in my
18  relationship with Mr. Kapur.
19          THE COURT:  And going back again to number 9, did he
20  ever say anything to you that indicated that MossFon was not --
21  or that the trust was not affiliated with his family?
22          THE WITNESS:  No.
23          THE COURT:  Thank you.
24          Go ahead, Mr. Kapur.
25          MR. KAPUR:  Thank you, your Honor.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300