51

F5keschc                        Romano - cross
BY MR. KAPUR:
Q.   Mr. Romano, you remember that I did provide all backup for
taxes, me or the office manager, or in definition, it was --
all the backup was provided to you, except in the later years,
where possibly we only had expenses and no revenue; just saying
in one of the later years, it was possible, although I remember
I did --
            THE COURT:  Sir, Mr. --
            MR. KAPUR:  Sorry, sir.
            THE COURT:  Mr. Kapur, you need to not describe what
you remember.  You need to ask questions to the witness.  So
I'm happy to have you take it nice and slow.  Just ask
item-by-item questions to the witness.
            Thank you.  Go ahead.
            MR. KAPUR:  Yes, your Honor.
BY MR. KAPUR:
Q.   So, Mr. Romano, you remember in one of the later years,
where the form probably just had expenses, you don't remember
as much backup?
A.   I don't recall the exact years, Mr. Kapur, as far as what
years were provided or not.  I do recall that in the earlier
years all of the backup was provided.  I have copies of all
that.  In the later years I just -- I don't know the exact
years.  I would tend to say one or two years, there was no
backup provided.  Correct.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

F5keschc                          Romano - cross

1   Q.  Understood.  Mr. Romano, if I asked you for this reference
2   letter, which was back in August of 2010, and I detailed in
3   this letter that was sent very late at night, it was -- go back
4   to Exhibit 9 -- it was sometimes we used to work until
5   2:00 a.m.  It was sent at 12:24 a.m., quite late at night.  And
6   if I didn't generalize in this e-mail and I was specific in
7   this e-mail and said, you know, this was for my brother's
8   private lending relationship, or I need a reference letter for
9   a client that knows my brother, would that have changed your
10  mind in terms of providing me this letter?
11  A.  I was providing a letter to you as a character witness for
12  you.
13  Q.  Correct.
14  A.  So I did not have any issue -- if it was for your brother,
15  I would have had to have asked more --
16  Q.  No.  You have a misunderstanding.
17          THE COURT:  Mr. Kapur, please let the witness finish.
18  You can always follow up, but our court reporter works very
19  hard and cannot type what two people are saying at the same
20  time.  You need to let the witness finish.
21          Please finish.
22  A.  Since it was for you for number 12, I did not have a
23  problem with that in putting that down.  If it was something
24  for your brother, I did not know your brother.  I never met
25  your brother at that point.  I could not have given your

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

53

F5keschc                          Romano - cross

1    brother any sort of a letter.
2    Q.  Understood.  But as long as it was for me and -- but the
3    purpose of the letter was to set up a structure for a third
4    party, you had no issue, you would have no issue of providing
5    me the letter back then?
6    A.  I didn't have a problem.
7              MR. ROESSNER:  I'm sorry.  I'm not sure I understand
8    that question.
9              THE COURT:  I think I understand it well enough.
10             Witness, do you understand the question?
11             THE WITNESS:  Did I have a problem in issuing this?
12   If I would have had an issue, I would not have signed it or
13   sent it.  I sent it.  I had no issue.  There was no personal
14   liability or professional liability in me signing this.
15   Q.  Thank you, Mr. Romano.
16             Just a general question Mr. Romano.  In the rush of
17   the day or -- I know you're a busy individual.  At the end of a
18   long day, have you ever sent a general e-mail with an
19   inadvertent inaccuracy ever in your life?
20             MR. ROESSNER:  Objection, again, to that question.
21   I'm not sure how that is germane --
22             THE COURT:  Have you ever sent an inaccurate e-mail at
23   the end of a long day?
24             THE WITNESS:  Sent it during the middle of the day.
25   Of course.  Absolutely.  Yes.

54

F5keschc                    Romano - cross
1   Q.  Thank you.  And I think I asked you this question already,
2   Mr. Romano --
3           THE COURT:  Speak a little more slowly and distinct
4   and loudly, so that everyone can make out what you're saying,
5   please.
6           MR. KAPUR:  Yes, your Honor.
7   Q.  I think we covered this, Mr. Romano, but I'm just going to
8   ask you just in case I did not cover it.  Did I ask you
9   anywhere in the e-mail to provide my personal tax returns to
10  this law firm?
11  A.  No, sir.
12          THE COURT:  What law firm?
13          MR. KAPUR:  The law firm of Mossack Fonseca.
14          THE COURT:  What document are you referring to,
15  Mr. Kapur?
16          MR. KAPUR:  I'm referring to the e-mail.  I think it
17  was Exhibit 9.  It's Exhibit 9, an e-mail on Thursday,
18  August 19th, or even outside the scope of this e-mail, if
19  Mr. Romano remembers, if I ever asked him for my personal tax
20  returns to ever be provided to the law firm that was conducting
21  KYC.
22  A.  No, sir.
23  Q.  Just moving to Ms. Rai's tax returns.  Can you tell me,
24  Mr. Romano, where on the tax returns -- let's just move to
25  Exhibit 23.

