69

F5keschc                    Kapur - direct

1  A.  I believe it was Kabir.
2  Q.  And this is the note that he provided, that he produced?
3  A.  Correct, from Dr. Abisha Raj.
4            THE COURT:  You asked your doctor to get a doctor's
5  note in India purporting to represent that you had been
6  diagnosed with the septic illness?
7            THE WITNESS:  Correct, yeah.
8            THE COURT:  In other words, it says that -- the note
9  reads, this is to certify that Mr. Chetan Kapur, who has been
10 under my treatment since 11 April, 2012, has been diagnosed
11 with a condition suggestive of septic illness, a salmonella
12 infection.
13           Do you see that?
14           THE WITNESS:  I do, your Honor.
15           THE COURT:  And that is the doctor's note that was
16 submitted to me by your lawyer, Ms. Drohan, correct?
17           THE WITNESS:  Correct, your Honor.
18           THE COURT:  Had you, in fact, been under the care of
19 Dr. Raj?
20           THE WITNESS:  No, your Honor.
21           THE COURT:  It was a false statement that you had
22 Ms. Drohan make to me, correct?
23           THE WITNESS:  Correct, your Honor.
24           THE COURT:  Did you lie to Ms. Drohan?
25           THE WITNESS:  About the doctor's note?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

```
                                                                    70
     F5keschc                    Kapur - direct
 1              THE COURT:  Yes.
 2              THE WITNESS:  Yes --
 3              THE COURT:  Did you tell Ms. Drohan that you were not,
 4   in fact, under the care of Dr. Raj?
 5              THE WITNESS:  Yes.  In response to what she had
 6   originally told me, I responded back, and as part of that
 7   response, I provided this doctor's note.
 8              THE COURT:  Okay.  You knew -- you received this
 9   doctor's note from your brother?
10              THE WITNESS:  Correct, your Honor.
11              THE COURT:  And you knew, did you not, that the
12   substance of the doctor's note in which this Dr. Raj says that
13   you are under his treatment for septic illness, you knew that
14   that was false, correct?
15              THE WITNESS:  Yes, your Honor.
16              THE COURT:  And you gave the note to Ms. Drohan,
17   correct?
18              THE WITNESS:  Yes, your Honor.
19              THE COURT:  And you, in giving it to Ms. Drohan, did
20   not tell her that the note was false, correct?
21              THE WITNESS:  I -- I didn't tell her.  I didn't -- I
22   didn't tell her it was false.  I think she knew.
23              THE COURT:  Well, how did she know that it was false?
24              THE WITNESS:  Your Honor, because initially she had
25   given me a short notice about the trial, I think it was around
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
```

```
                                                                71
     F5keschc              Kapur - direct
1    a week's notice.  I said, there's no way I'm going to be ready
2    for a trial.  I've never been to a trial before in my life.
3    You know, I simply said I was not attending.  I believe there
4    was a conference call in which she said -- told the Court I was
5    not attending.
6             An order came from the Court saying there was going to
7    be a default judgment if I don't attend.  Thereafter,
8    Ms. Drohan told me that if you don't attend, if you're not
9    there for some reason -- and these were her words -- if you're
10   not there for some reason, then I believe depositions will be
11   used and the worst scenario outcome will be a judgment against
12   your company, which is already closed.
13            Thereafter, I went seeking a note because I felt I'd
14   been harassed way too much by the plaintiffs in the case.  And
15   I saw it as an out not to -- you know, if there was just going
16   to be a judgment against my company, and that's what my adviser
17   was advising me, and the company was already closed --
18            THE COURT:  Did Ms. Drohan tell you it was okay to
19   make a false statement to the Court?  Is that what you're
20   saying?
21            THE WITNESS:  No.  She didn't explicitly say it was
22   okay.
23            THE COURT:  You knew that you were causing her to make
24   a false statement to me, correct?
25            THE WITNESS:  Yes.  Based on her advice, I did make --
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                                72
      F5keschc                   Kapur - direct
 1              THE COURT:  Wait.  She advised you to make a false
 2    statement to the Court?  You're under oath, Mr. Kapur.  Yes or
 3    no, did she tell you to make a false statement to the Court?
