```
F5keschc                    Kapur - direct
1    that's -- these e-mails that show correspondence between you
2    and MossFon.  You've had them for a few weeks, correct?
3    A.   That's correct.
4    Q.   And, in fact, you gathered some documents to submit to the
5    Court, isn't that right?
6    A.   Correct.  Those were from our 70 files once again, and
7    general documents about our managed account program.
8    Q.   So you haven't looked in any of those boxes to find
9    documents that would specifically relate to your managed
10   account program, right?
11   A.   No, I had no reason to.  This is a structure from years ago
12   that you're asking me about, because of the way I process work
13   so ...
14   Q.   Now, going back to the testimony about the doctor's note,
15   Mr. Kapur, it wasn't just that you weren't under that doctor's
16   care, but the doctor is in India, right?
17   A.   Correct.
18   Q.   And you were in New York, correct?
19   A.   Correct.
20   Q.   And did Ms. Drohan know that you were in New York?
21   A.   I believe she -- I believe she had a very good sense that I
22   was in New York.
23   Q.   When is the last time you had seen her prior to submitting
24   the doctor's note?
25   A.   I don't recall.  It's all too long ago.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                                   88
         F5keschc              Kapur - direct
 1              THE COURT:  Please speak up.  You're mumbling.
 2              What was your answer?
 3              THE WITNESS:  I'm sorry.  I don't recall,
 4       Mr. Solotaroff.  It was all quite long ago.  I don't recall the
 5       exact date after the note or before the note that I met with
 6       her.  But I know that while I was claiming to be in India, that
 7       she -- often in conversations with her said, you know, why
 8       don't you stop by my office, or -- you know, and I know she had
 9       caller ID.  I know she knew I was calling her from a 212
10       number.  So why say that and change the subject immediately
11       thereafter?
12       Q.  So you're saying that she was party with you in lying to
13       the Court?
14       A.  She was -- she was aware, in my opinion, that, you know, I
15       was in the US.
16              THE COURT:  She represented to the Court that you were
17       in India.  She told me that.  You know that, right?
18              THE WITNESS:  Yes, your Honor.
19              THE COURT:  You knew that she was there for telling a
20       falsehood to the Court, correct?
21              THE WITNESS:  Yes, your Honor.
22              THE COURT:  And you're saying that she was aware, just
23       as you were aware, that that was a falsehood?
24              THE WITNESS:  I believe so, yeah.
25              THE COURT:  Go ahead.
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                  (212) 805-0300
```

```
                                                                    89
        F5keschc              Kapur - direct
 1   BY MR. SOLOTAROFF:
 2   Q.  Now, in questioning from Judge Engelmayer, you said that
 3   the Schwarzes had been harassing you, correct?
 4   A.  I'm sorry.  Could you repeat the question?
 5   Q.  Sorry.  You believed that the Schwarzes had harassed you,
 6   correct?
 7   A.  And my company in general, and the employees in my company,
 8   yes.
 9   Q.  And the litigation against you in your view was part of
10   that harassment, right?
11   A.  I'd say the harassment was mostly prelitigation, as well as
12   continued throughout the litigation.
13   Q.  And in -- as you told the Court, in your mind, because of
14   that, because the Schwarzes had harassed you, it was okay for
15   you to submit a false statement to the Court, is that right?
16   A.  Well, it was that and a combination of what my attorney had
17   told me.  So in combination of the fact that I'd been harassed,
18   the fact that employees were called in and threatened under
19   different names, based on, you know, the articles and
20   defamation, you know, in public articles, you know, calls to
21   our service providers and accountants, making false
22   implications about a company and the way we did business, they
23   were doing anything and everything to harass us, our company,
24   our service providers, because they simply wanted to get paid
25   in preference.  And they clearly noted that in communication
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                                    90
         F5keschc              Kapur - direct
 1   with them that they wanted to be paid in preference to other
 2   investors.  And they were going to harass us until they got
 3   that preferential treatment.
 4   Q.  And, Mr. Kapur, in your mind the Schwarzes are continuing
 5   to harass you up to and including today, right?
 6   A.  Well, I'd say, you know, when they had direct communication
 7   with the company and me, that's when, you know, the main
 8   harassment took place.  And then my attorney advised me that
 9   you should just direct all the communications to the law firm
10   and just not communicate with them.  And I took the advice of
11   my attorney.
12   Q.  What about now?  Do you think the Schwarzes are still
13   harassing you?
14   A.  Well, I feel that -- I generally feel harassed.  I feel
15   generally feel harassed by the process, yes.
