```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/1/15
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

BENJAMIN SCHWARZ, CHRISTINA SCHWARZ,        :
and DANIEL SCHWARZ,                          :
                                             :          09 Civ. 9346 (PAE)
                    Plaintiffs,              :
                                             :
                                             :
        -v-                                  :
                                             :
THINKSTRATEGY CAPITAL MANAGEMENT LLC         :
and CHETAN KAPUR,                            :
                                             :
                    Defendants.              :
                                             :
-------------------------------------------------------------------X
-------------------------------------------------------------------X

SECURITIES AND EXCHANGE COMMISSION,          :
                                             :
                    Plaintiff,               :          11 Civ. 8094 (PAE)
                                             :
        -v-                                  :          OPINION & ORDER
                                             :
CHETAN KAPUR and LILABOC, LLC,               :
                                             :
                    Defendants.              :
                                             :
-------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

This Court has entered two judgments against Chetan Kapur, a defendant in each of the above-captioned cases: First, on June 1, 2012, after a four-day bench trial, the Court entered a judgment awarding $3,068,483 to the plaintiff investors in *Schwarz v. ThinkStrategy Capital Management LLC*, 09 Civ. 9346. That judgment was later amended to include prejudgment interest, resulting in a final award of $4,836,473. Second, on November 30, 2012, pursuant to the parties' settlement agreement, the Court entered a judgment awarding the SEC $4,988,196.59 in disgorgement, civil penalties, and prejudgment interest in *SEC v. Kapur*, 11 Civ. 8094.

Three years later, Kapur has not paid a penny toward satisfying either judgment against him. And the SEC has recently developed compelling evidence that Kapur possesses and has access to significant assets, including bank accounts abroad, that could be applied toward these judgments. Plaintiffs in each action now move to hold Kapur in contempt—the SEC until he pays the disgorgement and interest, and the Schwarzes until he provides certain information with respect to his assets. The only disputed issue is whether Kapur, who is now proceeding *pro se*, has established that compliance with the Court's orders in the two cases is impossible. For the following reasons, the Court finds that Kapur has not proven his inability to comply, holds him in contempt, and orders him incarcerated until he purges the contempt.

## I.       Background

In this section, the Court recounts the facts and procedural history of these two related cases, and a parallel criminal case before Judge Keenan. The Court does so for two reasons: first, to explain how the cases reached this stage, and second, to identify numerous incidents that have undermined Kapur's credibility and that contribute to the Court's rejection of his present claim of insolvency.

### A.       The Schwarz Case

On November 10, 2009, Benjamin, Christina, and Daniel Schwarz (collectively, the "Schwarz plaintiffs" or the "Schwarzes") filed suit in this District against Kapur and his now-defunct company, ThinkStrategy Capital Management LLC. Schwarz Dkt. 1. The Schwarz plaintiffs, who had each invested in a leveraged "fund of funds" run by ThinkStrategy, asserted claims of fraud, negligent misrepresentation, and breach of fiduciary duty under New York state law. Their central contention was that Kapur grossly misrepresented the nature and extent of the due diligence he had conducted on the hedge funds in which ThinkStrategy invested. Seven of

these sub-funds were later revealed as fraudulent, triggering the collapse of the ThinkStrategy fund and causing investors, including the Schwarzes, to suffer overwhelming losses. The Schwarz plaintiffs argued that if Kapur had not misled them about his diligence, they would never have invested in the ThinkStrategy fund.

The case was initially assigned to Judge Kaplan. Dkt. 2. On November 1, 2011, after discovery had closed and Judge Kaplan had denied the parties' cross-motions for summary judgment, the case was reassigned to this Court. Dkt. 99.

Shortly before the bench trial was to begin in March 2012, Kapur told his then-attorney, Vivian Drohan, Esq., that he was in India and was too ill to travel to the United States. In reality—unbeknownst to Drohan, counsel for the Schwarzes, and the Court—Kapur was healthy and in New York. To corroborate his false claim, Kapur provided Drohan with two fabricated doctors' notes to be transmitted to the Court. The first note, purportedly written by Dr. Shusil Dhurandhar in Mumbai on March 14, 2012, reads:

> This is to certify that Mr. Chetan Kapur is suffering from enteric fever since 10/3/12 and has been advised to take rest for at least three weeks. He is also advised to abstain from travelling till [sic] then.

Based on Kapur's representations, the doctor's note, and conversations with a person who identified himself as Dr. Dhurandhar, Drohan informed the Court that Kapur had been diagnosed with enteric fever, a highly contagious form of typhoid, and required at least three weeks to recover before he could travel to the United States. Dkt. 112, at 5–6; Dkt. 133, at 2. Drohan therefore requested an adjournment of the trial, or at least of Kapur's testimony. *See id.*

Throughout March and April 2012, Drohan continued to speak to Kapur and to the person identifying himself as Dr. Dhurandhar. *See* Dkt. 138, at 8–10. Based on these conversations, Drohan continually provided the Court with written updates regarding Kapur's

health, reporting first that his condition had improved and then that it took a turn for the worse. *Id.*; Dkt. 135, at 2–3. Kapur also provided a second fabricated doctor's note, purportedly written by Dr. Abhishek Raj in Mumbai on April 16, 2012. It reads:

> This is to certify that Mr. Chetan Kapur, who has been under my treatment since 11th April 2012, has been diagnosed with a condition suggestive of septic illness, a salmonella infection. There is presence of free fluid in his abdomen, along with an infection in his intestines. I advise him bed rest, devoid of any travel for a minimum of another 4–5 months.

SEC Ex. 31.

Kapur thus caused Drohan, unwittingly, to submit to the Court false information and documentation. The evident purpose of these submissions was to defer the scheduled trial, which the Court had previously declined to defer, or at least to obviate the need for Kapur to testify in person.[1] In the end, the trial proceeded, and the Court, with the consent of the parties, received, in lieu of live testimony, Kapur's deposition testimony. Months later, in July 2012, after the Court's post-trial decision had issued, Kapur was intercepted at the John F. Kennedy International Airport in New York City attempting to leave the country. This revealed that his claims to the Court, through Drohan, of absence and ill health had been fabricated. Kapur has since conceded to making such false statements to Drohan, and causing her to transmit them to the Court. *See* Dkt. 207, at 11–12; Dkt. 233, at 66–70, 87. Later, during the contempt proceedings before this Court, Kapur attempted to deflect responsibility for this obstructive conduct in various ways, including claiming that Drohan had given him "only a few days notice prior to the trial," Dkt. 207, at 11, implying that she had told him it was acceptable to fabricate

---

[1] With the benefit of hindsight, it is also possible that Kapur believed that a warrant was pending for his arrest and that he might be arrested if he appeared in the Schwarz action. In fact, Kapur was not charged with securities fraud until July 11, 2012, following the Schwarz trial and the Court's post-trial decision. *See* pp. 11–12, *infra*.

an excuse to avoid appearing at trial, Dkt. 233, at 70–72, 87–88, and stating that he felt "harassed" by the Schwarz plaintiffs, *id.* at 71–73, 89–91. Needless to say, the Court did not credit any of these purported justifications. Following the revelation that Kapur had lied about his whereabouts and health, Drohan ceased representing him. Kapur later retained Kevin Michael Shelley, Esq., who first appeared in the Schwarz action on October 7, 2013. Dkt. 144.

As to the trial in the Schwarz matter, on March 19, 20, and 21, and April 18, 2012, the Court held a bench trial, at which Drohan represented Kapur. *See* Dkt. 112–17. The Court heard live testimony from all three plaintiffs and from plaintiffs' expert witness, who testified about hedge fund due diligence practices; received deposition testimony, including Kapur's; and received extensive documentary evidence.

On May 31, 2012, the Court issued a lengthy Opinion and Order finding for the Schwarzes on all three claims: fraud, negligent misrepresentation, and breach of fiduciary duty. Dkt. 118. The Court found that Kapur, both in written materials and during one-on-one conversations with the Schwarzes, had made numerous false statements about the due diligence he conducted before investing in sub-funds. Concretely, the Court found, to obtain the Schwarzes' money, which totaled more than $3 million, Kapur falsely represented that ThinkStrategy: "(1) conducted background and reference checks on prospective sub-fund managers; (2) performed in-person interviews of sub-fund managers; (3) invested only in audited sub-funds; and (4) invested only in sub-funds with reputable service providers." *Id.* at 12. In fact, Kapur himself admitted, during his deposition, that ThinkStrategy did not regularly take *any* of these steps. *Id.* at 14–15. In reality, the Court held, "ThinkStrategy's due diligence was cursory" and "entailed virtually no independent verification of representations made to it by prospective sub-funds." *Id.* at 13.