55

F5keschc                    Romano - cross

1          Exhibit 23 I see Ms. Rai's income to be 27,000 for the
2    year 2007?
3    A.  Yes, sir.
4    Q.  And where in the tax returns would her savings over the
5    past 40 years of her work go?
6    A.  I do not know.
7    Q.  So her savings would not be mentioned on this tax return?
8    A.  Only the interest income from the savings account would go
9    on a tax return.
10   Q.  But the amount of money she had in a savings account over
11   the years would not be on this tax return?
12   A.  No, sir.
13   Q.  And I noticed in 2010, Ms. Rai's income was negative?
14          THE COURT:  Are you talking about Exhibit 26?
15          MR. KAPUR:  Exhibit --
16          THE COURT:  Is that what you want the witness to look
17   at?
18          MR. KAPUR:  Exhibit 26, or Exhibit 27 -- sorry.
19   Exhibit 27.
20          THE COURT:  Which one do you want him to look at?
21          MR. KAPUR:  27.
22          THE COURT:  Go ahead.  Please look at Exhibit 27.
23   BY MR. KAPUR:
24   Q.  Exhibit 27, Ms. Rai's income is $422 from business income?
25   A.  Yes, sir.

56

F5keschc                              Romano - cross
1   Q.  Is that a net amount for a business?  Is that a business
2   net?
3   A.  Yes, sir.
4   Q.  Net income amount?
5   A.  Yes, sir.
6   Q.  And the 8,619 is a carryover of her business from the prior
7   year?
8   A.  Yes, sir, from Exhibit 26.
9            MR. KAPUR:  No further questions.  Thank you,
10  Mr. Romano.
11           THE COURT:  No further questions, you said?
12           MR. KAPUR:  No.
13           THE COURT:  Okay.  Mr. Roessner, do you have any
14  further, any redirect?
15           MR. ROESSNER:  No, no redirect.
16           THE COURT:  Mr. Solotaroff?
17           MR. SOLOTAROFF:  Couple questions.
18  REDIRECT EXAMINATION
19  BY MR. SOLOTAROFF:
20  Q.  Mr. Romano, with respect to Exhibits 9 and 12, the e-mail
21  and then the letter, Mr. Kapur didn't tell you that he was
22  seeking a reference to assist a third-party client in creating
23  a relationship with MossFon trust, did he?
24  A.  No, sir.
25  Q.  And if he had told you that he was -- had he told you that

57
F5keschc                    Romano - redirect
1  he wanted to use your letter to set up an account that would
2  have belonged to a third party at MossFon, would you have
3  agreed to have submitted a letter?
4  A.  I would have had -- I would had to have checked with
5  counsel prior.
6  Q.  I know you're not a fraud examiner, but you are familiar
7  with anti -- in a general way with antimoney laundering laws?
8  A.  Yes, sir.
9  Q.  And are you familiar with the idea of "know your customer"?
10 A.  Yes, sir.
11 Q.  And would you have willingly assisted anyone in evading
12 antimoney laundering or "know your customer" restrictions?
13 A.  Absolutely not.
14          MR. SOLOTAROFF:  Nothing further, Judge.
15          THE COURT:  Okay.  Let me ask you this:  Did you
16 notify Mr. Kapur when you were preparing his tax returns of the
17 need for him to disclose to you any gifts he had made?
18          THE WITNESS:  Gifts?
19          THE COURT:  Gifts that might have triggered a gift tax
20 return?
21          THE WITNESS:  Yes.
22          THE COURT:  In other words, was he on notice that he
23 had to inform you of any gifts in excess -- in a given year in
24 excess of the annual gift exclusion?
25          THE WITNESS:  Yes.  That's part of our checklist we go
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