 4              THE WITNESS:  Well, the way she said it, your Honor,
 5    was if I'm not there for some reason.  I mean, she said if I'm
 6    not there for some reason, the depositions will be used and
 7    there will be a judgment against the company.
 8              THE COURT:  Did she tell you it was okay to make a
 9    false statement to the Court?
10              THE WITNESS:  No, she didn't use those words, your
11    Honor.
12              THE COURT:  Did she say to you in substance, it's okay
13    to make a false statement to the Court?
14              THE WITNESS:  That's how I understood it.
15              THE COURT:  You understood her to say that you should
16    lie to the Court, and you thought it was okay?  Is that what
17    you're saying?
18              THE WITNESS:  Well, she didn't say I should -- she
19    didn't say it in those words, your Honor.  She said if I was
20    not there for some reason.  That's what she said.
21              THE COURT:  Well, she may have described to you the
22    consequences of your not being there.  I'm asking you if she
23    told you it was all right to submit a fabricated doctor's note
24    to the Court.
25              THE WITNESS:  She didn't explicitly use those words,
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

F5keschc                    Kapur - direct

1    your Honor.  But she said if I'm not there for some reason.  So
2    to me it was almost advising me, you know, because I felt so
3    harassed, she saw I felt so harassed.  She knew.  She had given
4    me last-minute notice, and she had a habit of giving me
5    last-minute notice so --
6            THE COURT:  The trial date for the record had been set
7    long beforehand, Mr. Kapur.
8            THE WITNESS:  Yes, your Honor.
9            THE COURT:  Go ahead.  Mr. Roessner, go ahead.
10           You'll be able to do cross-examination.
11           Go ahead.
12   BY MR. ROESSNER:
13   Q.  And so your brother Kabir Kapur is the one who assisted you
14   in sending this false note to the Court?
15   A.  I had explained the circumstances of the situation to him.
16   He understood I'd been harassed by this one investor who wanted
17   preferential treatment since the fund went into liquidation.  I
18   had explained to -- explained all the circumstances under which
19   I required the note.  He understood and agreed to get me a
20   note.
21           THE COURT:  Sorry.  Let me see if I understand this.
22   You're telling me -- is it your testimony that your brother
23   knew that you were not under Dr. Raj's care?
24           THE WITNESS:  Yes, your Honor.
25           THE COURT:  Your brother knew this note was false,

```
                                                                74
         F5keschc              Kapur - direct
 1   correct?
 2           THE WITNESS:  Correct, your Honor.
 3           THE COURT:  Your brother knew that you were not under
 4   Dr. Raj's care for septic illness, correct?
 5           THE WITNESS:  Correct, your Honor.
 6           THE COURT:  But you told your brother that because you
 7   thought the legal proceeding against you was unfair, it was
 8   okay to submit a false note?  Is that correct?
 9           THE WITNESS:  No, your Honor.  I didn't say it was
10   unfair.  I just felt -- I just gave him the circumstances of
11   the case.  I explained to him how I'd been harassed by this
12   investor over the years, ever since the fund went into
13   liquidation, how they wanted preferential treatment; how that
14   we preferred to speak only with a legal, because of their
15   behavior.  I'd explained to him how much not only me but every
16   member of our team had been harassed by this investor --
17           THE COURT:  Let me see if I got this right:  Because
18   you felt that the Schwarzes were harassing you, you felt it was
19   okay to submit a false note to the Court, yes or no?
20           THE WITNESS:  As well as based on what my counsel had
21   told me, that if I'm not there for some reason.  The
22   combination of those two factors, I'd been requesting for the
23   note.
24           THE COURT:  You felt that because there was something
25   harassing about the Schwarz's lawsuit, it was okay to get a
                     SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
```

```
                                                                    75
         F5keschc              Kapur - direct
 1   false doctor's note which would be submitted to the Court,
 2   correct?