16   Q.  Do you feel like it's still okay to make false statements
17   to the Court?
18   A.  Absolutely not.
19   Q.  What changed?  Why was it okay for you in 2012 but not okay
20   now?
21   A.  Well, I have no reason -- well, I mean, the circumstances
22   back then, I just felt, you know, heavily harassed.  And
23   primarily because of what my attorney told me, you know, if I'm
24   not there for some reason, and depositions, you know, are going
25   to be used.  And the worst outcome of the case would be a
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

```
                                                                  91
         F5keschc              Kapur - direct
1    judgment against the company and not against me personally.  It
2    just made sense to me that -- you know, I mean, we were getting
3    harassed from them from the point the fund went into
4    liquidation with KBC.  We were being harassed.
5    Q.  Well, why not lie now?  Why not continue to provide false
6    statements to the Court to avoid having to pay the almost
7    $5 million judgment?
8    A.  I don't feel it's the right thing to do.
9            MR. SOLOTAROFF:  Your Honor, unfortunately it's a
10   little confusing, but Mr. Kapur's testimony at the June 24th
11   hearing, it's in the SEC's transcript binder.
12           THE WITNESS:  I don't have that.
13           THE COURT:  One moment.  What exhibit is it?
14           MR. SOLOTAROFF:  The SEC identified them by date.  So
15   it's the third one, Judge.
16           THE COURT:  I have the binder upstairs.  Are you going
17   to question about that material now?
18           MR. SOLOTAROFF:  I was just going to go quickly
19   through his testimony that day.
20           THE COURT:  We'll take a five-minute recess while we
21   get the binder.
22           How much longer do you think you'll be,
23   Mr. Solotaroff?
24           MR. SOLOTAROFF:  It's about probably 40, half an hour.
25           THE COURT:  Okay.  We'll resume in five minutes.
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

```
       F5keschc                Kapur - direct
1                (Recess)
2                THE COURT:  Mr. Kapur, I'll remind you you're still
3      under oath.  Sorry for the brief break, but I now have the
4      binder of deposition and hearing transcripts that was
5      previously submitted to me.
6                Go ahead, Mr. Solotaroff.
7      BY MR. SOLOTAROFF:
8      Q.  Mr. Kapur, did you understand prior to the June 24, 2014,
9      hearing that you were required to provide truthful testimony
10     about the 2007 transfers to Bank Sarasin?
11     A.  I was.
12     Q.  And I asked you to do this during our break, but did you
13     have an opportunity to review the testimony on page 40, line
14     17, to page 41, line 3?
15     A.  From 17 to 3?
16     Q.  Yes.
17     A.  To line 3, yeah.
18     Q.  Was that your testimony?
19     A.  Yes.
20     Q.  And could you also now also read from page 41, line 4,
21     to --
22               THE COURT:  Mr. Solotaroff, do you want him to read it
23     to himself or read it out loud?
24               MR. SOLOTAROFF:  To himself.
25     Q.  41, line 4, to page 42, line 8.  Just read the next page
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                                    93
         F5keschc                    Kapur - direct
 1    and the next eight lines of the following page.
 2    A.  From 7 to 8, yeah?
 3            THE COURT:  Page 41, line 4, to page 42, line 8.  Just
 4    read it quietly to yourself.
 5    A.  Okay.
 6    Q.  Was that your testimony in June of 2014?
 7    A.  Yes.
 8    Q.  If you could turn to Exhibit 3 in your exhibit book that's
 9    in front of you.
10    A.  In my exhibit folder?
11    Q.  No, the SEC's exhibit book.
12            THE COURT:  Sorry.  You want the SEC's exhibit book,
13    not his?
14            MR. SOLOTAROFF:  Yes, Judge.  I'm sorry.
15    Q.  And if you could direct your attention to the third page of
16    the exhibit.
17    A.  Yes.
18    Q.  And is that an e-mail between you and Mr. Stibolt?
19    A.  It appears that way, yes.
20    Q.  And was Mr. Stibolt an employee at Bank Sarasin in
21    Switzerland?
22    A.  It appears that he's an employee of Bank Sarasin.  I can't
23    be certain that it is in Switzerland.
24    Q.  And did you in this e-mail, did you tell Mr. Stibolt that
25    you had spent -- and I quote, I have spent the last five years
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
```

```
                                                                    94
        F5keschc                    Kapur - direct
 1      trying to figure out the transfers made from CCO to AAIA to APC
 2      and errors in his statement.  I am not one bit happy about my
 3      hard-earned money being accounted for in this manner.