If Kapur had conducted reasonable due diligence as to the sub-funds, consistent with his own representations and with industry standards, the Court held, he would have discovered "various red flags and irregularities that would have precluded a rational manager from investing client funds." *Id.* at 16. Even rudimentary diligence would have revealed, *inter alia*, that the founder of two of the sub-funds ThinkStrategy had invested in "had been disbarred for stealing escrow funds," that the purported auditors of two other funds were shams, and that another fund "had never before been audited." *Id.* at 16–21; *see also id.* at 11.

The Court further found that Kapur had refused to disclose to investors the names of the sub-funds ThinkStrategy invested in, claiming that that information was proprietary. *Id.* at 11–12. Accordingly, in deciding whether to invest with ThinkStrategy, the Schwarzes relied on Kapur's description of a "very elaborate and rigorous" selection process. *Id.* at 8; *see also id.* at 10, 23. In addition, Daniel Schwarz explicitly asked Kapur whether ThinkStrategy had invested in a particular hedge fund, Finvest. *Id.* at 9. Kapur falsely replied that it did not, and Daniel relied on that representation, when in fact ThinkStrategy had invested in Finvest. *Id.*

On these facts, the Court found that Kapur had committed fraud because he "made knowingly false representations to plaintiffs about a variety of subjects" to induce them to invest in the ThinkStrategy fund, and their justifiable reliance on those statements caused injury. *Id.* at 25–26. Similarly, the Court found that Kapur had committed negligent misrepresentation by violating his duty to give the Schwarzes accurate information. *Id.* at 29. And as to the breach of fiduciary duty claim, the Court held that Kapur had breached his duty to the Schwarzes by failing to correct various misrepresentations. *Id.* at 29–30.

The Court therefore ordered defendants to pay $3,068,483 in damages, which represented the Schwarz plaintiffs' total investment, less redemptions received. *Id.* at 35–37. The Court also

found Kapur individually liable because he "was the sole principal of ThinkStrategy" and "committed the torts of fraud, negligent misrepresentation, and breach of fiduciary duty through his own malfeasance." *Id.* at 31.

On June 1, 2012, the Court entered judgment. Dkt. 119.[2] On September 21, 2012, the Court entered an amended judgment that awarded the Schwarz plaintiffs prejudgment interest in the amount of $1,767,990, bringing to the judgment to a total of $4,836,473. Dkt. 132.

Thereafter, the Schwarz plaintiffs began discovery into Kapur's assets that could be used to satisfy the judgment against him. *See* Dkt. 140. On November 21, 2013, the Schwarzes moved to compel Kapur to turn over a Porsche 911 automobile that he had conveyed to Bina Rai, a family friend whom Kapur also described as his caterer, in October 2010. Dkt. 149–51. The Schwarzes argued that this conveyance had been fraudulent, designed to frustrate enforcement of the judgment against Kapur. *See id.* Kapur, for his part, claimed that he had transferred title of the Porsche to Rai to partially repay a $70,000 loan Rai had made to Kapur in 2000. Dkt. 154.

On February 5, 2014, Shelley moved to withdraw as counsel for Kapur, citing Kapur's nonpayment of legal fees and failure to cooperate in the litigation. Dkt. 161. The Court granted Shelley's motion, effective March 7, 2014. Dkt. 162. Since then, Kapur has proceeded *pro se*.

On June 24, July 9, and July 14, 2014, the Court heard testimony regarding the Schwarz plaintiffs' motion to compel. *See* Dkt. 207 ("June 24, 2014 Tr."), 219 ("July 9, 2014 Tr."), 215

---

[2] On July 30, 2012, after judgment was entered in the Schwarz case, a group of 10 individual and corporate investors filed suit against Kapur and ThinkStrategy. *See Schneider v. Kapur*, 12 Civ. 5818, Dkt. 1. The case was assigned to Judge Castel. Dkt. 3. Kapur was incarcerated between July 16, 2012 and July 31, 2013, *see* pp. 11–12, *infra*, and he failed to appear in the Schneider case. Accordingly, on February 26, 2013, Judge Castel entered default judgment against him. Dkt. 18. That judgment awarded the plaintiffs a total of more than $21 million. *Id.*

("July 14, 2014 Tr.").[3] Kapur testified that the Porsche was a "company car" purchased by ThinkStrategy and used for travel from New York City to meetings "all around the northeast," including in "New Jersey, Connecticut, upstate New York, Long Island, D.C., [and] Boston." June 24, 2014 Tr. 28–29. Between 2007 and 2010, however, the Porsche accrued only 1,574 miles—mileage that could easily be accrued in just one trip to each location. *See id.* at 30–31.

Kapur further testified that Rai had loaned him $70,000 in November 2000, when Kapur's father demanded repayment for Kapur's college education. *Id.* at 21. Kapur understood the loan to carry a 10-year repayment term. *See id.* at 24. As of October 2010, however, Kapur had not made any payments. *Id.* He testified that he had transferred the Porsche to Rai at that time because he "felt an obligation," and the car was "the only asset [he] had." *Id.* To corroborate his account, Kapur provided a written loan agreement dated November 29, 2000 and a "partial loan acceptance repayment agreement" dated October 12, 2010.

Rai's testimony was consistent with Kapur's account. She testified that between 1991 and 2008, she had earned $1,700 per month as a housekeeper and nanny. July 14, 2014 Tr. 8–9. By 2000, she had saved a total of $70,000. *Id.* at 12. Rai testified that she had loaned that entire amount to Kapur because Kapur's relationship with his father was deteriorating, and he needed to repay his father for his college loans. *Id.* at 13. Rai testified that she understood that Kapur would pay her back by 2010. *Id.* And in 2010, Kapur transferred his Porsche to Rai to partially repay the loan. *Id.* at 13–14. Rai does not drive in the United States, and she never drove the Porsche. *Id.* at 34. In March 2014, she testified, she sold the car to Manhattan Motorcars for $48,000. *Id.* at 34–36.

---

[3] The Court had scheduled evidentiary hearings for April 30, 2014 and May 12, 2014, but Kapur, despite notice of these hearings, failed to appear on each of those dates. *See* Dkt. 186–87.

At the hearing, the Schwarzes' counsel also questioned Kapur about two specific transfers: a $1.6 million transfer from ThinkStrategy's fund account to its management account and, the following day, a $2.1 million transfer from ThinkStrategy's management account to a JP Morgan/Bank Sarasin account held by a company called CCO Limited. *See* June 24, 2014 Tr. 33. Kapur claimed to have no recollection of these transactions and no familiarity with CCO Limited, and he could not explain why these transfers had occurred. *Id.* at 34–35, 40–41, 44–47. He acknowledged, however, that he had told the SEC that the $2.1 million transfer was a loan to his family. *Id.* at 48, 50. Kapur claimed that he "misspoke." *Id.* at 48.

On July 28, 2014, the Court issued an Opinion and Order denying the Schwarz plaintiffs' motion to compel. Dkt. 218. The Court declined to credit Kapur's testimony, finding Kapur "evasive" and "visibly uncomfortable answering questions." *Id.* at 5. However, the Court stated, it was not prepared, on the record before it, "to find that Rai (1) fabricated the series of events involving her loan to Kapur; (2) falsely testified under oath before this Court as to these events; and (3) was party (with Kapur) to creating two separate false and misleading documents that purport to substantiate her account." *Id.* at 6 (citation omitted). Accordingly, unpersuaded that Rai had perjured herself before the Court, the Court "narrowly" found, on the evidence then before it, that Kapur had borrowed $70,000 from Rai and that the transfer of the Porsche was legitimate. *Id.* The Court noted, however, that it "stands ready to consider any and all proper requests that would assist plaintiffs to collect on their judgment." *Id.* at 7.

## B.    The SEC Case

On November 10, 2011, the SEC filed a complaint against Kapur. SEC Dkt. 1. On November 16, 2011, pursuant to a settlement agreement between the parties, judgment was entered against Kapur. Dkt. 5 ("Judgment"). Kapur "consented to entry of th[e] Judgment

without admitting or denying the allegations of the Complaint (except as to jurisdiction)." *Id.* at 1. The Judgment also provided that Kapur was permanently enjoined from violating the securities laws and was required to pay disgorgement, in an amount to be determined by the Court. *Id.* at 1–4.

The Judgment was initially signed by Judge Sweet, sitting in Part I. *Id.* at 4. The case was then assigned the Judge Kaplan. Dkt. 3. On February 17, 2012, the case was reassigned to this Court. Dkt. 8. In the SEC action, as in the Schwarz case, Drohan represented Kapur until late 2012, when she, and the Court, learned that his statements regarding his travel to, and illness in, India had been false. Kapur's subsequent counsel in the Schwarz case, Shelley, never appeared in the SEC action, so Kapur has proceeded *pro se* for the past two and a half years.