58

F5keschc                          Romano - redirect

 1   through with clients.
 2              THE COURT:  You gave him the checklist that solicited
 3   that information?
 4              THE WITNESS:  We go through that verbally with clients
 5   or in an e-mail.  In this case back then it probably would have
 6   been a phone call.
 7              THE COURT:  You have no doubt, though, that somehow
 8   you communicated that to Mr. Kapur?
 9              THE WITNESS:  No doubt.  In every single year, I don't
10   know 100 percent, your Honor.  I mean, that would have been
11   conveyed in the earlier years.  In the later years, I don't
12   know that that was 100 percent conveyed.
13              THE COURT:  Did Mr. Kapur to your memory ever notify
14   you of any gift he had made to Ms. Rai?
15              THE WITNESS:  Absolutely no.
16              THE COURT:  What about to anyone else?
17              THE WITNESS:  Absolutely not.
18              THE COURT:  Thank you.
19              Any further questions from anyone?
20              MR. ROESSNER:  No, your Honor.
21              MR. SOLOTAROFF:  No, your Honor.
22              MR. KAPUR:  No, your Honor.
23              THE COURT:  Okay.  Thank you, Mr. Romano.  Your
24   testimony is complete.  You may step down.
25              (Witness excused)
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

59

F5keschc                              Romano - redirect

1              THE COURT:  Mr. Roessner, am I correct that your next
2    witness is Mr. Kapur?
3              MR. ROESSNER:  As an adverse witness, yes, your Honor.
4              THE COURT:  Why don't we take a ten-minute
5    mid-afternoon recess, and we'll resume then.
6              MR. ROESSNER:  Thank you, your Honor.
7              (Recess)
8              THE COURT:  We'll resume the hearing now.
9    Mr. Roessner, please call your next witness.
10             MR. ROESSNER:  The commission would like to call
11   Mr. Kapur as an adverse witness.
12             THE COURT:  Yes.  Mr. Kapur, please take the stand.
13    CHETAN KAPUR,
13
14        called as a witness by the Government,
15        having been duly sworn, testified as follows:
16             THE COURT:  Okay.  Welcome to the witness stand,
17   Mr. Kapur.  I'll ask you, please, just to keep your voice up
18   and speak slowly.  And please respond distinctly to the
19   question that has been put to you.  After Mr. Roessner, and if
20   he wishes, Mr. Solotaroff put questions to you, afterwards
21   you'll have an opportunity, in effect, to cross-examine
22   yourself, to address any topics that you believe haven't been
23   fully covered during the direct examination.  Okay?
24             But I'll remind you that you're under oath.  And like
25   all witnesses under oath, your testimony is subject to
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

60

F5keschc                        Romano - redirect
1  penalties for perjury.  So please be sure that what you're
2  testifying to is truthful.  Do you understand?
3          THE WITNESS:  I understand, your Honor.   Thank you.
4          THE COURT:  Counsel, you may inquire.
5  DIRECT EXAMINATION
6  BY MR. ROESSNER:
7  Q.  Good afternoon, Mr. Kapur.
8  A.  Good afternoon, Mr. Roessner.
9  Q.  Now, your family pays your monthly expenses, correct?
10  A.  That's correct.
11  Q.  They pay the vendors directly, right?
12  A.  That's correct, Mr. Roessner.
13  Q.  And in Exhibit 5 that you submitted today, it's an
14  affidavit from your brother, Kabir Kapur?
15  A.  Excuse me.  I'm sorry.  I'm going to get my binder.
16          THE COURT:  One moment.  I'm going to ask each of you,
17  but particularly you, Mr. Kapur, to keep your voice up.  Do not
18  mumble.  Wait for Mr. Roessner to finish.  It's hard for me to
19  follow what you're saying.
20          Let's begin the question again, Mr. Roessner.
21          MR. ROESSNER:  Your Honor, can I approach the witness
22  and provide him with his exhibits.
23          THE COURT:  Yes.
24          MR. ROESSNER:  Because I'm going to ask some
25  questions.
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

61
```
         F5keschc                    Kapur - direct
1    Q.  If you could turn to Exhibit 5.
2               THE COURT:  This is Exhibit 5 from Mr. -- this is
3    Defense Exhibit 5, Kapur Exhibit 5?
4               MR. ROESSNER:  Yes, your Honor.
5               THE COURT:  So please turn to Kapur Exhibit 5.
6               THE WITNESS:  Exhibit 5?
7    BY MR. ROESSNER:
8    Q.  Yes, Mr. Kapur.
9         And your brother loaned you $47,080 for the last six
10   months of 2014?
11   A.  Yes.  During the last six months of 2014, Kabir Kapur lent
12   me 46-- 7,080 dollars.
13   Q.  They were for your monthly expenses?
14   A.  Correct.  Those were for my monthly expenses, correct.
15   Q.  It's approximately $8,000 a month, are your monthly
16   expenses?
17   A.  I don't know if it divides into that, but that was the
18   amount that he provided over that period for living expenses.
19   Q.  Now, your family has not offered to pay the judgment
20   entered against you in this matter, correct?
21   A.  No.  They themselves are having extreme difficulty in terms
22   of paying my personal expenses.  And so they stopped paying my
23   legal expenses towards the end of 2013 and thereafter.  They
24   just simply have been refusing to pay any legal expenses
25   because they're financially unable to support both my legal and
```
                      SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