 3            THE WITNESS:  Not only --
 4            THE COURT:  Was that your state of mind?
 5            THE WITNESS:  Not only the lawsuit, your Honor.  They
 6   used to call us up under different names to -- and speak to
 7   employees in the company in different names and made
 8   threatening statements.
 9            THE COURT:  So because you were unhappy with the
10   Schwarzes, you felt it was okay to submit a false statement to
11   the Court, is that correct?  You're saying a bunch of negative
12   things about the Schwarzes.  What I'm taking away is that
13   because you felt that way about the Schwarzes, it was okay to
14   submit a false note to the Court.  Was that your state of mind?
15            THE WITNESS:  Yes, your Honor.  I felt harassed and --
16   yes.
17            THE COURT:  Thank you.  You may inquire.
18   BY MR. ROESSNER:
19   Q.  Mr. Kapur, I'm going to turn back to the commission's
20   exhibits.  And I'm going to start with -- let me start by
21   saying, are you familiar with the entity Mossack Fonseca?
22   A.  Sorry.  Could you repeat the question.
23   Q.  Are you familiar with the entity Mossack Fonseca?
24   A.  I am now, after going through exhibits.
25   Q.  Sorry, Mr. Kapur?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                                  76
          F5keschc                  Kapur - direct
 1    A.   I'm familiar -- I became familiar.  I got -- my memory got
 2    refreshed about my dealings with them from the exhibits that
 3    you submitted.
 4    Q.   And when you worked with ThinkStrategy, you worked with
 5    Mossack Fonseca?
 6    A.   It appears that way from the exhibits, yes.
 7    Q.   How about the MossFon trust?
 8    A.   I believe that was probably one of the subsidiaries or
 9    something of that nature.
10    Q.   If you can turn to Exhibit 5 in the commission's exhibits.
11    A.   Just if we could -- Mr. Solotaroff, I don't know if you
12    were going to ask for --
13             THE COURT:  Sorry.  Could you turn to Exhibit 5 of the
14    commission's exhibits.  Do you have that in front of you?
15             THE WITNESS:  Yes, your Honor.
16             THE COURT:  Please turn to that.
17             MR. SOLOTAROFF:  Your Honor, may I just be heard
18    briefly?  I think it will assist everyone.
19             Mr. Kapur had told both Mr. Roessner and myself during
20    the recess that he believed that the exhibit -- not this
21    exhibit but Exhibit 7 was not complete, was not a complete copy
22    of the original Exhibit 7 that had been submitted in the SEC's
23    reply memorandum -- reply affirmation, rather.  And both
24    Mr. Roessner and I -- I don't specifically remember, but I told
25    Mr. Kapur that if he felt that he needed a fuller set, that he
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                   (212) 805-0300
```

```
                                                                 77
       F5keschc                 Kapur - direct
 1     might ask the Court if the Court had it.  We don't have the
 2     full exhibit, but obviously the Court has access to PACER.  And
 3     so anyway, so I suggested that he do that.  He was concerned
 4     about upsetting the Court and --
 5             THE COURT:  I have no idea what you're talking about
 6     because the issue has been about Exhibit 5.  You're talking
 7     about Exhibit 7.  I don't know what you're talking about.
 8             MR. SOLOTAROFF:  Mr. Kapur had asked me to ask the
 9     Court about Exhibit 7.  He just raised the issue now.  That's
10     why I'm doing it, Judge.  But we can wait until we get to
11     Exhibit 7.
12             THE COURT:  Why don't we wait until we get to that.
13     Let's not interrupt the examination.
14             Go ahead, Mr. Roessner.
15     BY MR. ROESSNER:
16     Q.  Mr. Kapur, are you on SEC Exhibit 5?
17     A.  Yes, Mr. Roessner.
18     Q.  And there is an e-mail address there.  The "to" is
19     ckapur3@gmail.com.  Is that your e-mail address?
20     A.  It appears to be.
21     Q.  Is it an e-mail address that you've used in the past?
22     A.  It appears to be.  I think it was something I used if the
23     company e-mail wasn't working.