 4              Do you see that?
 5      A.  I see.  And it says five hours, not five years.
 6      Q.  I'm sorry.  Five hours.
 7      A.  Yes.
 8      Q.  And that was something that you said to Mr. Stibolt at Bank
 9      Sarasin, right?
10      A.  Correct.
11      Q.  So you did have your own money at Bank Sarasin, correct?
12      A.  Incorrect.
13      Q.  You didn't have your own hard-earned money at Bank Sarasin?
14      A.  No, I did not.
15      Q.  Whose money was it?
16      A.  It was a client's money.  We often personalized managed
17      accounts and also give an optimistic view of assets to come
18      into managed accounts when we were dealing with bank staff.  It
19      helped provide better servicing to us, and it helped better
20      meet the reasonable needs of our clients.
21      Q.  Which client had -- which of your clients had money at Bank
22      Sarasin?
23      A.  The clients in this e-mail, obviously.
24      Q.  What's that person's name?
25      A.  I don't recall, Mr. Solotaroff.  This is from like seven
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                    95
          F5keschc                    Kapur - direct
1    years ago.
2    Q.  And was there at least at one point records relating to the
3    existence of this client you say the money belonged to?
4    A.  Could you repeat your question.  Were there records?
5    Q.  Sorry.  Were there at any point records that would have
6    indicated whose money this was at Bank Sarasin, if not yours?
7    A.  I imagine it would be with the bank.
8    Q.  What about with you?
9    A.  Typically a lot of our managed accounts were the records,
10   because the structures never belonged to us.  We were just
11   doing a mandate based on a managed account agreement.  And so
12   you know the records would be with the bank.
13   Q.  So you, based on what you're telling us, you lied to
14   Mr. Stibolt, correct?
15   A.  I wouldn't say I lied.  I would just say the day-to-day
16   team at the bank was unaware of the ownership of these
17   structures.  And we often did personalized accounts so that we
18   received better servicing.  As an MRG manager in the field, we
19   were often doing relatively small managed accounts, which is
20   the size of our managed accounts were relatively small.  And we
21   often were just put at the back of the line or receive poor
22   servicing.  And to receive better servicing, yeah, we did say,
23   you know, it's -- sometimes they just had the misimpression
24   themselves.  Also, we didn't say anything.  They assumed that
25   the person they were dealing with owned the structure, which
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

```
                                                                96
        F5keschc               Kapur - direct
   1    was not the case.
   2    Q.  Okay.  But this time you told Mr. Stibolt that it was your
   3    own hard-earned money, right?
   4    A.  Yeah.  We were frustrated.  In the e-mail I'm trying to get
   5    servicing here for the client.
   6    Q.  So you did lie in this e-mail, according to what you're
   7    telling us?
   8    A.  I was just trying to meet the needs and demands of our
   9    clients.  They expect accurate, complete and timely,
  10    comprehensive reporting on their moneys.  We provided
  11    administrative services and we wanted to respond back.
  12    Q.  But you lied to Mr. Stibolt?
  13    A.  It was an incorrect statement.  It was -- you can
  14    characterize it however you like, but I just know we were just
  15    trying to meet the needs of our clients.
  16    Q.  Now, under this scenario that you're testifying about,
  17    would your client have contacted you to complain about these
  18    statements?
  19    A.  Correct.
  20    Q.  How would that client have contacted you?
  21    A.  Well, we communicated in a variety of different forms in
  22    the managed account program.
  23    Q.  Now, is it also your testimony that these e-mails that
  24    Mr. Roessner went through with you involving the Moss Fonseca
  25    group, that those were also part of this managed account
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

```
                                                                97
        F5keschc                  Kapur - direct
 1      platform that you say you had, right?
 2      A.  Correct.
 3               MR. SOLOTAROFF:  Judge, may I approach.
 4               THE COURT:  Yes.
 5               MR. SOLOTAROFF:  I'm going to hand up an exhibit I've
 6      marked as now Exhibit 37.  It's actually the part of Exhibit 7
 7      that we had handed up earlier, but everything got confused, so
 8      I'm just going to mark it.
 9               THE COURT:  I'm confused.  This is part of SEC
10      Exhibit 7?
11               MR. SOLOTAROFF:  It was the part we handed up in the
12      beginning.
13               THE COURT:  Can we not break it up any more?  Why
14      don't we just use Exhibit 7, if it's already in evidence.
15               MR. SOLOTAROFF:  That's fine.
16      BY MR. SOLOTAROFF:
17      Q.  So Exhibit 7, Mr. Kapur, does that Exhibit 7 have page 1 in
18      it that's in front of you?