On November 29, 2012, after discovery and briefing, the Court granted the SEC $3,252,271 in disgorgement, $735,925.59 in prejudgment interest, and $1 million in civil penalties, for a total of $4,988,196.59. Dkt. 21. The Court explained that "[t]he primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." *Id.* at 4 (quoting *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996)). In calculating disgorgement, the Court noted, it must "arrive at 'a reasonable approximation of profits causally connected to the violation'" and has discretion to deduct "certain expenses incurred while garnering the illegal profits." *Id.* at 5 (citations omitted). Based on Kapur's tax returns, the Court found that, between 2003 and 2009, Kapur had received aggregate gross receipts of $5,389,083 and had legitimate, verifiable business expenses of $2,086,812. *Id.* at 6. The SEC therefore requested, and the Court awarded, disgorgement in the amount of $3,252,271. *Id.* As to prejudgment interest, the Judgment stated that Kapur "shall pay disgorgement of ill-gotten gains, [and]

prejudgment interest thereon" and provided a method for the calculation of such interest. *Id.* at

10. Accordingly, the SEC requested, and the Court awarded, $735,925.59 in prejudgment

interest. *Id.* at 10–11. Similarly, as to civil penalties, the Judgment provided that Kapur "shall

pay . . . civil penalties" in an amount set by federal securities law. *Id.* at 11. Based on factors

including the intentional nature of Kapur's fraudulent conduct, the substantial losses to investors,

and Kapur's refusal to sit for a deposition, the Court imposed a civil penalty of $1 million. *Id.* at

11–13.

On November 30, 2012, the Court entered judgment in the amount of $4,988,196.59.

Dkt. 23. On January 3, 2013, on the SEC's motion, Dkt. 24, the Court entered separate amended

judgments against Kapur and his company that clarified the liabilities and responsibilities of each

defendant, incorporated the terms of the Judgment entered by Judge Sweet in November 2011,

Dkt. 1, and provided specific instructions regarding payment. *See* Dkt. 25–26.

The SEC, like the Schwarz plaintiffs, thereafter began discovery into Kapur's assets that

could be used to satisfy the judgment against him. *See* Dkt. 28. After failing to appear for two

scheduled depositions, Kapur was finally deposed on November 28, 2014. *See* Dkt. 32–35. On

December 4, 2014, the Court ordered Kapur to pay $881.03 in expenses the SEC incurred in

traveling to and hiring court reporters for the no-show depositions. Dkt. 36.

### C.    The Criminal Case Against Kapur

On July 11, 2012, a grand jury indicted Kapur for one count of securities fraud, one count

of investment advisor fraud, and five counts of wire fraud. *See United States v. Kapur*, 12 Cr.

535, Dkt. 2. The Indictment alleged, among other things, that Kapur had "deceived investors

through false and misleading statements and material omissions," including about "current

performance" and "due diligence." *Id.* ¶ 4.

On July 16, 2012, Kapur was arrested while attempting to leave the United States, and detained at the Metropolitan Detention Center. *See* Dkt. 4, 10. The case was assigned to Judge Keenan; Kapur retained Daniel Arshack, Esq., to represent him. Dkt. 6. On August 2, 2012, Judge Keenan denied Kapur's bail application based on the risk of flight. Dkt. 31, at 16.

On May 23, 2013, after attending several pretrial conferences, Kapur moved to dismiss the Indictment on the grounds that the charges were asserted outside the statute of limitations. Dkt. 18–21. On June 21, 2013, the Government filed its opposition. Dkt. 25.

On July 16, 2013, before the Court had resolved Kapur's motion, Kapur pled guilty to one count of failure to preserve books and records pursuant to a superseding Information. Dkt. 26–27. In the course of entering his guilty plea, Kapur testified that he had been aware of recordkeeping requirements applicable to the managed funds and managed accounts, and he willfully failed to preserve books and records in an easily accessible place. Dkt. 31, at 15–16.

On July 31, 2013, Judge Keenan released Kapur on bail until sentencing upon posting of $5,000 cash. *See id.* at 16. Rai posted Kapur's bail, and he was briefly released.

On August 21, 2013, Judge Keenan sentenced Kapur to time served, a term of just over 12 months, and one year of supervised release. Dkt. 34, 35. Judge Keenan ordered Kapur to pay a special assessment of $100 but did not impose a fine, finding, based on the evidence before him, that Kapur did not have the ability to pay a fine. Dkt. 35, at 18.

### D.    The Contempt Proceedings[4]

On January 6, 2015, the SEC moved to hold Kapur in contempt for failing to pay any portion of the judgment against him. SEC Dkt. 38–40. In support of that motion, the SEC presented extensive evidence of Kapur's assets, including funds in two Swiss bank accounts.

On January 9, 2015, the Court ordered Kapur to provide "evidence that compliance is now factually impossible." Dkt. 41 (quoting *United States v. Rylander*, 460 U.S. 752, 757 (1983)). Concretely, the Court directed Kapur to provide: "(1) a detailed accounting of all transactions involving the funds he has received since judgment was entered in this matter on January 3, 2013, along with supporting documentation such as bank account and credit card statements; (2) a disclosure naming any and all accounts, including but not limited to off-shore accounts held by him; any entities in which he has an interest (or entities that he has created with asset protection firms, including but not limited to any entity associated with the Mossack Fonseca Group); and any funds held on his behalf by others; these disclosures must also be accompanied by supporting documentation; and (3) a sworn declaration attesting to the accuracy and completeness of the disclosures made in compliance with items (1) and (2)." *Id.* In a later order clarifying the Court's instructions, the Court warned Kapur that a finding of civil contempt could lead to coercive sanctions including "'confining a contemnor indefinitely until he complies' with the court's orders." Dkt. 44 (quoting *In re Chief Executive Officers Clubs, Inc.*, 359 B.R. 527, 536 (S.D.N.Y. 2007)).

---

[4] The Schwarz plaintiffs first sought to hold Kapur in contempt in August 2014, contending that Kapur's testimony that he had no recollection of the Bank Sarasin transfers had been false. *See* Schwarz Dkt. 221. The Court denied their request based on the evidence then before it, finding that "[i]mprisonment would be a disproportionate sanction" and that "if Kapur has money with which to pay a fine, that money ought instead to be paid towards restitution." *Id.*

On March 6, 2015, Kapur provided a sworn declaration attesting that he does not have any accounts or assets. *See* Dkt. 52 (sealed record). According to Kapur, since September 2011, his relatives and friends have loaned him money to cover all of his expenses. These include $3,350 per month for rent and amounts ranging from $35 to $20,527.83 to pay balances on Kapur's credit cards, which he uses to pay for food, clothing, laundry, taxi rides, vacations, movie tickets, art classes, and numerous other discretionary expenses. Kapur declared that, rather than simply giving him funds, others pay his rent and credit card bills directly. To corroborate this account, Kapur attached several purported loan agreements, as well as credit card statements from January 2013 through February 2015. Kapur also represented that his family and friends are not willing to pay his legal fees or any portion of the outstanding judgments against him.

On March 25, 2015, the SEC submitted a reply memorandum and declaration in support of its motion to hold Kapur in contempt. Dkt. 49–50. There, the Commission argued that Kapur has access to substantial assets, including at least one Swiss bank account.

On April 1, 2015, the Schwarz plaintiffs, based on the SEC's factual investigation into Kapur's assets, moved to hold Kapur in contempt. Schwarz Dkt. 222. Based on documents the SEC had obtained in post-judgment discovery and had publicly filed, the Schwarzes argued that Kapur's testimony in the earlier Schwartz-case hearing, to the effect that he had no recollection of the Bank Sarasin transfers, had been false.

On April 30, 2015, the Court scheduled a joint contempt hearing in the SEC and Schwarz cases. SEC Dkt. 55; Schwarz Dkt. 224. The Court notified Kapur that it was "seriously considering imposing contempt sanctions, including incarceration," and encouraged Kapur—who has been proceeding *pro se* since March 2014—to obtain counsel. *Id.*

That day, Kapur applied for pro bono counsel. SEC Dkt. 57; Schwarz Dkt. 226.[5] On

review of Kapur's application, which disclosed, *inter alia*, approximately $5,000 in monthly

living expenses, the Court's Pro Se office recommended that the application for appointment of

counsel be denied. On May 1, 2015, after carefully and independently reviewing Kapur's

submission, the Court concluded that Kapur does not qualify for *in forma pauperis* status. SEC

Dkt. 58; Schwarz Dkt. 227. The SEC had by then presented extensive evidence of Kapur's

access to funds, including in accounts abroad. Further, the Court noted, "[a]lthough Kapur

attests to having no income or assets, he reports approximately $5,000 per month in expenses

and, as such, is not indigent." *Id.* The Court therefore denied Kapur's request for appointed

counsel, while again reminding Kapur of his right to retain private counsel. *Id.*

On May 20 and 21, 2015, the Court held a contempt hearing. There, the Court heard

testimony from Brad Mroski, an assistant chief accountant at the SEC; Joseph Romano, a CPA at

Presti & Naegele; and Kapur. *See* Schwarz Dkt. 233–36 ("Contempt Tr."). In addition, pursuant

to a stipulation among the parties, the Court received numerous documents into evidence. *See*

SEC Dkt. 62–64.[6] These include bank records, tax returns, emails, and documents describing the

ThinkStrategy managed account program. The SEC obtained its evidence by issuing subpoenas

---

[5] Pursuant to § 210.20.20 of the Criminal Justice Act ("CJA") guidelines, "counsel may be appointed under the CJA for a person charged with civil or criminal contempt who faces loss of liberty." As with pro bono counsel, however, appointment of CJA counsel requires litigants to be financially eligible. *See* 18 U.S.C. § 3006A(a); CJA Guidelines § 110.30(b). A person is considered financially eligible if his "net financial resources and income are insufficient to obtain qualified counsel." CJA Guidelines § 210.40.30(a).