62

F5keschc                    Kapur - direct

1   personal expenses.  I believe that was detailed in Exhibit 3,
2   in the affidavit of Manju Kapur, where she specified, you know,
3   why they had been refusing me moneys for legal expenses.
4   Q.  And your family has the view that the judgment entered
5   against you is unfair?
6   A.  I don't believe they have a view either way.  They just --
7   they just know as a matter of fact that it's a default
8   judgment.
9   Q.  Now, Mr. Kapur, do you recall an engagement ring that you
10  purchased from Bianca jewelers?
11  A.  Yes.  Many, many years ago, there was a purchase of an
12  engagement ring.  Correct.
13  Q.  Mr. Kapur, approximately $92,000?
14  A.  Approximately.  I believe it was somewhere at that range,
15  correct.
16  Q.  And you --
17          THE COURT:  Please keep your voice up.  Thank you.
18          THE WITNESS:  Sorry, your Honor.
19  Q.  And you received this ring back, correct?
20  A.  It was provided to my mother.
21  Q.  And did you ever receive money --
22          THE COURT:  Sorry.  It was provided by whom to your
23  mother?
24          THE WITNESS:  If I recollect correctly, your Honor, it
25  was provided by the girl I was going to get engaged to back to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

63

F5keschc                          Kapur - direct

1    my mother.
2              THE COURT:  Sorry.  Let's walk through the facts here.
3    What's the name of the woman you were engaged to?
4              THE WITNESS:  Georgianna.
5              THE COURT:  When were you engaged to Georgianna?
6              THE WITNESS:  It was back in end of 2008.
7              THE COURT:  And when did you and she call off your
8    engagement?
9              THE WITNESS:  I believe it was at some point in 2009.
10             THE COURT:  What were the circumstances?
11             THE WITNESS:  We just mutually agreed that it wasn't a
12   good fit, and we decided not to get engaged.
13             THE COURT:  What happened to the engagement ring when
14   you called off the engagement?
15             THE WITNESS:  If I'm recollecting correctly, your
16   Honor, she provided it back to my mother.
17             THE COURT:  Had your mother given her the engagement
18   ring?
19             THE WITNESS:  Had my mother -- no, your Honor.
20             THE COURT:  You were the one who was engaged to
21   Georgianna?
22             THE WITNESS:  That's correct, your Honor.  Yes.
23             THE COURT:  Who paid for the engagement ring?
24             THE WITNESS:  I did, your Honor.
25             THE COURT:  Thank you.  Go ahead, counsel.

64

F5keschc                        Kapur - direct

1  BY MR. ROESSNER:
2  Q.  Did your mother give you any money for having the ring
3  turned over to her?
4  A.  I'm sorry.  Could you repeat the question.
5  Q.  Did your mother provide you with any of the proceeds from
6  the ring?  What did your mother do with the ring?
7  A.  Right.  She told me she sold the ring.
8  Q.  And did she give you the proceeds from the ring?
9  A.  No, she did not.
10 Q.  Have you asked her for the proceeds of the ring?
11 A.  I have not asked her for the proceeds of the ring, no.
12        THE COURT:  Why, if I may, why did Georgianna give the
13 ring to your mother?  Did you tell her to give the ring to your
14 mother?
15        THE WITNESS:  No, your Honor.  It's just in --
16 relations weren't good at that time.
17        THE COURT:  Between who and who?
18        THE WITNESS:  Between me and Georgianna.  That's why,
19 you know, we called off the engagement, because relations
20 weren't good.  And she wanted to -- she felt it was the right
21 thing to do, is give back the ring.
22        THE COURT:  When you say give back the ring -- sir,
23 I'm speaking.  The ring came from you, not your mother,
24 correct?  The person who gave the ring to Georgianna was you,
25 correct?