24             THE COURT:  One moment.  I see.  This is page three of
25     Exhibit 5.  It's a separate document that is marked as
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
```

```
                                                                78
         F5keschc                    Kapur - direct
1        Plaintiff's Exhibit 8, and it is an e-mail addressed to CKapur3
2        from MossFon Trust Corp.  Is that what you're referring to?
3                MR. ROESSNER:  Yes, your Honor.
4                THE COURT:  Sorry.  I was looking at the front page of
5        the exhibit.  Go ahead.
6                MR. ROESSNER:  Sorry, your Honor.
7        BY MR. ROESSNER:
8        Q.  In this e-mail you're being sent an e-mail from the MossFon
9        Trust Corporation.  And the second full sentence begins:  We
10       have been requested by our lawyer, Alexandra Koranyi, in order
11       to communicate with you concerning the acquisition of a fully
12       managed company and foundation and open a bank account with
13       Bank Vontobel Zurich.
14               Do you see that, Mr. Kapur?
15       A.  Is that in the first paragraph, Mr. Roessner, that you're
16       reading from?
17       Q.  It's the second sentence.  It begins on the second line.
18       A.  Yes, Mr. Roessner, I see.
19       Q.  And did you, in fact, acquire an entity from the MossFon
20       Trust Corporation?
21       A.  It appears that way.
22       Q.  On the second page of this document there is a -- sorry,
23       the fourth page.  It's page 23 on the bottom right-hand corner.
24       A.  Next page, Mr. Roessner?
25       Q.  Yes.
                       SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
```

```
                                                                79
         F5keschc                Kapur - direct
1    A.   All right.
2    Q.   Would you be so kind as to confirm.  It starts with, would
3    you be so kind.
4             THE COURT:  Sorry.  To be clear, Mr. Kapur, are you on
5    the page of the exhibit that bears on the bottom right hand the
6    notation, page 23?
7             THE WITNESS:  Yes, your Honor.
8             THE COURT:  Okay.  And I think Mr. Roessner is trying
9    to direct your attention to the top of the page.  Is that
10   correct, Mr. Roessner?
11            MR. ROESSNER:  Yes, your Honor.
12            THE COURT:  Go ahead.
13   BY MR. ROESSNER:
14   Q.   The MossFon entity is asked, would you be so kind as to
15   confirm if you would like to incorporate your own company
16   foundation, or would you like to acquire one of our ready-made
17   companies' foundation.  Do you see that?  That's the first
18   sentence.
19   A.   Yes.
20   Q.   On page 24, the next page, first full paragraph says, as
21   you will notice from the above chart, which we don't have
22   because it's not listed, you will have a Panamanian corporation
23   which will have a bank account.  The Panamanian foundation will
24   be owner of the company, parenthetical, shares of the
25   Panamanian company will be issued in the name of the
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

```
                                                                  80
         F5keschc              Kapur - direct
 1    foundation, closed parenthetical.  Inside the Panama foundation
 2    we will prepare for you the regulations with the information
 3    about the beneficiaries.  And the next says, opening of a bank
 4    account with Bank Vontobel.  Do you see that?
 5    A.  I do see that, Mr. Roessner.  Yes.
 6    Q.  Now, as you sit here today, do you have any documents
 7    regarding this transaction?
 8    A.  Mr. Roessner, just the exhibits that you provided.  And I
 9    would note that Exhibit 7 in your prior motion had all -- had
10    the whole stream of e-mails for that one e-mail that helps me
11    explain a lot of what I'm going to explain, I imagine.  And it
12    would be good to have that full exhibit so that I can properly
13    explain things.  But you've just taken snippets out of context
14    but --
15            THE COURT:  I think the question is whether you have
16    any other documents relating to this corporation.
17            THE WITNESS:  No.
18    Q.  Have you contacted the MossFon trust and sought documents,
19    since the commission's filed the reply brief in this matter
20    attaching these e-mails?
21    A.  Could you repeat the question?  Have I contacted what's
22    that?  Fonseca?