19      A.  Page nine.
20      Q.  Let me hand you a complete version.
21      A.  You want me to use yours?
22      Q.  Yes.
23      A.  Okay.  I thought we were not using that.  Yep.
24      Q.  And if you go to page three of that document, do you see
25      that?
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

F5keschc                Kapur - direct

1   A.  I do.
2   Q.  And it's an e-mail from you to MossFon Trust Corporation
3   dated June 8, 2010.  Do you see that?
4   A.  Yeah.  I think it's June.  Correct.
5   Q.  And in that e-mail you say in the second paragraph, I went
6   over a source of funds with Alexandra already.  It is my
7   savings and earnings over the years from my past work
8   experiences and my businesses, investment advisory, investment
9   management.
10          Do you see that?
11  A.  I do.
12  Q.  And are you telling us now that that wasn't true either?
13  A.  Those were my source of funds in general, Mr. Solotaroff.
14  If you move to page five and you look at the KYC in this
15  compliance department, they needed to know source of funds not
16  only for the structure; they needed to know source of funds for
17  the person paying the invoices.  And they generally needed to
18  know source of funds for the person they were dealing with,
19  because they were doing a background check, part of general
20  KYC, Mr. Solotaroff.
21  Q.  So your testimony is that statement didn't relate to the
22  money that was going to be deposited in the family's and
23  children's charitable trust?
24  A.  Correct.  We were in phase one of our managed account
25  program.  This was just a standard KYC in asking general

```
                                                                  99
         F5keschc              Kapur - direct
 1   question and got a general response, and also response because
 2   this was a source of funds.
 3   Q.  And this managed account platform that you've talked about
 4   was in operation in June of 2010?
 5   A.  It was.  In fact, we had moved our managed account program
 6   into a different corporate entity called AIM Advisory Group,
 7   LLC.  I mentioned that in the April 30 testimony as well.
 8   Q.  And AIM Advisory LLC had operated the managed account
 9   platform?
10   A.  I'm sorry.  Could you repeat the question?
11   Q.  AIM advisory had operated your managed account platform?
12   A.  What do you mean by "operated"?
13   Q.  Well, it had a managed account platform with clients?
14   A.  Correct.  We had -- we from day one had a managed account
15   program, and then we decided, you know, to move our managed
16   account program, which was a comprehensive program, into a
17   separate corporate identity, if you will.  And so that
18   corporate identity -- that was back in early 2010 -- was AIM
19   Advisory Group, LLC.
20   Q.  Now, Mr. Kapur, you were questioned by the SEC in
21   November 2010.  Do you remember that?
22   A.  I agree with you if it's -- if you're refreshing my memory.
23           MR. SOLOTAROFF:  I'm handing up to the witness, Judge,
24   what's been marked as Exhibit -- I've marked it as Schwarz
25   Exhibit 2.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                              100
     F5keschc                    Kapur - direct
 1            THE COURT:  Where is your binder?
 2            MR. SOLOTAROFF:  It's not in the binder, Judge.  I
 3   wasn't sure I was going to need it.  I'm handing it to --
 4            THE COURT:  Do you have a copy for me?
 5            MR. SOLOTAROFF:  Yes, I do, Judge.
 6            THE COURT:  Sorry.  This doesn't have an exhibit
 7   sticker.  I should write Schwarz Exhibit 2 on it?
 8            MR. SOLOTAROFF:  Yes, Judge, please.
 9            THE COURT:  And this is SEC investigative testimony in
10   this case?  Is that correct?
11            MR. SOLOTAROFF:  Yes, Judge.
12            THE COURT:  Is there any objection to my receiving
13   this?
14            MR. ROESSNER:  No, your Honor.
15            MR. KAPUR:  No, your Honor.
16            THE COURT:  This is your testimony before the SEC in
17   this matter, Mr. Kapur?
18            MR. KAPUR:  I believe so, your Honor, yes.
19            THE COURT:  Then I'll receive Schwarz Exhibit 2.
20            (Plaintiff's Schwarz Exhibit 2 received in evidence)
21   BY MR. SOLOTAROFF:
22   Q.  If you turn to page 614 of the document.  And if you can
23   see that the pages are in the text?
24            THE COURT:  The very end.
25   A.  Sure.  Okay.
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

```
                                                                      101
         F5keschc                    Kapur - direct
 1    Q.   And do you see where that is?  Just a few pages from the
 2    end.
 3    A.   Do you want me to read 614?
 4    Q.   I'm going to direct you, Mr. Kapur.  Were you asked this
 5    question and did you give this answer on page 614, line 23:
 6              So are there any other -- defining the word client as
 7    funds or separately managed accounts, are there any other
 8    accounts besides the funds that are in liquidation with
 9    PriceWaterhouse?
10    "A   No."