[6] Docket entry 62 consists of the SEC's exhibits, with the same numbers they were assigned during the contempt hearing. The Court therefore cites these documents by exhibit number alone. Docket entries 63 and 64 consist of the Schwarzes' exhibits and Kapur's exhibits, but the numbering on the docket report does not match the hearing exhibit numbers. Accordingly, for these documents, in the interest of user-friendliness, the Court recites both the docket number and the exhibit number.

to Drohan, Presti & Naegele, and domestic banks including Bank of America. However, the SEC was not able to obtain records from the overseas banks and corporations discussed below.

The evidence presented by the SEC and the Schwarzes established that Kapur possesses or has access to several sources of funds that he could use to satisfy the outstanding judgments against him. First, a series of emails produced by the SEC show that Kapur holds an account at Bank Sarasin, a Swiss bank, under the name CCO Limited. SEC Ex. 3. And as the Schwarzes established at a previous hearing, Kapur transferred $2.1 million from ThinkStrategy to that account in 2007. *See* July 14, 2014 Tr. 33. This point was central to the Schwarz plaintiffs, who seek to hold Kapur in contempt until he testifies truthfully about the $2.1 million transfer from ThinkStrategy to the CCO account at Bank Sarasin and about his assets in any other offshore accounts.

Second, an additional series of emails produced by the SEC showed that Kapur opened an account under the name Family and Children Charitable Trust at Vontobel, another Swiss bank, and deposited $6 or $7 million in that account. SEC Ex. 7. Further, based on data from the Clearing House for International Payment Services ("CHIPS"), which maintains records of international electronic funds transfers, and records from several domestic banks, Mroski testified that two large wire transfers passed from the Family and Children Charitable Trust account at Vontobel to Rai's Bank of America account: one for $74,817.70 on August 23, 2011, and another for $72,000 on January 31, 2012. Contempt Tr. 23, 25, 29. These funds were soon thereafter returned to Kapur as "loans." *See* SEC Dkt. 52 (sealed record).

Third, the SEC elicited testimony from Kapur that he had purchased a $92,000 engagement ring for his then-girlfriend in 2008, that she returned the ring to Kapur's mother,

Manju, when the couple split up in 2009, and that Manju thereafter sold the ring. Contempt Tr. 62–64. To date, Kapur has not attempted to recover the funds from his mother. *Id.* at 64–65.

Fourth, at a previous hearing, Kapur had testified that he had purchased a Porsche 911 automobile in 2007 and had given the car to Rai in 2010, purportedly to partially satisfy a preexisting debt. June 24, 2014 Tr. 21–24, 28–29; July 9, 2014 Tr. 13–14. The SEC produced bank records showing that Rai sold the car for $48,000 in 2014. SEC Ex. 21. Rai then gave Manju $20,500, SEC Ex. 22, and Manju, in turn, made a $20,527.83 payment on Kapur's Chase bank credit card, SEC Dkt. 64, Ex. 3, at 2 (admitted as Kapur Ex. 2). The remaining $27,500 from the sale of the Porsche has not been accounted for.

Fifth and finally, the records produced by Kapur himself show that he received $234,000 in "loans" to cover his personal expenses over the course of two years. *See* SEC Dkt. 52 (sealed record). He therefore, at a minimum, has access to an income stream amounting to several thousand dollars per month, which he could use toward satisfying the outstanding judgments.

Kapur, for his part, testified that he has no income or assets he could use to pay any part of the outstanding judgments against him. Rather, he claimed, he lost everything during the financial crisis, Contempt Tr. 113, and his family has loaned him money to cover his living expenses since 2011, *id.* at 119–21. After supporting him for years, Kapur testified, his family is "having extreme difficulty" and is "financially unable to support both [his] legal and personal expenses." *Id.* at 61–62, 122.

All parties submitted post-hearing briefs. *See* SEC Dkt. 65 ("SEC Post-Hearing Br."); Schwarz Dkt. 237 ("Schwarz Post-Hearing Br."). Kapur's post-hearing brief attached several documents, including bank statements, tax returns, emails, and information about the Schwarzes.

*See* SEC Dkt. 66; Schwarz Dkt. 238 ("Kapur Post-Hearing Br."). He also filed a sworn

declaration responding to issues raised in the plaintiffs' post-hearing briefs. Schwarz Dkt. 239.

## II.     Applicable Legal Standards

Federal law provides that "[a] court of the United States shall have power to punish by

fine or imprisonment, or both, at its discretion, such contempt of its authority" including

disobedience to its lawful orders. 18 U.S.C. § 401. Before the court may hold a party in

contempt for disobeying a lawful order, the "movant must establish that (1) the order the

contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is

clear and convincing, and (3) the contemnor has not diligently attempted to comply in a

reasonable manner." *Latino Officers Ass'n City of N.Y., Inc. v. City of New York*, 558 F.3d 159,

164 (2d Cir. 2009) (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995))

(emphasis omitted).

Once the moving party has made such a showing, "a party's complete inability, due to

poverty or insolvency, to comply with an order to pay court-imposed monetary sanctions is a

defense to a charge of civil contempt." *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir.

1995). At that point, "[t]he alleged contemnor bears the burden of producing evidence" that

"clearly, plainly, and unmistakably" establishes "that compliance is *impossible*." *Id.* (emphasis

in original); *see also Rylander*, 460 U.S. at 757 (collecting cases); *Close-Up Int'l, Inc. v. Berov*,

474 F. App'x 790, 795 (2d Cir. 2012) (summary order) (collecting cases). "Conclusory

statements are inadequate to carry this burden," and "[t]he court is not required to credit the

alleged contemnor's denials if it finds them to be 'incredible in context.'" *Huber*, 51 F.3d at 10

(quoting *Maggio v. Zeitz*, 333 U.S. 56, 76 (1948)).

Further, "a mere showing that the party was unable to pay the *entire* amount by the date specified is insufficient to avoid a finding of contempt." *SEC v. Aragon Capital Advisors, LLC*, No. 07 Civ. 919 (FM), 2011 WL 3278907, at *5 (S.D.N.Y. July 26, 2011) (quoting *SEC v. Musella*, 818 F. Supp. 600, 602 (S.D.N.Y. 1993)) (emphasis added). "[I]nability to pay is a defense only when it is impossible for the contemnor to pay *any portion* of the ordered disgorgement." *SEC v. Zubkis*, No. 97 Civ. 8086 (JGK), 2003 WL 22118978, at *4 (S.D.N.Y. Sept. 11, 2003) (emphasis added). "Otherwise, the party must pay what he or she can." *Musella*, 818 F. Supp. at 602.

## III. Discussion

Kapur concedes that he has not complied with the Court's unambiguous judgments. *See* Kapur Post-Hearing Br. ¶ 3. As noted, the Court has entered a judgment awarding the SEC $3,988,196.59 in disgorgement and prejudgment interest, *see* SEC Dkt. 23, 25–26, and a judgment awarding the Schwarz plaintiffs $3,068,483 in damages and prejudgment interest, *see* Schwarz Dkt. 119, 132. To date, Kapur has not made any payments toward either judgment. SEC Ex. 2; *see also* Contempt Tr. 123–24. In addition, the Court has ordered Kapur to disclose, *inter alia*, all bank accounts, including off-shore accounts, that he holds. SEC Dkt. 41, 44; *see also* Contempt Tr. 59–60, 111, 146 (placing Kapur under oath). Kapur maintains that he has no such accounts and therefore has nothing to disclose.