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

65

F5keschc                          Kapur - direct

1              THE WITNESS:  Correct.
2              THE COURT:  And you're saying Georgianna on her own,
3     without consulting with you, decided to give the ring to your
4     mother?  Is that your testimony?
5              THE WITNESS:  Yes.  Yes, your Honor, that's how I
6     recollect it.
7              THE COURT:  What's Georgianna's last name?
8              THE WITNESS:  Ene, E-N-E.
9              THE COURT:  Where does she live?
10             THE WITNESS:  Currently, I don't know, your Honor.
11             THE COURT:  What city did she live in when you were
12    engaged?
13             THE WITNESS:  She lived in New York.
14             THE COURT:  And your testimony is that it was her
15    suggestion, it was her idea, not yours, that she give the ring
16    to your mother?  I think that was your testimony, correct?
17             THE WITNESS:  Correct, your Honor.
18             THE COURT:  And you, not your mother, had paid for the
19    ring, correct?
20             THE WITNESS:  That's correct, your Honor.
21             THE COURT:  And after that point did you ever ask your
22    mother for the proceeds of the ring, which had been purchased
23    for $92,000?
24             THE WITNESS:  No, your Honor.
25             THE COURT:  Go ahead, counsel.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

66

```
F5keschc                       Kapur - direct
 1              And do you know what became of the proceeds when your
 2   mother sold the ring?
 3              THE WITNESS:  No, your Honor.
 4              THE COURT:  Thank you.
 5   BY MR. ROESSNER:
 6   Q.  Mr. Kapur, I want to turn to a matter briefly.  During the
 7   litigation of this case the SEC attempted to depose you, and
 8   there was a letter submitted to the Court, a doctor's note,
 9   indicating that you were ill and couldn't attend.  Do you
10   recall that?
11   A.  I do, Mr. Roessner, yes.
12   Q.  And the note was -- the doctor's note was false?
13   A.  Correct.
14   Q.  And the person who procured that note from an Indian doctor
15   was Kabir Kapur?
16   A.  I believe so, yes.
17              THE COURT:  Mr. Roessner, could you just put a date on
18   that?
19              MR. ROESSNER:  I'm sorry, your Honor.  Yes.  The
20   letter was sent to the Court on April 16, 2012.  And the
21   doctor's name is Dr. Raj, R-A-J.
22              THE COURT:  Do you have an exhibit?
23              MR. ROESSNER:  I have it here.  I can submit it to the
24   Court for identification.
25              THE COURT:  Please do.
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

67

F5keschc                        Kapur - direct
1             MR. ROESSNER:  If I might approach.
2             THE COURT:  Mr. Roessner, would you kindly attempt to
3    authenticate the document.
4    BY MR. ROESSNER:
5    Q.  Mr. Kapur, the letter that you've just been handed is
6    signed by your attorney, Mr. Drohan?
7             THE COURT:  Ms. Drohan.
8             MR. ROESSNER:  Ms. Drohan.  I'm sorry, your Honor.
9    A.  It has an electronic signature mentioning her name, yes.
10   Q.  And Ms. Drohan was your attorney at that time?
11   A.  I believe so, yes.
12   Q.  And the second page of this document is a note.  Can you
13   state who the note is from?
14   A.  It seems to be from a Dr. Raj.  Dr. Abisha Raj.
15   Q.  Mr. Kapur, if it's possible, can you move the mic a little.
16   I'm having a little difficulty hearing back here.  I'm sorry.
17            THE COURT:  Let's just back up on this.  I'm confused,
18   Mr. Roessner, about a few things.
19            To begin with, I think we need to mark this as an
20   exhibit before we go any further.  What exhibit number?  Is
21   this a successive exhibit number in the SEC series?
22            MR. ROESSNER:  It would be Exhibit 31 for the
23   commission.
24            THE COURT:  I'm going to mark this as SEC Exhibit 31.
25            Now, you prefaced this by saying that Mr. Kapur had
                     SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

68

F5keschc                          Kapur - direct
1    failed to show up for an SEC deposition by claiming to be ill,
2    but the correspondence you've put in front of me in Exhibit 31
3    is correspondence that I recognize from the separate civil
4    litigation.  And this letter, as I recall, was submitted to
5    explain why Mr. Kapur would be unable to attend the civil trial
6    in the Schwarz case.  I'm a little puzzled as to the
7    relationship between your question and the document.
8              MR. ROESSNER:  I'm sorry, your Honor.  I might be
9    confused.  My understanding was that this was submitted in the
10   commission's matter, and I might be wrong.
11             THE COURT:  Look at the exhibit that you handed me.
12             MR. ROESSNER:  Your Honor, I had misspoken.  This is
13   related to Mr. Schwarz's letter, not the commission's case.
14   But the fact of the matter remains, the doctor's note was
15   procured by Mr. Kabir.
16             THE COURT:  Let's establish that as to how the
17   doctor's note came to be.
18             MR. ROESSNER:  I'm sorry, your Honor.
19             THE COURT:  No worries.  Go ahead.
20   BY MR. ROESSNER:
21   Q.  Mr. Kapur, if you can look to the second page.  This note,
22   who procured this note?
23   A.  I believe it was -- I had requested my brother to get a
24   doctor's note.
25   Q.  And which brother?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300