23    Q.  The MossFon trust, the entity that was e-mailing you.
24    A.  No.
25            THE COURT:  When were you last in contact with the
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

```
                                                                    81
         F5keschc              Kapur - direct
1    MossFon trust?
2              THE WITNESS:  Your Honor, it would be in -- based on
3    my recollection from these exhibits, it would be in 2010.
4              THE COURT:  I'm asking for your recollection, not from
5    the exhibits.  When were you last in touch with the MossFon
6    trust?
7              THE WITNESS:  I don't recall.
8    BY MR. ROESSNER:
9    Q.  If you can turn to Exhibit 7.
10             THE COURT:  And my law clerk has notified me, by the
11   way, as to Exhibit 7 that she has checked PACER.  What is
12   reproduced here as Exhibit 7 is consistent with what is on
13   PACER, which is to say the document seems to go from page 10 to
14   12, and there's no page 11 on PACER.  Let me just confirm that
15   I understood that correctly.
16             THE LAW CLERK:  The pagination at the bottom right.
17             THE COURT:  Okay.  Go ahead, Mr. Roessner.
18   Q.  Mr. Kapur, have you turned to Exhibit 7?
19   A.  Should I be looking at Mr. Solotaroff's 7 or your 7?
20             THE COURT:  SEC 7, please.
21   Q.  I'd like you to turn to page 9 of Exhibit 7.  Bottom
22   right-hand corner there's a page number.  If you could just
23   turn to page 9.
24   A.  Sure.  Sure.  I'm here.
25   Q.  Have you reviewed the document, Mr. Kapur, page nine?
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

```
                                                                82
        F5keschc              Kapur - direct
 1   A.   All of it?  Okay.  Sure.
 2   Q.   If I could refer you to the last paragraph, I'm just going
 3   to ask one question about this page, and then we'll move on.
 4   A.   Sure.
 5   Q.   The first sentence of that paragraph indicates that the
 6   MossFon Trust Corporation is writing to you.  It says, we
 7   referred to our most recent exchange of e-mails regarding your
 8   interest in the acquisition of a shelf vintage company
 9   incorporated in 2007 and the incorporation of a private
10   interest foundation under the name Family and Children
11   Charitable Foundation.
12            Do you see that?
13   A.   I do.  I do, Mr. Roessner.
14   Q.   Did you acquire that entity, Family and Children Charitable
15   Foundation?
16   A.   It appears that way from the communications.
17            THE COURT:  And is that true?  That's how it appears
18   certainly.  Is it true?
19            THE WITNESS:  I believe it to be true, yes, your
20   Honor.
21   Q.   And it mentions "shelf vintage company."  What is a shelf
22   vintage company?  Do you know what that is?
23   A.   I think that might just be a shelf company.
24            THE COURT:  What does the word vintage mean?  Does it
25   mean the company already exists?
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                              83
     F5keschc                 Kapur - direct
 1              THE WITNESS:  I believe it means that the company was
 2   in -- not currently incorporated, but incorporated maybe
 3   several years ago.  And structuring firms, they always had, you
 4   know, companies available.  So if a client wanted a company,
 5   you know, if it started back in '99 and today we're in 2015,
 6   you know, and if the trust company had such a company available
 7   on the shelf, we would ask them, you know, do you have this
 8   company?  And then we'd ask the client what name they'd like,
 9   and we try and match it up to the client's needs.
10              THE COURT:  So in effect, it's an old company that may
11   not actually be engaged actively in any pursuits, but it's
12   available for sale?
13              THE WITNESS:  Correct, your Honor.  That was common
14   for these trust companies and accounting firms and law firms to
15   purchase such companies.
16              THE COURT:  Go ahead, counsel.
17   BY MR. ROESSNER:
18   Q.  Turn to Exhibit 8.  Turn to the page that has Plaintiff's
19   Exhibit 11 marked on there.  And it's page 1 on the bottom
20   right-hand corner.
21   A.  All right.
22   Q.  And this is an e-mail to you.  The e-mail address in the
23   "to" line is chetan.kapur@aimadvdrp.com.  Do you see the e-mail
24   address?