11              Was that your testimony?
12    A.   I believe so, yes.
13    Q.   And if you turn to page 616, line 10.
14    A.   616, line 10, okay.
15    Q.   Were you asked these questions and did you give these
16    answers:
17    "Q   Do you provide any advisory services through any additional
18    entities?
19    "A   Currently, no.
20    "Q   Do you have any plans to?
21    "A   We were thinking potentially launching a managed account
22    platform, but that hasn't launched.
23    "Q   Can you tell us more about that?
24    "A   It was to be a more for family, more for structured advice,
25    friends and family.
                     SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
```

```
                                                                    102
     F5keschc                  Kapur - direct
 1   "Q   What was going to be the name of that vehicle?
 2   "A   The AIM group.
 3   "Q   AIM Advisory Group?
 4   "A   AIM Advisory Group."
 5          Was that your testimony?
 6   A.   Yes, Mr. Solotaroff.
 7   Q.   So isn't it true that this managed account platform that
 8   you've told us about actually was never launched?
 9   A.   Incorrect, Mr. Solotaroff.  You are contorting and taking
10   out of context --
11          THE COURT:  Just answer.  Don't make accusations about
12   Mr. Solotaroff.  Just tell us about the facts.
13          Your testimony here denies that there was a managed
14   account platform that was launched.  Was that testimony
15   incorrect?
16          THE WITNESS:  Your Honor, this was talking about the
17   AIM Advisory Group, not the managed account program.  And when
18   I said it wasn't launched, it means -- I meant it didn't
19   generate revenues, which is correct.
20          THE COURT:  Go ahead, Mr. Solotaroff.
21   Q.   Now, how many clients did you have managed accounts for?
22   A.   I'd say over the years, I would say maybe -- I'm just
23   guessing because it's been many years.  My company has been
24   closed for five years.  We had probably eight to nine managed
25   accounts, but I would qualify that a lot of those managed
                   SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

F5keschc                    Kapur - direct

```
 1   accounts were unpaid managed accounts, so as to unpaid
 2   business.  So I remember there were two or three that were
 3   going to go from unpaid to paid status, but that never
 4   materialized because of the financial crisis.
 5   Q.   And who were those clients?
 6   A.   What do you mean, who were those clients?
 7   Q.   What were the names of those eight or nine clients that you
 8   say you had?
 9   A.   I don't recall all the names.
10   Q.   Any of them?
11           THE COURT:  Do you recall any of the names?
12           THE WITNESS:  Sure, your Honor.  I recall the
13   Millennium Group.  I recall doing an account for the Imperial
14   Group, as well as for the Mangusta Group.  Those are the ones
15   I'm recalling.
16   Q.   The Millennium Group, that was something you had managed;
17   you had managed some money for the Millennium group back in
18   2003/2004, right?
19   A.   It may have been then, or possibly around then, sure.
20   Q.   If you can turn to page 423 of this document.
21   A.   423.  Sure.
22   Q.   And just to get some context for the Court, Mr. Kapur, you
23   are being questioned here about some returns that you had
24   advertised in connection with the capital fund, right?
25   A.   Do you mind if I read it so I can refresh my recollection?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
                                                                    104
     F5keschc              Kapur - direct
 1   Q.   Sure.
 2   A.   Page 423?
 3   Q.   Yes.
 4   A.   (Pause) Do you have these exhibits?
 5   Q.   I don't.  Forget the context.  I'll just ask you about the
 6   testimony.
 7            Were you asked this question and did you give this
 8   answer.  We had gone through that, too, and you mentioned
 9   Millennium, correct?
10            THE COURT:  What line?
11            MR. SOLOTAROFF:  I'm sorry, line 21, Judge.  Page 423.
12   "A   Because we did a managed account for them.
13   "Q   Any other managed accounts?  You didn't mention any others
14   before, but I'll give you another chance.  Are there any other
15   managed accounts?
16   "A   Just a family managed account."
17            Was that your testimony?
18   A.   Yes, as it related to the ThinkStrategy Capital fund eight
19   class returns prior to the start of the fund.  That was in
20   response to that specific question.
21   Q.   Now, so when you were originally asked about the Sarasin
22   transfer before we had the e-mails to you and Mr. Stibolt, you
23   said you didn't remember what that transfer was about, right?
24   A.   Now I'm confused.  What are you talking about now?
25   Q.   When you testified before the judge last year, the
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```