Accordingly, the issues for the Court to resolve are (1) whether plaintiffs have established that Kapur "has not diligently attempted to comply in a reasonable manner," *Latino Officers Ass'n*, 558 F.3d at 164, and, (2) if so, whether Kapur has "clearly, plainly, and unmistakably" proven "that compliance is *impossible*," *Huber*, 51 F.3d at 10 (emphasis in original). Based on the evidence adduced at the contempt hearing, plaintiffs have satisfied their burden, and Kapur,

whose testimony the Court largely rejects as incredible, has not. Concretely, the Court finds that Kapur has access to several sources of funds, including: (a) an account at Bank Sarasin, a Swiss bank; (b) an account at Bank Vontobel, another Swiss bank; (c) the proceeds from the sale of an engagement ring Kapur purchased in 2008; (d) the proceeds from the sale of a Porsche Kapur purchased in 2007; and (e) "loans" from family and friends. Yet Kapur has not paid a penny toward either judgment, nor has he provided a truthful accounting of the Swiss bank accounts as required by the Court's orders. The Court discusses each source of funds, in detail, below.

### A. Bank Sarasin Account

The evidence presented at the contempt hearing established that Kapur controls an account at a Swiss bank, Bank Sarasin, under the name "CCO Limited," which, according to the most recent evidence available, contained at least $2.1 million. On September 5, 2008, Kapur emailed Philip Stibolt, a senior vice president of Bank Sarasin, and complained that:

> I have spent the past 5 hours trying to figure out the transfers made from cco to aaia to apc, and errors in the statement. I am not one bit happy about *my hard earned money* being accounted for in this manner. I urge you to check every statement sent to me each month before it gets sent, so that I get accurate statements—which is the least I should expect from *my bank*.

SEC Ex. 3 (emphasis added). Kapur went on to explain that "cco should only send monies to aaia" and to direct how funds should be transferred among various accounts. *Id.*

Prior to this exchange between Kapur and Stibolt, at least $2.1 million had been transferred into in the CCO account at Bank Sarasin. On July 25, 2007, $1.6 million was transferred from the ThinkStrategy Multistrategy Fund account to the ThinkStrategy Capital Management account at Wachovia. June 24, 2014 Tr. 33–34, 46–47. The next day, July 26, 2007, $2.1 million was transferred from the ThinkStrategy Capital Management account to an account for the benefit of CCO Limited at J.P. Morgan/Bank Sarasin. *Id.* at 33–34, 42–45.

Kapur's explanation for these transfers has shifted dramatically.  At a deposition conducted by the SEC on November 17, 2010, Kapur testified that the $2.1 million transfer was a loan to his family in India.  Kapur then testified, in relevant part:

> Q. Do you recognize Bank Sarasin? I believe it's out of Switzerland.
> A. Sure.
> Q. Who holds an account there?
> A. I believe it's a family—my family.  Family loan, I believe.
> Q. So the counterparty in this transaction is a family account?
> A. Yes.
> Q. Is this with family in India?
> A. Yes.
> Q. This is going from the management company, correct?
> A. Correct.
> Q. Do you recall why you sent $2.14 million to that family account?
> A. Just for my family. Just for my family's use, as a loan to my family.
> . . .
> Q. Were there terms to that loan? Are they going to pay it back?
> A. You know, it might be forgiven.  It really depends.
> Q. It might be a gift?
> A. It might be forgiven or it might be a gift, but it was given as a loan but—
> Q. I'm assuming, at least at this point, that this is your own money?
> A. Yes.
> . . .
> Q. Who, specifically, did you loan the money to?
> A. To my brother. . . .  Karan.
> Q. Is there any purpose he's using that for?
> A. He runs a business as well, so to assist him with his business.
> . . .
> Q. What does he do?
> A.  He's in the clothing business and garments, import/export of manufacturing clothing.
> Q. Manufacturing clothing and the garment business?
> A. A variety of different businesses.

SEC Dkt. 63, Ex. 4, at 96–97 ("2010 Dep. Tr.") (admitted as Schwarz Ex. 2).  Since late 2013, however, Kapur has maintained that this testimony was a "mistake"; he claims he "misspoke" because he was overwhelmed by the SEC's "rapid fire" questions.  June 24, 2014 Tr. 53.

Kapur has since suggested a number of alternative explanations for the $2.1 million transfer of what he had called "my hard earned money" into that account.  *See* June 24, 2014 Tr.

43–47; Kapur Post-Hearing Br. ¶ 10. Kapur has acknowledged, however, that the "possibilit[ies]" he has identified are "just speculation," June 24, 2014 Tr. 46; *see also* Contempt Tr. 164–65, and has not committed to a single explanation. Tellingly, he has not provided a single document that meaningfully corroborates any of them, *see* Contempt Tr. 85–87, 165, and, in contravention of the Court's orders, has not come forward with account statements or other documentation from the bank. Moreover, as discussed below, each potential explanation is undermined by other portions of Kapur's own sworn testimony.

First, Kapur suggested that the transfer perhaps could have been "an accrued payment to a service provider for services rendered (such as consulting, advisory or placement agent services)." Kapur Post-Hearing Br. ¶ 10. But at multiple hearings, Kapur testified that he had no recollection whatsoever of the $2.1 million transfer. *See* June 24, 2014 Tr. 43; Contempt Tr. 94–95. To earn a $2.1 million payout, a consultant or advisor would have had to supply valuable services over a significant period of time. The Court is skeptical, to say the least, that Kapur would retain no memory of such a relationship and no records related to such an entity or the services it provided.

Second, Kapur suggested that the transfer could have been "an accrued rebate to an institutional investor." Kapur Post-Hearing Br. ¶ 10. However, Kapur testified that he had no specific reason to think that the transfer reflected a rebate to an investor, and he conceded that the money for such a transfer would have not have come from ThinkStrategy's Capital Management account, but instead from its Multistrategy Fund account. *See* June 24, 2014 Tr. 43–45.

Third, Kapur suggested that the transfer could have been "an error reversal, where a Fund or Managed Account investor erroneously sent the funds to the Management Company instead of

the Funds or Managed Account structure." Kapur Post-Hearing Br. ¶ 10. This purported

possibility is, however, directly contracted by the bank records, which show no such investor

error. To the contrary, the bank records show that the funds necessary to complete the $2.1

million transfer came from the ThinkStrategy Multistrategy Fund account. June 24, 2014 Tr.

46–47.

In addition, none of these three possibilities accounts for the words Kapur used in an

email to describe this money, prior to the lawsuits and judgments against him. Specifically, in

his email to Stibolt, Kapur referred to the funds in the CCO account as "my hard earned money."

SEC Ex. 3. And revealingly, when confronted with that email during the contempt hearing,

Kapur's explanation for the $2.1 million transfer shifted yet again. There, Kapur testified that

the CCO account was part of ThinkStrategy's managed account program:

> Q. So you did have your own money at Bank Sarasin, correct?
> A. Incorrect.
> Q. You didn't have your own hard-earned money at Bank Sarasin?
> A. No, I did not.
> Q. Whose money was it?
> A. It was a client's money. We often personalized managed accounts and also give
> an optimistic view of assets to come into managed accounts when we were dealing
> with bank staff. It helped provide better servicing to us, and it helped better meet
> the reasonable needs of our clients.
> Q. Which client had—which of your clients had money at Bank Sarasin?
> A. The clients in this e-mail, obviously.
> Q. What's that person's name?
> A. I don't recall, Mr. Solotaroff [counsel for the Schwarz plaintiffs]. This is from
> like seven years ago.
> . . .
> Q. So you, based on what you're telling us, you lied to Mr. Stibolt, correct?
> A. I wouldn't say I lied. I would just say the day-to-day team at the bank was
> unaware of the ownership of these structures. . . . [T]o receive better servicing,
> yeah, we did say, you know, it's—sometimes they just had the misimpression
> themselves. Also, we didn't say anything. They assumed that the person they were
> dealing with owned the structure, which was not the case.
> Q. Okay. But this time you told Mr. Stibolt that it was your own hard-earned
> money, right?

A. Yeah. We were frustrated. In the e-mail I'm trying to get servicing here for the client.

Contempt Tr. 95–96.

This theory—that the CCO account belonged to a ThinkStrategy client whose money he managed, and Kapur had misrepresented the funds as his own to obtain better servicing—is again contradicted by other testimony Kapur has given under oath. During his November 2010 deposition before the SEC, Kapur was repeatedly asked to identify every managed account he had ever handled. *See* 2010 Dep. Tr. 35 ("Are there any other managed accounts?"), 42 ("[I]s there any other account that you managed?"), 48 ("Is there any other managed account that would factor into that to generate those returns?"), 76 ("Were there any other managed accounts . . . ?"). In response to these queries, Kapur listed only five accounts: (1) a "Millennium" account that Kapur ceased managing in December 2003, *see id.* at 35, 45; (2) a "Zenith" account that had a zero balance as of October 2004, *id.* at 59, 76; (3) an "Option Express" account that had a zero balance as of June 2006, *id.* at 66, 76; (4) a family account, *id.* at 35; and (5) a managed account, *id.* at 42, 48. None of these accounts is identifiable as the Bank Sarasin account. Also at odds with this claim, Kapur further testified, at the time of his deposition in November 2010, that he was "thinking potentially about launching a managed account platform, but that hasn't launched." *Id.* at 128. Therefore, according to this testimony, when ThinkStrategy made the $2.1 million transfer in July 2007, Kapur's managed accounts, if any, were limited to a family account and a personal account.