25   A.  I do, Mr. Roessner, yes.
                     SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

```
                                                              84
     F5keschc                  Kapur - direct
 1   Q.   Are you familiar with that address?
 2   A.   I am.
 3   Q.   Is it your address?
 4   A.   It's the company's address.  It was for the managed account
 5   platform that we had at the time.  And as part of the managing
 6   account platform we set up structures for our managed account
 7   clients.  And if you like, I can go through a process of
 8   setting up structures with the managed account clients, and
 9   then the funding processing thereafter, we did a managed
10   account after the structure was funded.
11   Q.   Let me just ask a couple questions on this document first.
12   If you could look at 2A, beginning, since you expect a deposit
13   in the bank's fund -- in the foundation's bank account in an
14   amount between US 6 million and US 7 million during the first
15   year, would you please provide us with a statement from your
16   accountants that you have the money together with your personal
17   annual returns for the last three years.
18          Do you see that?
19   A.   I do, Mr. Roessner.
20   Q.   And you provided MossFon a letter from your accountant, is
21   that correct?
22   A.   I provided them a general reference letter, along with a
23   reference letter also from my bank.  And I also provided them,
24   it seems from your e-mail, a certificate of insurance of
25   ThinkStrategy Capital Management.  It was all part of their
                   SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

```
                                                                    85
         F5keschc                   Kapur - direct
 1    general KYC due diligence.
 2    Q.   Do you have a copy of those other documents you supplied to
 3    the MossFon trust?
 4    A.   I'm just getting all this from your e-mail.  If you have
 5    Exhibit 7 on your prior filing, it will show a letter was
 6    provided from a bank, a bank reference besides for the letter
 7    provided by the accountants, Mr. Joseph Romano, as well as you
 8    will note the insurance certificate provided for the company
 9    ThinkStrategy Capital Management.  It's important for me to
10    have that full exhibit to point out several things.
11    Q.   Outside of MossFon and Mossack Fonseca, were there other
12    companies you used?  For example, Asia City Trust, are you
13    familiar with that entity?
14    A.   I'm familiar from your exhibit, Mr. Roessner.  I'm not --
15    we worked, just so you understand, with hundreds of
16    counterparties and service providers at ThinkStrategy.  So, I
17    mean, we worked with numerous law firms.  We worked with
18    numerous trust companies.  So, you know, I'm -- yes, by your
19    exhibit, it seems we did work with them, correct.
20    Q.   Your testimony, as I understand, the relations you had with
21    MossFon or Asia City were for your clients, is that right?
22    A.   It was for ThinkStrategy's managed account program.
23    Q.   Do you have --
24    A.   Or the AIM Advisory Group's program.
25    Q.   Do you have any documents corroborating that statement?
                     SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
```

```
                                                                    86
         F5keschc                    Kapur - direct
1    A.   I can certainly look for them, based on what documents I
2    have on file.
3    Q.   When you say -- have you brought any of those documents
4    with you today?
5    A.   No, Mr. Roessner, I -- I did not.
6              MR. ROESSNER:  I have no further questions.
7              THE COURT:  Mr. Solotaroff, any questions from you?
8              MR. SOLOTAROFF:  Yes, Judge.
9              Judge, just so we're clear, this is my opportunity to
10   ask Mr. Kapur questions?  This is my main opportunity, is
11   that --
12             THE COURT:  Well, it doesn't seem to me to make a lot
13   of sense for you to then recall him as a witness on your case.
14   So why don't you use your opportunity now.
15             MR. SOLOTAROFF:  That's great.
16   DIRECT EXAMINATION
17   BY MR. SOLOTAROFF:
18   Q.   Good afternoon, Mr. Kapur.
19   A.   Good afternoon, Mr. Solotaroff.
20   Q.   Now, I think you just said that you -- that there may be
21   some documents that would corroborate your statement about
22   having obtained these entities for your clients, right?
23   A.   I have a box of 70 files.  I can go through it, but, you
24   know, I can go through it for you, if that's what you wish.
25   Q.   Well, didn't you receive -- you received this e-mail
                     SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
```