At the contempt hearing, Kapur testified that, in fact, he had managed accounts for eight or nine clients including the "Imperial Group" and the "Mangusta Group," Contempt Tr. 103, two entities Kapur had failed to list as managed account clients during his November 2010 deposition. But this testimony was unpersuasive and, in any event, impeached by other

24

testimony Kapur gave at the contempt hearing: He also testified that, in June 2010, he had been "in phase one of [the] managed account program" in June 2010. *Id.* at 98. Thus, even if Kapur had managed accounts for clients whom he failed to identify when directly asked about this subject during his November 2010 deposition—and, as discussed at pages 31–32, *infra*, the Court rejects Kapur's testimony as to this point—he certainly did not have such accounts three years earlier, in July 2007, when the $2.1 million transfer was made. And, as noted, despite the Court's orders, Kapur has not come forward with any documentary evidence of these accounts he controlled, including evidence as to the beneficial owners of these accounts or activity in these accounts since the dates reflected in the evidence adduced by the SEC.

For these reasons, the Court finds that Kapur controls the CCO account at Bank Sarasin and has access to at least $2.1 million that he could use to partially satisfy the judgments against him. *See SEC v. Princeton Econ. Int'l Ltd.*, 152 F. Supp. 2d 456, 459 (S.D.N.Y. 2001) ("It is well-settled that if a court finds that a defendant could at some time in the past have complied with a court order, the court should presume a present ability to comply.") (quoting *U.S. ex rel. Thom v. Jenkins*, 760 F.2d 736 (7th Cir. 1985)); *see also SEC v. Universal Exp., Inc.*, 546 F. Supp. 2d 132, 135 (S.D.N.Y. 2008) (same); *SEC v. Bremont*, No. 96 Civ. 8771 (LAK), 2003 WL 21398932, at *5 (S.D.N.Y. June 18, 2003) (same). The Court also finds that Kapur has not testified truthfully about the off-shore accounts he possesses, as required by the Court's orders. *See* SEC Dkt. 41, 44; Contempt Tr. 59–60, 111, 146 (placing Kapur under oath). Accordingly, the SEC and the Schwarzes have established that Kapur has not diligently attempted to comply with the Court's orders, and Kapur has not proven his inability to pay any portion of the outstanding judgments against him.

## B.    Bank Vontobel Account

The evidence adduced at the contempt hearing also established that Kapur held an account at Vontobel, another Swiss bank.  In May and June 2010, Kapur exchanged a series of emails with Daniel Leon, a representative of the Mossfon Trust Corporation; Alexandra Kourany, an attorney affiliated with Mossfon; and Edison Teano, a trust executive at Mossfon.  SEC Ex. 7.[7]  The emails reveal Kapur's intent to acquire a Panamanian shelf company, incorporate a foundation to hold the shares of that company, open an account for the foundation at Bank Vontobel, and deposit $6 or $7 million into that account.  *See id.* at 56, 74–80.

Specifically, the emails reflect that Kapur was interested in two vintage shelf companies—Margson Commercial Inc. and Quaitridge International Assets Inc.—although they do not indicate whether Kapur ultimately acquired either of those entities.  *See id.* at 5 (June 8, 2010 email from Kapur to Leon stating: "Let me call you on the names, as there seems to be a disconnect on names that I am ideally seeking.  But if nothing else available—margson commercial would work."), 56 (June 28, 2010 email from Leon to Kapur stating: "We have taken note that you would like to acquire the vintage company Quaitridge International Assets Inc.  Therefore, we will keep it reserved for you free of charges.").

The emails also show that Mossfon set up a foundation for Kapur called the "Family and Children Charitable Foundation" (the "Foundation").  On May 21, 2010, Leon told Kapur that he and his team would "proceed to verify the availability of Family and Children Charitable Foundation to see if it might be used for the incorporation of the Foundation." *Id.* at 74.  On June 1, 2010, Leon informed Kapur that he had "reserved for you the name of the Foundation at

---

[7] The complete series of emails was admitted as SEC Exhibit 7.  Each party submitted individual emails or excerpts under various other exhibit numbers.

the Public Registry of Panama just to avoid that any other Agent in Panama may incorporate a Foundation with this name, while you go through our Due Diligence procedures." *Id.* at 65. Then, on June 28, 2010, Leon asked Kapur to "please let us know if you need us to incorporate the foundation Family and Children Charitable Foundation as per our previous exchange of emails (as [we] understand the foundation would be the holding of the shares of the company Quaitridge International Assets Inc.)." *Id.* at 56.

Finally, the emails state that Kapur planned to open a bank account at Vontobel for the Foundation, and to deposit a significant amount of money into that account. *See id.* at 56, 80. On June 8, 2010, Kapur explained that the funds would come from his "savings and earnings over the years from [his] past work experiences, and [his] businesses (investment advisory, investment management)." *Id.* at 5. And on June 28, 2010, Leon noted that Kapur "expect[ed] to deposit in the Foundation's bank account an amount between US $6,000,000 and US $7,000,000 during the first year." *Id.* at 56.

Significantly—in evidence that was not before the Court in 2014, when it declined to discredit Rai's testimony—at least two wire transfers passed from the Foundation to Rai, each in a multi-step process. First, on August 18, 2011, $75,565 was transferred from the Foundation's Vontobel account to a Mossfon escrow account. SEC Ex. 20, at 2; *see also* Contempt Tr. 25–27 (Mroski). The escrow account, which was held by HSBC, operated through the Winterbotham Trust Company. *See id.* Five days later, on August 23, 2011, $74,817.70 was transferred from the Mossfon escrow account to Rai's Bank of America account. SEC Ex. 20, at 3; *see also* Contempt Tr. 25–28; SEC Ex. 16. Second, on January 27, 2012, $72,743 was transferred from the Foundation's Vontobel account to a Mossfon escrow account. SEC Ex. 20, at 4; *see also* Contempt Tr. 28. And on January 31, 2012, $72,000 was transferred from the Mossfon escrow

account to Rai's Bank of America account via a Deutsche Bank trust account. SEC Ex. 20, at 5; SEC Ex. 15.[8]

After receiving these transfers, Rai gradually returned the funds to Kapur. According to Kapur's records, Rai "loaned" him $10,000 on September 10, 2011 and an additional $124,000 between November 2011 and April 2014. Kapur Ex. 2, at 4–5. The funds were used to pay Kapur's rent and credit card bills. *See id.*

The record before the Court indicates that Rai simply could not have made these "loans" to Kapur without the transfers from the Foundation. The most direct evidence is Rai's bank account records: Before receiving the $74,817.70 transfer in August 2011, her account balance was $0. SEC Ex. 18. And before receiving the $72,000 transfer in January 2012, her account balance was $233. SEC Ex. 19. Accordingly, although the funds passed through Rai's bank account, the conclusion is inescapable: Kapur was using his own money to pay his own rent and credit card bills.

Further, in light of Rai's testimony about her work history, it is extremely unlikely that she had sufficient savings or income to make such substantial loans to Kapur. Rai testified that she emigrated from India in 1991 with no savings. July 14, 2014 Tr. 12. Once in the United States, she earned $1,700 per month as a housekeeper and nanny. *Id.* at 8–9. By 2000, she testified, she had saved a total of $70,000, more than one-third of the total wages she had earned over the past decade. *Id.* at 12. Rai then loaned $70,000, her entire life savings, to Kapur so that he could repay a debt to his father. *Id.* at 13. Between 2000 and 2008, Rai continued to earn $1,700 per month as a housekeeper and nanny. *Id.* at 8–9. Starting in 2008, Rai testified, she

---

[8] In addition to the CHIPS records, these transfers are reflected in Rai's bank account statements, SEC Exs. 18–19, and spreadsheets prepared by HSBC, Deutsche Bank, and Bank of America, SEC Exs. 15–17.

earned $2,000 per month providing catering services to ThinkStrategy. *Id.* at 8, 24.[9] At some

point after that, Rai and Kapur attempted to open an art gallery. *Id.* at 24. Rai invested $80,000

in the venture and lost much of her investment when the business failed. *Id.* at 24–26. Around

the same time, Rai lost her catering income because Kapur went to jail, and ThinkStrategy shut

down. *See id.* at 25. Thus left with little to no savings or income, Rai simply could not have

"loaned" Kapur $134,000 between November 2011 and April 2014 without the transfers from

the Foundation. Indeed, by July 2014, Rai testified that she was in debt. *Id.* at 39–40.

At the contempt hearing, Kapur, with the transfers from his Foundation account to Rai

now revealed, tellingly did not call Rai to testify. Instead, in his own testimony, he denied

ownership of the Bank Vontobel account and claimed that he had set up the Foundation and the

account as part of ThinkStrategy's managed account program. Contempt Tr. 85, 125–30, 140–

42; *see also* Kapur Post-Hearing Br. ¶ 10. Although he admitted that he had "g[i]ve[n] the

impression" that the Foundation and account were for his personal use, he testified that

"certainly this was not the case." Kapur Post-Hearing Br. ¶ 10. Rather, Kapur claimed, he

created the structures, including by providing personal information for the due diligence process,

but the structures were funded and owned by a third party. *See id.* The Court finds this account

incredible, for several reasons.

First, as Kapur concedes, this claim directly contradicts the information Kapur provided

to Mossfon. Concretely, Kapur told Leon, Kourany, and Teano that he wanted to create the

Foundation and that he would deposit $6 or $7 million in the Foundation's account from his own

---

[9] Rai's testimony on this point was contracted by Romano, who prepared Rai's tax returns from 2006 through 2012 and testified that, as far as he knew, she had never worked for ThinkStrategy. Contempt Tr. 38. Romano also testified that, between 2006 and 2012, Rai's reported annual income ranged from $0 to $39,000 and did not include any interest income. *Id.* at 37–39.

"savings and earnings over the years from [his] past work experiences, and [his] businesses (investment advisory, investment management)." SEC Ex. 7, at 5, 56.

To acquire the shelf company, incorporate the Foundation, and open the Vontobel account, Mossfon required Kapur to go through its standard due diligence procedures. *See id.* at 65–66, 74–76. Teano explained that "as a trust entity," Mossfon is required by law to "know [its] client" and "determine their sources of funds." *Id.* at 57. Accordingly, Leon requested information including the "[n]ame of the principal clients and providers," the "origin of the funds," and the "[p]urpose of the bank account and the activities of the company/Foundation." *Id.* at 75. He also requested documents including Kapur's passport, curriculum vitae, reference letters, and personal bank statements. *Id.* at 54, 56, 76.

Kapur appears to have complied with most of Leon's requests. *See id.* at 5, 56. Notably, Kapur asked Romano, his accountant at Presti & Naegle, for a letter of reference. SEC Ex. 9. His email to Romano stated, in relevant part: "My family is setting up a trust structure with [Mossfon]. Their compliance department per their standard procedure needs an accountant letter to confirm basically that we file taxes." *Id.* Romano provided the requested letter, wherein he noted that he had "known Mr. Kapur for over 5 years," believed Kapur "has conducted his affairs in a professional and competent manner," and "always found him to be creditworthy and upstanding." SEC Ex. 10. In addition, although Kapur balked at providing his personal tax returns, he did not object to providing his personal bank account statements. SEC Ex. 7, at 56 ("I am happy to provide the statements of the current bank showing assets, and have already detailed in writing the source of funds. I have never been asked for personal tax returns as part of KYC, and this is a very unusual request.").

In his dealings with Mossfon and Romano, Kapur never suggested that he was working on behalf of anyone other than himself. To the contrary, Kapur repeatedly represented that the Foundation would belong to him and would be funded with his money. Kapur's argument—in essence, that he lied to Leon, Kourany, Teano, and Romano, but told the truth before this Court—raises obvious bright-red flags. Moreover, Kapur does not explain how he could have provided personal bank statements documenting balances of at least $6 or $7 million if, as he claims, he lacked such assets at the time. *See* Contempt Tr. 127–28.

Second, Kapur's testimony cannot be squared with the transfers from the Foundation to Rai in August 2011 and January 2012, following which Rai used the money to benefit Kapur. In a sworn declaration, Kapur attested that those transfers were loans to Rai that Kapur's brother, Kabir, arranged through a "private lending relationship." SEC Dkt. 66, Ex. 1, at ¶ 3(c). Kapur claims that, unbeknownst to him, Kabir's contact was one of Kapur's clients, and the contact happened to transfer money to Rai from the Foundation Kapur had structured. These facts, if proven, would present an astonishing coincidence. Without any evidence corroborating Kapur's account—Kapur did not, for example, offer testimony from Kabir, provide any details about his mysterious "private lending relationship," or produce a loan agreement—the Court finds such a coincidence entirely implausible.

Third, even setting aside the transfers to Rai, Kapur's uncorroborated testimony about the managed account program is incredible. Kapur has repeatedly testified that by mid-2010, ThinkStrategy was "scaling back" and "winding down operations." 2010 Dep. Tr. 7; *see also id.* at 127 (as of November 2010, ThinkStrategy had no clients or accounts apart from the funds in liquidation); July 9, 2014 Tr. 12–13 (fund went into liquidation in fall 2008); Contempt Tr. 103 (two or three managed account clients "never materialized because of the financial crisis"); *id.* at

139 (in 2010, ThinkStrategy's "resources were almost fully depleted"). Kapur also testified that, as of November 2010, he was "thinking potentially about launching a managed account platform," but it "ha[dn't] launched." 2010 Dep. Tr. 128. To resolve this discrepancy, Kapur claimed that "when [he] said it wasn't launched, it means—[he] meant it didn't generate revenues." Contempt Tr. 102. He further explained that the managed account program was not run by ThinkStrategy, but rather by the AIM Advisory Group, *id.* at 85, an entity he previously had testified was "Rai's art business," July 9, 2014 Tr. 20; *see also* 2014 Dep. Tr. 41–42. This testimony does not hold water. The managed account program—if it existed at all in 2010—did not include structuring the Foundation and the Vontobel account.

In sum, the Court finds that the Foundation and its Vontobel account are owned and controlled by Kapur, and that Kapur has access to the $6 or $7 million he deposited into that account. *See Princeton Econ. Int'l Ltd.*, 152 F. Supp. 2d at 459. Again, the evidence provided by the SEC establishes that Kapur has not made a diligent effort—indeed, any effort—to comply with the Court's orders, and has not, at all, proven his inability to pay the outstanding judgments.

### C. Engagement Ring

In late 2008, Kapur purchased a $92,000 engagement ring from Bianca Jewelers for his then-girlfriend, Georgianna Ene. Contempt Tr. 62–63. At some point in 2009, however, Kapur and Ene called off the engagement. *Id.* at 63. Ene thereafter gave the ring to Kapur's mother, Manju, who sold it. *Id.* at 63–64; *see also* 2014 Dep. Tr. 92–93. While the proceeds belong to Kapur, Manju did not give them to him, and he has not asked Manju for them. *Id.* at 64–65.

Kapur's failure to recover, or try to recover, these funds from his mother does not establish his inability to pay the outstanding judgments against him. To the contrary, "[a] judgment debtor must make all reasonable efforts to recover monies disbursed to friends,

relatives and associates." *Bremont*, 2003 WL 21398932, at \*6 (citing *Commodity Futures Trading Com'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1530 (11th Cir. 1992)); *see also SEC v. Durante*, No. 01 Civ. 9056 (DAB) (AJP), 2013 WL 6800226, at \*4 (S.D.N.Y. Dec. 19, 2013) *report and recommendation adopted*, 2014 WL 5041843 (S.D.N.Y. Sept. 25, 2014) (holding defendant in contempt where he "cannot show where that money eventually went nor has he taken any steps to recover it").

Absent any evidence to the contrary, the Court assumes that Manju sold the ring for its full value and that she holds the proceeds (or assets of equal value) on Kapur's behalf. *See Princeton Econ. Int'l Ltd.*, 152 F. Supp. 2d at 459. The Court therefore concludes that Kapur has access to $92,000, which he could use toward satisfying the outstanding judgments against him.

### D.   Porsche 911

In 2007, Kapur purchased a Porsche 911 automobile that, he claimed, ThinkStrategy employees used to travel from New York City to meetings "all around the northeast." June 24, 2014 Tr. 28–29. In 2010, Kapur transferred the Porsche to Rai. *Id.* at 21–24; July 9, 2014 Tr. 13–14. At that time, the Porsche had been driven only 1,574 miles, June 24, 2014 Tr. 30–31, and was worth $54,450, Schwarz Dkt. 157. Rai testified that she does not drive in the United States, and she never drove the Porsche. July 14, 2014 Tr. 34. Rai nevertheless kept the car until March 2014, when she sold it to Manhattan Motorcars for $48,000. *Id.* at 34–36.

On March 14, 2014, Manhattan Motorcars issued Rai a check for $48,000. SEC Ex. 21. Rai deposited the check on March 17, 2014. *Id.* Then, on March 28, 2014, Rai gave Kapur's mother, Manju, $20,500. SEC Ex. 22. Days later, on April 1, 2014, Manju made a $20,527.83 payment on Kapur's Chase bank credit card. Kapur Ex. 2, at 2.

Kapur maintains that he transferred title of the Porsche to Rai for a legitimate reason: He testified that he did so to partially repay a $70,000 loan Rai had made to Kapur in 2000, when Kapur's father demanded repayment for Kapur's college education. June 24, 2014 Tr. 21. Because the loan carried a 10-year repayment term, Kapur "felt an obligation" to repay Rai in 2010, and the car was "the only asset [he] had" at that time. *Id.* at 24. Rai likewise testified, at the earlier hearing in the Schwarz case, that she loaned Kapur $70,000 in 2000 because Kapur's relationship with his father was deteriorating, and he needed to repay his father for his college loans. July 9, 2014 Tr. 13.

For the reasons discussed at page 28–29, *supra*, the Court is skeptical that Rai loaned Kapur $70,000 in 2000. Although the Court was willing to credit Rai's testimony on this point when it first addressed this issue in July 2014, *see* Dkt. 218, the substantial new evidence provided by the SEC and by Kapur himself—which shows that Kapur's "payment" on the loan ultimately circled back to him—convincingly impeaches her testimony.

Kapur's attempt to provide a benign explanation for the path of the Porsche proceeds is also unavailing. He testified that Manju loaned Rai $65,562 on February 25, 2014, and so Rai, after selling the Porsche on March 14, 2014, transferred $20,500 to Manju to partially repay that loan. Contempt Tr. 120–21; Kapur Ex. 2, at 3. But this account is contradicted by Rai, who testified that Manju loaned her $11,000. July 14, 2014 Tr. 36. It also, like Kapur's other explanations, defies common sense: Why would Rai borrow $65,000 weeks before selling a sports car worth $54,000 that she owned but never drove? Moreover, Kapur's story also fails to

account for the remainder of the Porsche proceeds, and the remainder of the purported loan balance.[10]

Accordingly, the Court concludes that Kapur had access to the Porsche proceeds and could have used those funds to partially satisfy the outstanding judgments against him. Although Kapur appears to have spent $20,500 to pay off his credit card bill, the other $27,500 remains unaccounted for.

### E. "Loans" from Family and Friends

Even if the Court accepted Kapur's account of his financial situation, the records he provided reveal that he received "loans" totaling $718,188.85 between July 17, 2012 and May 13, 2015. *See* Kapur Ex. 2. Excluding loans that covered Kapur's legal expenses, the loans for Kapur's personal expenses from August 12, 2013 to May 13, 2015 totaled $233,988.85, an average of $11,142.33 per month. *See id.* Kapur's loan agreements and credit card statements reveal numerous unnecessary and excessive expenditures, including an apartment with a monthly rent of $3,500; frequent taxi rides around New York City; professional house cleaning; subscriptions to the New York Times, the Wall Street Journal, and PR Newswire, among others; vacations to Miami and Boca Raton; and classes at the Art Students League. *See* SEC Dkt. 52 (sealed document). Further, while the loan agreements with Kapur's parents and with Rai indicate that the installments were used to pay Kapur's rent and credit card bills, the loan

---

[10] The Court also notes that the purported loan agreements for which Kapur vouches, when viewed in their totality, are extremely suspicious. Kapur testified that he did not prepare any of these loan documents, and that the respective lenders either prepared the documents or arranged to have them prepared. Contempt Tr. 155–60. However, each loan agreement contains nearly identical language and the same idiosyncratic grammatical error. *See id.* (noting that each loan agreement confuses "it's" and "its").

agreement with Kapur's brother, Kabir, shows loans totaling $47,080 between June and December 2014 for unspecified "personal activities." *See* Kapur Ex. 2, at 7–9.

Kapur testified that his family is "financially unable to support both [his] legal and personal expenses." Contempt Tr. 61, 122. This claim is suspect in light of the substantial sum Kapur has received to date. But even assuming *arguendo* that his only source of funds is "loans" from his relatives and close friends, and that those funds are limited, Kapur could still satisfy a portion of the judgments against him by reducing his monthly expenditures.

## IV.    Contempt Sanctions

As noted, the Court has entered clear and unambiguous orders, and Kapur has failed to comply with them. For the foregoing reasons, the Court finds that Kapur has access to several million dollars held in two Swiss bank accounts—as to which he has not testified truthfully—as well as more modest funds from the sales of the engagement ring and the Porsche, and "loans" from family and friends. Kapur thus "has not clearly established his inability to comply with the terms of the order," *Huber*, 51 F.3d at 10, indeed, far from it. As such, he is in contempt.

The Court therefore has authority to impose sanctions, including a monetary fine or term of incarceration. 18 U.S.C. § 401; *Armstrong v. Guccione*, 470 F.3d 89, 101 (2d Cir. 2006) (quoting *In re Debs*, 158 U.S. 564, 595 (1895)); *Chief Executive Officers Clubs, Inc.*, 359 B.R. at 536. Before imposing a sanction, however, the Court "must consider '(1) the character and magnitude of the harm threatened by the contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction.'" *Aragon Capital Advisors*, 2011 WL 3278907, at *8 (quoting *Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir. 1987)). "The ultimate consideration is whether the coercive sanction is reasonable in

relation to the facts." *Zubkis*, 2003 WL 22118978, at *4 (quoting *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1353 (2d Cir. 1989)).

In similar circumstances, courts in this District have incarcerated defendants until they purged the contempt by paying the judgments against them. *See Durante*, 2013 WL 6800226, at *5; *Universal Exp., Inc.*, 546 F. Supp. 2d at 142; *Bremont*, 2003 WL 21398932, at *7 (collecting cases from other districts); *Princeton Econ. Int'l Ltd.*, 152 F. Supp. 2d at 458. In *Durante*, for instance, the defendant, Durante, failed to pay an outstanding $25 million judgment against him. 2013 WL 6800226, at *3. Durante claimed that he had no assets, earned only $50,000 per year, and funded his living expenses with gifts and loans from close friends. *Id.* at *3–4, *9–10. The expenses allegedly covered by Durante's friends included "$17,000 in bills at Bloomingdale's and Bergdorf Goodman, college tuition for his children, a Porsche Cayenne for his wife, and lavish trips to Europe." *Id.* at *4. Finding Durante's testimony unsupported and not credible, the Court concluded that Durante "has chosen to make every effort to hide his financial condition and steadfastly frustrate the SEC's attempts at collection. Durante only offers a fanciful tale of unparalleled charity and generosity by 'friends.' (Even if that were true, Durante should be using these funds to pay off the judgment, not to live a life of luxury.)." *Id.* at *14. Accordingly, the Court ordered Durante incarcerated until he purged the contempt by "mak[ing] meaningful payments toward the disgorgement amount and provid[ing] a current and accurate accounting of his income and assets." *Id.*

Similarly, here, the Court cannot and does not credit Kapur's claim of destitution, and the funds he has access to—even if limited to some $11,000 per month in "loans"—should be used to begin paying off the outstanding judgments against him. As for the appropriate sanction, "[i]mposing escalating fines on a defendant who has brazenly refused to pay an already large

judgment would be an empty gesture"; "[o]nly the most powerful coercive sanctions offers any prospect of producing compliance." *Universal Express*, 546 F. Supp. 2d at 142. Because Kapur "has failed to comply, despite being given every opportunity to do so, he should be ordered incarcerated." *Durante*, 2013 WL 6800226, at *14.

At the next conference in this case—scheduled for July 7, 2015 at 3:30 p.m.—Kapur will surrender to the United States Marshals.[11] Kapur will remain incarcerated until he has purged the contempt, either by: (1) paying the $3,988,196.59 in disgorgement and prejudgment interest to the SEC, or (2) providing documentation, including records of both Swiss bank accounts, that concretely and unambiguously establishes his inability to pay any greater amount than the portion (if any) he eventually pays. Detailed payment instructions appear in the final amended judgment in the SEC case. *See* SEC Dkt. 25, at 4.

The Court will review Kapur's detention every six months to ensure that it retains its coercive function and does not "slip[] into the impermissible terrain of a punitive sanction." *Armstrong*, 470 F.3d at 114 (Sotomayor, J., concurring). The first such conference will be held on January 6, 2015 at 9:30 a.m.

## CONCLUSION

For the foregoing reasons, the motions for contempt are granted. As a sanction for failing to pay the disgorgement and prejudgment interest in the SEC case, and for failing to testify truthfully about his Swiss bank accounts in the Schwarz case, Kapur will be incarcerated until he purges the contempt. The Clerk of Court is respectfully directed to terminate the motions pending at 09 Civ. 9346, Dkt. 222, and 11 Civ. 8094, Dkt. 38.

---

[11] The Court previously confiscated Kapur's passport. *See* Schwarz Dkt. 231; SEC Dkt. 60.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: July 1, 2015
New York, New York